FILED

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA** PM 1:23
**JACKSONVILLE DIVISION**

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

MONDELĒZ INTERNATIONAL, INC. and )
THE KELLOGG COMPANY, )
)
Plaintiffs, )
)
v. )          No. 3:12-cv-1181-J-20JBT
)
SEA STAR LINE, LLC, )
SALTCHUK RESOURCES, INC., and )
LEONARD H. SHAPIRO, )
)
Defendants. )

## COMPLAINT AND DEMAND FOR JURY TRIAL

**Contents**

I.     Conspiracy Overview.................................................................................. 1
II.    Jurisdiction and Venue.............................................................................. 1
III.   Plaintiffs...................................................................................................... 9
IV.    Defendants and Co-Conspirators............................................................ 12
       A.    Defendant and Co-Conspirator Jones Act Carriers..................... 12
             1.    Defendant Sea Star Line, LLC................................................ 12
             2.    Defendant Saltchuk Resources, Inc. .................................... 16
             3.    Co-conspirators Crowley Maritime Corporation and Crowley
                   Liner Services, Inc. ...................................................................25
             4.    Co-Conspirator Horizon Lines.......................................... 30
             5.    Co-Conspirator Trailer Bridge, Inc...................................... 34
             6.    Co-Conspirator Matson Navigation Company, Inc. ...................... 38
       B.    Defendant and Co-Conspirator Industry Trade Associations and
             Individuals.......................................................................................39
             1.    Co-Conspirators Maritime Cabotage Task Force and
                   Transportation Institute ...................................................39
             2.    Co-Conspirator Peter Baci ................................................ 40
             3.    Co-Conspirator Alexander G. Chisholm.......................................41

|  |  | 4. | Co-Conspirator R. Kevin Gill | 42 |
|  |  | 5. | Co-Conspirator Gregory Glova | 43 |
|  |  | 6. | Co-Conspirator Gabriel Serra | 43 |
|  |  | 7. | Co-Conspirator Charles G. Raymond | 44 |
|  |  | 8. | Defendant Leonard H. Shapiro | 45 |
|  | C. | Other Co-Conspirators | | 45 |
| V. | Trade and Commerce | | | 46 |
|  | A. | Overview of Jones Act Carriers | | 46 |
|  | B. | Defendants and Their Co-Conspirator Jones Act Carriers Dominate Shipments Between the U.S. Mainland and Puerto Rico | | 48 |
|  | C. | Lack of Substitutes and Stable Demand for Cabotage Shipping Services to Puerto Rico | | 49 |
|  | D. | High Barriers to Entry and Jones Act Protection | | 51 |
|  | E. | The Conspiracy Had a Direct and Substantial Effect on Interstate Commerce | | 53 |
| VI. | Criminal Antitrust Proceedings | | | 55 |
|  | A. | Horizon Lines | | 56 |
|  | B. | Sea Star Line | | 58 |
|  | C. | Frank Peake (Sea Star) | | 61 |
|  | D. | Peter Baci (Sea Star) | | 61 |
|  | E. | Gabriel Serra (Horizon) | | 65 |
|  | F. | Kevin Gill (Horizon) | | 67 |
|  | G. | Gregory Glova (Horizon) | | 69 |
|  | H. | Alexander Chisholm (Sea Star) | | 71 |
|  | I. | Crowley Liner Services | | 76 |
| VII. | Implementing the Conspiracy | | | 80 |
|  | A. | Defendants and Their Co-Conspirators Competed Intensely Prior to the Start of the Conspiracy | | 80 |
|  | B. | Defendants and Their Co-Conspirators Eliminated Navieras/NPR's Capacity | | 81 |
|  |  | 1. | The Puerto Rico government started Navieras/NPR in response to the lack of competition for cabotage shipping services. | 81 |
|  |  | 2. | Private owners purchased Navieras/NPR and eventually filed for bankruptcy in 2001 | 82 |
|  |  | 3. | In April 2002, defendant Sea Star agreed to acquire certain assets of Navieras/NPR. | 83 |
|  |  | 4. | In early 2002, defendants and co-conspirators agreed to eliminate NPR's capacity | 85 |

          5.    By agreeing to orchestrate NPR's demise, defendants and co-conspirators took the first step for their overall agreement to control and manipulate capacity, allocate customers, rig bids and fix prices. ................................................................87

    C.    Defendants and Co-Conspirators Implemented Their Agreements to Allocate Customers, Rig Bids and Fix Prices for Cabotage Shipping Services ...............................................................89

          1.    Defendants and their co-conspirators began carrying out their conspiracy shortly after eliminating the Navieras/NPR capacity. .....................................................89

          2.    Defendants and co-conspirators sought to equalize and stabilize market shares for the Puerto Rico trade lane. ..................90

          3.    Defendants and their co-conspirators carried out and furthered their conspiracy through numerous communications and meetings. ..........................................................91

          4.    Defendants and their co-conspirators agreed to allocate and rig bids to customers.................................................105

          5.    Defendants and their co-conspirators agreed to fix, increase and maintain fuel cost and other charges....................112

          6.    Defendants and their co-conspirators agreed to and did ensure that compliance with the conspiracy could be monitored and trued-up as necessary. ......................................116

    D.    Defendants and Their Co-Conspirators' Conspiracy Artificially Increased and Maintained Rates ...............................117

VIII.    Offenses Charged...................................................... 121

IX.    Effects of Unlawful Conduct .......................................... 123

X.    Fraudulent Concealment ............................................... 123

XI.    Injury to Plaintiffs.................................................... 131

XII.    Injunctive Relief..................................................... 131

XIII.    Prayer for Relief..................................................... 131

Plaintiffs Mondelēz International, Inc. and The Kellogg Company, by their undersigned

attorneys, bring this action against the foregoing defendants for treble damages and injunctive

relief arising out of defendants' violations of the antitrust laws of the United States and,

demanding a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure, allege the

following.

## I.    Conspiracy Overview

1.    As described in more detail below, defendants and their co-conspirators participated in

a *per se* unlawful conspiracy to allocate customers, sales volumes and market shares, control and

manipulate capacity, rig bids and fix prices of shipping for cabotage shipping services between

the U.S. mainland and Puerto Rico starting as early as May 2002 and continuing until at least

April 2008.  As described in greater detail in Section X, at all relevant times, defendants and

their co-conspirators affirmatively concealed the existence of the conspiracy.  Plaintiffs only

became aware of the existence of the conspiracy and the details alleged herein as a result of the

criminal antitrust investigation and subsequent guilty pleas first disclosed in April 2008 and as a

result of  subsequent settlement and cooperation agreements with co-conspirators Serra, Baci,

Gill, Glova and Chisholm.

## II.    Jurisdiction and Venue

2.    This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15,

26) for injunctive relief and to recover damages that plaintiffs have sustained because of

defendants' *per se* unlawful violations of Section 1 of the Sherman Act (15 U.S.C. § 1).  This

Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337.

3.     Each defendant is subject to personal jurisdiction pursuant to Section 12 of the

Clayton Act (15 U.S.C. § 22), the Florida long-arm statute and/or Rule 4(k)(2) of the Federal

Rules of Civil Procedure.

4.     Personal jurisdiction exists over each defendant under the Florida long-arm statute

because as part of and in furtherance of their conspiracy, defendants and their co-conspirators:

engaged in substantial and not isolated activity, including continuous and systematic general

business contacts, within Florida; operated, conducted, engaged in, or carried on a business or

business venture within Florida; and/or committed tortious acts within Florida.

5.     Venue is proper in this district under Sections 4, 12, and 16 of the Clayton Act (15

U.S.C. §§ 15, 22 and 26) and 28 U.S.C. § 1391(b) and (c).  A substantial part of the events or

omissions giving rise to this claim occurred in this District; each defendant is subject to personal

jurisdiction in this District; defendants transact business or are found in this District; one or more

defendants has an agent within this District; and/or there is no district in which this action may

otherwise be brought and one or more defendants is subject to personal jurisdiction within this

District.  The interstate commerce described in this complaint was carried out, in substantial part,

within this District, and Plaintiffs distributed and sold their products within this District.

6.     As described more fully below, personal jurisdiction over each defendant exists in this

District and venue is proper in this District for, at least the following reasons.

   A.   Defendant Sea Star Line, LLC ("Sea Star") has its principal place of business in

Jacksonville, Florida.

   B.   Co-conspirators Crowley Liner Services, Inc. and Crowley Maritime Corporation

have their principal place of business in Jacksonville, Florida.

C.  Co-conspirator Trailer Bridge, Inc. has its principal place of business in Jacksonville, Florida.

D.  Defendant Saltchuk Resources personnel, including, but not limited to, defendant Leonard Shapiro and co-conspirators Mark Tabbutt and Robert Magee, regularly came to Jacksonville to meet with Sea Star managers as part of Saltchuk's overall supervision and control of all material management, financial, strategic and operational decisions for Sea Star.

E.  Defendant Saltchuk Resources personnel, including, but not limited to, defendant Leonard Shapiro and co-conspirators Mark Tabbutt and Robert Magee, regularly attended meetings and carried out extensive and repeated acts in furtherance of the conspiracy within the Middle District of Florida, including numerous acts in Jacksonville, Florida.

F.  Defendant Sea Star provided marine transportation services between Jacksonville, Florida and Puerto Rico.  Sea Star has terminal, warehousing and sales operations in Jacksonville, Florida.

G.  Co-conspirators Horizon Lines, Crowley and Trailer Bridge provided marine transportation services between Jacksonville, Florida and Puerto Rico.  Horizon Lines, Crowley and Trailer Bridge have terminal, warehousing and sales operations in Jacksonville, Florida.

H.  Co-conspirators Frank Peake, Peter Baci, and Alexander Chisholm of Sea Star were domiciled and resided and worked in Jacksonville, Florida.

I.  Co-conspirators Tom Farmer and Rob Grune of Crowley were domiciled and resided and worked in Jacksonville, Florida.

J.   Approximately 75% of all shipments between the U.S. mainland and Puerto Rico move in and out of the Port of Jacksonville.

K.   The Department of Justice's criminal antitrust investigation and prosecutions focused on Jacksonville, Florida.  As more fully described below, all five individuals who pled guilty for their roles in  this conspiracy entered their pleas and were sentenced as part of judicial proceedings in the Middle District of Florida.

L.   Defendant Sea Star and co-conspirators Horizon Lines and Crowley Liner Services all pled guilty to felony criminal antitrust violations for participating in a conspiracy to allocate customers, rig bids and fix prices for shipments between the U.S. mainland, including in particular the Port of Jacksonville, and Puerto Rico.

M.   The day-to-day operations of the conspiracy were carried out largely within the Middle District of Florida and in particular in or near Jacksonville, Florida, including by way of example the following, all of which are more fully described below.

i.   During one of his many business trips to Jacksonville for meetings with Sea Star management, defendant Leonard Shapiro (a founding partner, principal and director of defendant Saltchuk Resources) told Sea Star's Peter Baci that Shapiro and Horizon's Gabe Serra has agreed to split shipment volumes on the Puerto Rico route 50/50 between Sea Star and Horizon and directed Baci to take steps to implement this agreement.

ii.   Sea Star's Peter Baci met with Horizon's Kevin Gill and/or Greg Glova at the Hyatt Orlando Airport Hotel in 2005 to discuss various aspects of the conspiracy, including "Yield Plans" (*i.e.*, pricing and profit plans).

4

iii. Saltchuk's Mark Tabbutt and Bob Magee met with Horizon's Chuck Raymond and John Keenan in Ponte Vedra, Florida on or about October 26, 2005, to discuss and agree upon an extension of the Sea Star-Horizon capacity sharing agreement. This followed the Puerto Rico Summit held on October 25-26, 2005, at the World Golf Village near St. Augustine. There was an earlier Puerto Rico Summit in 2003, also at the World Golf Village, which all four Puerto Rico carriers attended and where Saltchuk's Bob Magee made a presentation urging the carriers to increase rates by 50%.

iv. Sea Star's Frank Peake and Peter Baci met with Horizon's Gabe Serra and Greg Glova in Orlando, Florida in August 2006 to discuss various aspects of the conspiracy, including how their market share and customer allocation schemes applied to shipments of refrigerated containers.

v. Sea Star's Frank Peake and Peter Baci met with Horizon's Gabe Serra and Greg Glova on October 24, 2006, at the Hyatt Orlando Airport Hotel to discuss various aspects of the conspiracy, including to exchange and discuss lists of allocated customers.

vi. Sea Star's Frank Peake and Peter Baci met with Horizon's Gabe Serra and Greg Glova in Orlando, Florida in December 2006 to discuss various aspects of the conspiracy, including the 2007 Sea Star Yield Plan and the Sea Star-Horizon capacity sharing agreement.

vii. Sea Star's Peter Baci met with Horizon's Kevin Gill and/or Greg Glova at the World Golf Village near St. Augustine, Florida in September 2007 to discuss various aspects of the conspiracy, including Yield Plans.

viii.   Sea Star's Frank Peake and Peter Baci met with Horizon's Gabe Serra and Greg Glova in Orlando on February 20, 2008, to discuss various aspects of the conspiracy.

ix. Horizon's Gabe Serra and Crowley's Rob Grune met in Orlando, Florida on March 31, 2008, at a Starbuck's coffee shop to discuss various aspects of the conspiracy, including the allocation of and pricing for various customers, including Kraft which was allocated to Horizon and Crowley.

x. Horizon's Greg Glova met with Crowley's Tom Farmer in Jacksonville from time to time beginning in 2006 and continuing until April 2008 to discuss various aspects of the conspiracy, including pricing for and bids to various customers.

xi. Sea Star personnel based in Jacksonville, including Peter Baci and Frank Peake, routinely communicated via telephone, fax and email and met in person in furtherance of the conspiracy with personnel of co-conspirators Horizon, Crowley and Trailer Bridge, many of whom were based or otherwise present in the Middle District of Florida, including Jacksonville. Likewise, Horizon personnel based in San Juan (Gabe Serra) and Charlotte (Kevin Gill and Greg Glova) routinely communicated by telephone, email and fax with Sea Star personnel based in Jacksonville (Frank Peake and Peter Baci) in furtherance of the conspiracy.

7.     Jurisdiction and venue for defendant Saltchuk Resources are proper in this District based upon the acts of its officers, directors and agents in furtherance of the conspiracy within this District as alleged herein.  In addition, the acts of Sea Star are attributable to Saltchuk for jurisdictional and venue purposes because Saltchuk exercised continuing supervision of and made or controlled all material management, financial, strategic and operational decisions for Sea Star, and transacted business through Sea Star, Sea Star is Saltchuk's agent and alter ego and Saltchuk/Sea Star effectively functioned as a single entity.  By way of example, and as described in greater detail below and as confirmed in part by the November 30, 2004 and May 15, 2007 video interviews of Saltchuk's founding partner and former Chairman, Michael D. Garvey, on Saltchuk's website, Saltchuk's supervision of and control over Sea Star included the following.

A.   Saltchuk controlled the Sea Star board of directors and selected, appointed and terminated all executive-level personnel at Sea Star and was directly involved in determining their compensation.

B.   Saltchuk was directly involved in budgeting for Sea Star, and in particular budgeting for capital expenditures.

C.   Saltchuk was directly involved in and controlled strategic planning for Sea Star.

D.   Saltchuk provided the funds for all major Sea Star capital expenditures.

E.   Saltchuk provided guarantees for loans and other financing and credit that third parties extended to Sea Star.

F.   In 2002, Saltchuk decided and directed Sea Star to bid for and acquire certain assets of Navieras/NPR.  Saltchuk further directed that one of the four ships acquired in this asset purchase be re-sold to co-conspirator Horizon Lines.

7

G.  Saltchuk decided whether to sell Sea Star, including to reject Horizon's 2007 offer to buy Sea Star.

H.  Saltchuk received dividends and distributions from Sea Star, and, as directed by Saltchuk, prior to January 1, 2007, Sea Star's tax losses or gains were passed through to Saltchuk.

I.  Saltchuk directed Sea Star to contract with other Saltchuk affiliates, including co-conspirator American Shipping Group, for ship management, marine terminal and stevedoring services.

J.  Saltchuk dictated certain aspects of Sea Star's pricing, including how Sea Star provided volume discounts to customers.

K.  Saltchuk directed that another Saltchuk-owned company, co-conspirator Totem Ocean Trailer Express, make approximately ten of its employees available to take positions at Sea Star for several months starting in 2002 to assist Sea Star with operational problems stemming from its attempts to integrate the Navieras/NPR assets that Sea Star acquired as determined by Saltchuk and with funds provided by Saltchuk.

L.  In or about February 2004, Saltchuk directed Sea Star's Peter Baci to compile detailed market share data for the Puerto Rico route, including containerships versus barges and Sea Star versus Horizon, for a meeting with Saltchuk.

M.  During an April 2004 Sea Star quarterly management review meeting, co-conspirator Robert Magee discussed Saltchuk's corporate philosophy with Sea Star management and said that Sea Star needed to increase rates by at least 20%.

N.   Saltchuk personnel, including defendant Leonard Shapiro and co-conspirators Mark Tabbutt and Robert Magee, regularly came to Jacksonville and spent considerable time working with Sea Star employees to supervise and assist with financial, operating and sales and marketing activities.  As part of these ongoing Saltchuk contacts with the Middle District of Florida, defendant Shapiro participated in a Sea Star sales and marketing meeting with a large customer, Caribbean Shipping, and provided his business card to the customer that identified Shapiro as "Principal and Director" for "Saltchuk Resources, Inc."

O.   Saltchuk did not contest personal jurisdiction or venue in Duval County, Florida in the action Caribbean Shipping brought against Saltchuk, Sea Star and others for the same conspiracy at issue here, *Caribbean Shipping Services, Inc. v Sea Star Line, LLC*, No. 16-2008-CA-008795, Division CV-G.

III.   **Plaintiffs**

8.   Plaintiff Mondelēz International, Inc. ("Mondelēz) is a Virginia corporation with its principal executive office at Three Parkway North, Deerfield, Illinois.  Prior to October 1, 2012, Mondelēz was known as Kraft Foods Inc.  Mondelēz owns and controls all claims for relief asserted herein and is the real party in interest.

9.   At all relevant times prior to October 1, 2012, Kraft Foods Inc. was the ultimate parent of Kraft Foods Global, Inc. and its predecessors and affiliates.  In August 2011, Kraft Foods Inc. announced plans to create two independent public companies: the Global Snacks Business and the North American Grocery Business. In connection with this proposed transaction, in March 2012, Kraft Foods Global, Inc., which was initially organized as a Delaware corporation, redomesticated to Virginia and changed its name to Kraft Foods Group, Inc.

10.    Effective October 1, 2012, Kraft Foods Inc. changed its name to Mondelēz International, Inc. At the same time, Kraft Foods Inc. spun-off its wholly owned subsidiary, Kraft Foods Group, Inc. ("Kraft Foods Group"), by distributing all of the shares of Kraft Foods Group common stock on a pro rata basis to holders of Kraft Foods Inc. common stock. The spin-off resulted in two publicly traded companies: Mondelēz International, Inc. and Kraft Foods Group, Inc.

11.    Mondelēz is the world's largest chocolatier, biscuit baker and candy maker, and the second largest maker of gum. Mondelēz comprises global snacking and food brands of the former Kraft Foods Inc., including the *Cadbury, Jacobs, LU, Milka, Nabisco, Oreo, Tang,* and *Trident* brands, with estimated 2011 revenues of $36 billion.

12.    Kraft Foods Group, which was spun-off as an independent public company on October 1, 2012, is one of the largest consumer packaged food and beverage companies in North America, with estimated 2011 revenues of $18.7 billion. Its brands include *Kraft* cheeses, dinners and dressings, *Oscar Mayer* meats and *Maxwell House* coffees.

13.    During the relevant period, Mondelēz, including its predecessors and separately incorporated parents, subsidiaries and controlled affiliates (including without limitation Kraft Foods Group, Inc. and Kraft Foods Global, Inc., which are referred to herein as "Kraft" and "Kraft Foods") purchased all cabotage shipping services for which Mondelēz seeks damages directly from one or more defendants or co-conspirators for marine transportation between the U.S. mainland and Puerto Rico, and was injured by defendants' and their co-conspirators' antitrust violations as alleged herein.

14.    The Kellogg Company is a Delaware corporation with its principal executive office at One Kellogg Square, Battle Creek, Michigan.  The Kellogg Company is the world's leading producer of cereal, as well as a leading producer of convenience foods, including cookies, crackers, toaster pastries, cereal bars, frozen waffles and vegetarian foods.  The Kellogg Company markets more than 1,500 products in over 180 countries.  The Kellogg Company brands include *Kellogg's*, *Keebler*, *Eggo*, *Morningstar Farms*, *Townhouse*, *Kashi* and others. During the relevant period, The Kellogg Company, including its predecessors and separately incorporated parents, subsidiaries and controlled affiliates, all of which are plaintiffs in this action and hereafter are collectively referred to, along with The Kellogg Company, as "Kellogg," purchased cabotage shipping services directly from one or more defendants or co-conspirators for marine transportation between the U.S. mainland and Puerto Rico, and were injured by defendants' antitrust violations alleged herein.  Kellogg owns and controls all claims for relief asserted herein and is the real party in interest.

15.    During the relevant period, plaintiffs purchased Puerto Rico cabotage shipping services directly from one or more of the defendants or their co-conspirators pursuant to private and confidential negotiated rate agreement contracts pursuant to §14101(b) of the Interstate Commerce Commission Termination Act ("ICCTA") (49 U.S.C. §14101(b)).  As provided for in §14101(b)(1) of the ICCTA, these agreements waived in writing plaintiffs' rights and remedies under Section B of the ICCTA, including their right to file complaints with the Surface Transportation Board ("STB").  As a result, the STB has no regulatory authority over any aspect of plaintiffs' contracts, including the rates, surcharges and other fees in plaintiffs' contracts. Under 49 U.S.C. §14101(b)(2), this federal court action is plaintiffs' exclusive remedy for

defendants' *per se* unlawful conspiracy to allocate customers, rig bids and fix rates, surcharges and other fees.

16. Co-conspirator Horizon Lines consistently has stated in its SEC and other regulatory filings that the private and confidential rate agreements used for shipments on the Puerto Rico route are exempt from STB regulation, and therefore the filed-rate doctrine does not apply. *See, e.g.,* May 19, 2006 Horizon Lines S-1 Registration Statement, at 103 ("Our rates in the Puerto Rico and Alaska markets are predominantly contained in negotiated transportation agreements which are exempt from STB rate regulation."); 2007 Horizon Lines Form 10-K, at 42 ("[I]n the case of our Puerto Rico and Alaska trade routes, we primarily ship containers on the basis of confidential negotiated transportation service contracts that are not subject to rate regulation by the STB."). In this connection, the U.S. Department of Transportation's Maritime Administration also noted in its May 2006 report, *Competition in the Noncontiguous Domestic Maritime Trades,* at 48, that, according to the June 2004 Reeve & Associates report ("Competitiveness in the United States' Domestic Noncontiguous Liner Shipping Markets") commissioned by defendants and their co-conspirator Jones Act carriers, "over 85 percent of cargoes in the [Puerto Rico] trade are shipped under confidential contracts."

IV.     **Defendants and Co-Conspirators**

     A.     **Defendant and Co-Conspirator Jones Act Carriers**

          1.     **Defendant Sea Star Line, LLC**

17. Defendant Sea Star Line, LLC ("Sea Star") is a Delaware limited liability company with its principal place of business in Jacksonville, Florida. Sea Star is privately owned, with a 90% ownership interest held by defendant Saltchuk Resources, Inc. ("Saltchuk" or "Saltchuk

Resources") and a 10% ownership stake held by Taino Star, Inc., a group of investors involved

in stevedoring, real estate and banking in Puerto Rico. During part of the relevant period (in or

after 2005), the managing partner of Sea Star was co-conspirator American Shipping Group

("ASG") (effective January 1, 2012, known as TOTE, Inc.). ASG is a wholly-owned Saltchuk

subsidiary, and is a member of the Sea Star Line limited liability company. Defendant Saltchuk

and co-conspirator ASG are described more fully below. During the relevant period, one or

more plaintiffs requested bids and other pricing proposals for cabotage shipping services from

Sea Star.

18.    Sea Star provides common carrier liner service between the U.S. mainland and Puerto

Rico, and between the U.S. Virgin Islands and the Dominican Republic. Sea Star accounts for

approximately 25% of all marine freight shipments to Puerto Rico. As part of this service,

during the relevant period, Sea Star operated three combination roll-on roll-off/lift-on lift-off

vessels: *El Faro*, *El Yunque*, and *El Morro*. As explained more fully below, *El Faro* was

formerly known as *Northern Lights* and was operated by co-conspirator Totem Ocean Trailer

Express ("Totem Ocean") until late 2005. During the relevant period, Sea Star operated

terminals in San Juan, Jacksonville and Port Everglades, Florida, Philadelphia, Pennsylvania and

Houston, Texas.

19.    As described below, during the conspiracy period, Sea Star also provided service to

Puerto Rico from Port Elizabeth, New Jersey, pursuant to a capacity-sharing agreement with co-

conspirator Horizon. This agreement, which lasted until early 2010, involved slots for hundreds

of containers on Horizon containerships for Sea Star's service between Port Elizabeth, New

Jersey and San Juan, as well as between Jacksonville, Florida and San Juan, Puerto Rico. In

April 2010, only after the conspiracy among the Jones Act carriers was publicly disclosed, Sea

Star added weekly service between San Juan and Tioga Marine Terminal in Philadelphia using

its own ships. Sea Star suspended this northeast service in mid-2011 after a rate war with

Horizon.

20.    Sea Star began operating in or about August 1985 as Sea-Barge Line, with weekly tug-

barge service between Miami and San Juan. From 1985 to 1987, Sea-Barge was owned (a) 60%

by Zapata Gulf Marine, and (b) 40% split between (i) T.S.E.L. Maduro (Florida), Inc., a Miami-

based shipping agent and stevedore, and (ii) Luis A. Sucesores, Inc., a Puerto Rican shipping

agency and stevedoring company.  A Zapata entity leased tugs to Sea-Barge for Sea-Barge's

Puerto Rico service.

21.    Starting in 1998 and continuing at least until the third quarter of 2004, co-conspirator

Matson Navigation had an ownership interest in Sea Star.  According to the October 19, 1998

*Pacific Shipper*, Matson Navigation, Totem Resources Corporation (defendant Saltchuk's

predecessor) and a group of Puerto Rican investors purchased the assets and liabilities of Sea-

Barge Line, Inc.  Sea-Barge Line, Inc. was renamed Sea Star Line, LLC.  As a result of this

transaction, Sea Star was owned (a) 45% by Matson Navigation, (b) 45% by defendant Saltchuk

Resources, and (c) 10% by Taino Star, Inc.  Matson Navigation also provided direct loan

guarantees of at least $32 million to and for the benefit of Sea Star and provided the

containerships that Sea Star operated when Sea Star shifted from using tug-barges for its Puerto

Rico service.  Matson Navigation initially chartered two container/roll-on, roll-off vessels, the

*Kaimoku* and *Kainalu* (renamed the *El Yunque* and *El Morro*), to Sea Star in October 1998 and

April 1999, respectively.  In February 2002, Matson Navigation sold both ships to Sea Star.  In a

14

related February 1, 2002 press release, Sea Star said that this transaction "underscores the investors' [*i.e.*, Matson Navigation and Saltchuk's] long-term commitment" to Sea Star's Puerto Rico service. Saltchuk approved and was involved in the financing for Sea Star's purchase of these ships.

22.    Subsequently, in or about July 2002 (which coincides with the start of the conspiracy with respect to Puerto Rico shipments), Matson Navigation reduced its stake in Sea Star from 45% to 20% when Matson Navigation declined to fund a capital call. At the same time, defendant Saltchuk increased its ownership interest in Sea Star from 45% to 70%. As reported in the November 1, 2004 Form 10-Q for Matson's parent Alexander & Baldwin, during the third quarter of 2004, Matson Navigation sold its remaining 20% interest in Sea Star for approximately $7 million, which represented a $1.2 million gain for Matson Navigation. At the same time, Matson's $11 million guarantee of Sea Star's debt was discontinued. As a result, Saltchuk now owns 90% of Sea Star and Taino Star the other 10%. Saltchuk provided all or most of the funds to purchase Matson's remaining ownership interest in Sea Star.

23.    In early 2002, as discussed in greater detail below, using funds provided by Saltchuk and based on a decision made and approved by Saltchuk, Sea Star purchased certain assets of the bankrupt cabotage carrier Navieras/NPR. These assets included four vessels that Navieras/NPR had used to provide three weekly sailings (two from Florida and one from Philadelphia) between the U.S. mainland and Puerto Rico. As directed by Saltchuk, Sea Star scrapped three of the Navieras/NPR ships and sold the fourth to co-conspirator Horizon Lines. The transaction did not include Navieras/NPR contracts with customers. As a result of the Navieras/NPR transaction as well as organic growth, Sea Star's share of the Puerto Rico market increased from 8-9% to 21-

22%. The other remaining Jones Act carriers—defendants and co-conspirators—serving Puerto Rico also increased their market shares (and rates) after Navieras/NPR's demise. In its 2010 10-K (p. 8), Trailer Bridge states that, based on Port Import Export Reporting Service ("PIERS," a service affiliate of the Journal of Commerce) data, as of November 2010, Sea Star's container volume market share for the Puerto Rico trade lane (excluding vehicles) was 23.8%.

24.    In July 2010, Sea Star, Saltchuk Resources, American Shipping Group and Leonard Shapiro agreed to pay $18.5 million (gross) to resolve claims asserted by a putative class of Puerto Rico shippers. Saltchuk provided all or part of this $18.5 million settlement payment. Plaintiffs are asserting claims outside of that settlement class and requested exclusion from any court-approved litigation or settlement class.

25.    As described in greater detail below, on December 19, 2011, Sea Star pled guilty to violating federal antitrust laws with respect to the Puerto Rico trade lane and was sentenced to pay a $14.2 million fine over five years. Under Section 5(a) of the Clayton Act (15 U.S.C. § 16(a)), the Sea Star guilty plea is admissible in subsequent civil litigation as *prima facie* evidence of Sea Star's liability.

### 2.    Defendant Saltchuk Resources, Inc.

26.    Defendant Saltchuk Resources, Inc. ("Saltchuk") is a Washington corporation with its principal place of business in Seattle, Washington. Saltchuk is a privately held company with interests in numerous maritime and other businesses, primarily in the transportation, energy and real estate sectors. Saltchuk is the common ultimate parent of two Jones Act carriers, defendant Sea Star and co-conspirator Totem Ocean, that operate on the Puerto Rico and Alaska trade routes, respectively. In addition, as discussed in detail above, during part of the relevant period,

Saltchuk's principal partner in Sea Star was co-conspirator Matson Navigation. During the relevant period, Saltchuk, directly or through Sea Star and Totem Ocean, owned and operated seven Jones Act-qualified ships.

27.   Saltchuk was founded in 1982 (as Totem Resources Corporation) by five Seattle investors: Stanley H. Barer (now chairman emeritus), Michael D. Garvey (founding partner and retired former Chairman), Frederick M. Goldberg (on current Saltchuk board), Leonard H. Shapiro (also an officer of Totem Ocean) and Everett W. Trout. Saltchuk states on its website that it serves two primary functions for its operating companies: overseeing management and gathering and allocating capital. According to a February 8, 2012 Saltchuk press release, since its founding in 1982, Saltchuk "had grown their portfolio to over twenty independent companies, organized into six operating groups," including TOTE, Inc. (formerly known as American Shipping Group). An April 3, 2012 Saltchuk press release states that Saltchuk includes more than twenty companies, with consolidated assets of $1.6 billion, $2.2 billion in annual revenues and 7500 employees. Because Saltchuk is privately held, detailed financial and operating data are not available for Saltchuk, Sea Star, Totem Ocean or ASG. Saltchuk also promotes a "Saltchuk OneTeam" concept on its website, but access to additional data regarding this program is password protected.

28.   Saltchuk's wholly owned subsidiary, co-conspirator American Shipping Group ("ASG"), is based in Federal Way, Washington. During part of the relevant period (starting in or after 2005), ASG was the designated managing partner of Sea Star (and a member of the Sea Star limited liability company) and also Totem Ocean's direct parent. Effective January 1, 2012, ASG was renamed TOTE, Inc. and its five business segments were reorganized into TOTE

Maritime (Sea Star Line and Totem Ocean Trailer Express), TOTE Ship Management

(Interocean American Shipping) and TOTE Logistics (Alta Logistics and Spectrum Logistics).

According to Sea Star's website, ASG was a "holding company that oversees the performance,

management and operation of all Saltchuk deep (blue) water ship companies" and currently

oversees three businesses including two offshore domestic liner companies (Sea Star and Totem

Ocean) and a ship management company for vessel owners (Interocean American Shipping). In

addition to Sea Star and Totem Ocean, ASG (and ultimately Saltchuk) owns or has controlling

interests in over twenty operating companies involved in water and air cargo shipments and other

industries in Hawaii, Alaska and elsewhere. By way of example, ASG (and ultimately Saltchuk)

owns Young Bros. (and its affiliate Hawaiian Tug and Barge), a tug-barge operator that has

monopoly status as the exclusive provider of LTL (less than full trailer load) intercoastal service

in the Hawaiian islands, as well as Aloha Cargo, the dominant inter-island air cargo carrier in

Hawaii. Interocean American Shipping ("IAS") is based in Moorestown, New Jersey, and is a

technical ship management and ship crewing company. IAS employs more than 2,000 seamen

and manages or operates approximately twenty-five vessels.

    29.   Executives of Saltchuk and its subsidiaries and affiliates, including ASG and Totem

Ocean, hold (and have held) high ranking positions at Sea Star and Totem Ocean as well as co-

conspirator cabotage shipping trade associations. For example, defendant Leonard H. Shapiro is

one of Saltchuk's founders and one of its major shareholders. Shapiro also is a current or former

Totem Ocean officer who, in his capacity as a Saltchuk partner, was deeply involved in Sea

Star's conspiratorial conduct. Likewise, until his death in late 2009, co-conspirator Robert P.

Magee was Chairman and CEO of ASG, Chairman of Sea Star, and former President and CEO of

Totem Ocean.  Magee also was a director of co-conspirator cabotage carrier trade groups, the

Maritime Cabotage Task Force and the Transportation Institute.  Saltchuk's Chairman Mark

Tabbutt also actively participated in the Maritime Cabotage Task Force and its Domestic Liner

Council.

30.    In June 2010, Saltchuk shifted Sea Star's President, co-conspirator Frank Peake, to

ASG to assist ASG's President Tim Engle on strategic planning for all ASG companies that

operate in Puerto Rico and Alaska.  Saltchuk designated Steve Hastings, who had been Vice

President of Operations at Sea Star, to succeed Peake as President of Sea Star.  Thereafter, in

February 2012, Saltchuk named Peter Keller, who had worked as a consultant to Sea Star, as

Sea Star's president, succeeding Steve Hastings.  As described in greater detail below, Saltchuk's

current Chairman and Director, co-conspirator Mark N. Tabbutt (the son-in-law of Saltchuk co-

founder and retired former chairman Michael Garvey) participated in meetings and other

communications in furtherance of the overall conspiracy to allocate customers, market share and

sales volumes, control and manipulate capacity, rig bids and fix prices.

31.    Executives of Saltchuk and its subsidiaries and affiliates, including ASG and Totem

Ocean, regularly supervised and participated in all key management, financial, strategic and

operational decisions at Sea Star.  As stated in the November 30, 2004 and May 15, 2007 video

interviews of Saltchuk's founding partner and retired former Chairman Michael Garvey on

Saltchuk's website, Saltchuk is directly involved in the selection of and compensation for Sea

Star executives as well as budgeting for Sea Star, and in particular budgeting for Sea Star capital

expenditures.  Saltchuk also provided the funds for all significant Sea Star capital expenditures

and directed and controlled strategic planning for Sea Star.  Saltchuk's current Chairman, Mark

Tabbutt (Michael Garvey's son-in-law), visited Sea Star in Jacksonville about once per year to
direct and discuss Saltchuk-directed and controlled management changes.  For example, after
Saltchuk fired Mike Shea as President of Sea Star in or about November 2002, Saltchuk's
Tabbutt and Bob Magee went to Jacksonville to explain to Sea Star personnel that Saltchuk was
replacing Mike Shea with Bob Magee as Sea Star's President.  In or about July 2003, Magee
announced that Frank Peake, a former Horizon employee, would replace him as president.
Saltchuk made each of these management decisions.  Tabbutt similarly attended Sea Star board
of directors and/or board of managers meetings, financial and operating performance reviews
and Sea Star annual sales meetings in Jacksonville.

   32.   In addition to Tabbutt, Magee and Shapiro, other Saltchuk personnel regularly visited
Sea Star and/or Jacksonville, including founding partner and former Chairman Mike Garvey,
Director/Principal Fred Goldberg, Director/Principal Everett Trout, President Tim Engle and Ivy
Barton Suter.  Examples include, but are not limited to, the following.

   A.   Magee gave a presentation at the JAX Port Puerto Rico Summit at the World Golf
Village near St. Augustine in late August 2003, where Magee encouraged the trade (and in
particular, the other three carriers who attended the Summit) to get rates up by 50%.  Magee
also attended a second Puerto Rico Summit on October 25-26, 2005, and a related
conspiratorial meeting with Horizon executives on October 26, 2005, at Ponte Vedra,
Florida.

   B.   Tim Engle, who became President of Saltchuk, spent at least a month at Sea Star's
headquarters in Jacksonville in late 2007-early 2008 to familiarize himself with Sea Star's

—

finances and operations. Engle also met with co-conspirator Crowley's Rob Grune in Fort Lauderdale, Florida, on or about April 12, 2008.

 C. Mike Garvey, Saltchuk's founding partner and former Chairman, visited Jacksonville on at least two occasions and made at least one presentation to Sea Star management.

 D. Everett Trout, a Saltchuk director, went on at least one sales call for Sea Star with Bill Stallings, Sea Star's Vice President-Sales, in Jacksonville to International Transport Logistics, Inc. (ITL).

 E. Ivy Barton Suter, later a director of Saltchuk and subsequently CEO of co-conspirator Trailer Bridge, made an ethics presentation to Sea Star in Jacksonville.

33. As noted previously, Saltchuk directed and controlled who served as Sea Star's directors and officers and also supervised, was directly involved in and controlled Sea Star's strategic planning and budgeting. Saltchuk also directly involved itself in Sea Star's day-to-day management and operations. Examples include the following.

 A. Saltchuk directed Sea Star how to provide certain discounts to customers, instructing Sea Star to remove customer volume discounts from Sea Star's written contracts.

 B. In 2002, Saltchuk directed another of its companies, Totem Ocean, to provide about ten of its employees for positions at Sea Star's headquarters in Jacksonville for approximately four months to help Sea Star address operational and administrative issues as Sea Star tried to integrate the Navieras/NPR assets it had acquired.

C.   Saltchuk further directed that Sea Star contract with other Saltchuk affiliates, including co-conspirator ASG, for ship management, marine terminal services, ship charters, and stevedoring.

D.   Saltchuk also reviewed and provided funding for all major Sea Star capital expenditures, including by way of example the 2002 purchase of Navieras/NPR assets.

34.   Starting in 1998 and continuing until at least 2003, defendant Shapiro visited Sea Star's Jacksonville office regularly (*i.e.*, every two to three months and for several days each visit) to conduct management and pricing reviews and to meet with Sea Star personnel, including co-conspirator Peter Baci.  Though pricing was Shapiro's primary focus, while at Sea Star in Jacksonville, Shapiro also worked on information technology for Sea Star's back-office systems and pushed for Sea Star to adopt and prepare certain financial and operating reports, such as net-to-vessel reports, using the same format as Totem Ocean to facilitate Saltchuk's review of Sea Star's financial and operating results.  Likewise, high-level Saltchuk/ASG personnel, including co-conspirators Mark Tabbutt and Robert Magee, reviewed and approved the decision to transfer the *Northern Lights* from Totem Ocean to Sea Star, which was modified and renamed *El Faro*.

35.   Throughout the relevant period, Saltchuk through various officers, directors and agents including, but not limited to, defendant Leonard Shapiro and co-conspirators Robert Magee and Mark Tabbutt, exercised actual or apparent authority over defendant Sea Star.  These persons acted on Saltchuk's behalf and within the apparent authority created and conferred by Saltchuk.  In this connection, Saltchuk, ASG, Totem Ocean and Sea Star made representations to third parties and the public generally regarding their interrelationships, and those representations gave rise to a reasonable understanding and belief that Saltchuk, through various officers,

directors and agents including, but not limited to, defendant Shapiro and co-conspirators Magee

and Tabbutt, possessed authority and was authorized to act on defendant Sea Star's behalf.

Saltchuk is liable for its direct acts in furtherance of the conspiracy as well as for the antitrust

violations where, as here, its agents acting with actual or apparent authority conspired with other

carriers to allocate customers, rig bids and fix prices for cabotage shipping services.

36.   Saltchuk exercised substantial and direct control over Sea Star Line's strategic

planning, budgets, finances and capital expenditures.  As stated on Saltchuk's website, "Within

our broader family of companies, the Saltchuk office is located in Seattle with a team of 17

people.  Our primary role is to perform the traditional shareholder responsibilities of setting

expectations and allocating capital."  This is reflected in Saltchuk's capital decisions for Sea Star

Line throughout the conspiracy, including the following.

A.   In 2002, Saltchuk made the decision for Sea Star to acquire certain assets of

Navieras/NPR and provided funding for the $32 million purchase price.  Saltchuk also

made the decision and directed that three of the ships acquired from Navieras/NPR be

scrapped and that the fourth be sold to co-conspirator Horizon Lines.

B.   In 2005, Saltchuk made the decision for Totem Ocean to transfer one of its ships,

the *Northern Lights*, to Sea Star.  Saltchuk provided the estimated $10-11 million in capital

to convert the ship for Sea Star's use, after which it was renamed *El Faro*.

C.   Saltchuk subsequently made the decision to remove the *El Faro* from service on

the Puerto Rico route after co-conspirators Mark Tabbutt and Bob Magee met with Horizon

Lines executives Chuck Raymond (CEO) and John Keenan (COO) in Ponte Vedra, Florida,

on or about October 26, 2005, to discuss how the *El Faro*'s introduction was impacting the conspiracy.

   D.   In 2004, Saltchuk likely provided the $7 million to purchase Matson's 20% ownership interest in Sea Star.

   E.   Saltchuk provided loan guarantees for financing that third parties extended to Sea Star.

   F.   Saltchuk reviewed, approved and provided funding for all major Sea Star capital expenditures.

   G.   Saltchuk received dividends and distributions from Sea Star.

   H.   Saltchuk directed Sea Star Line to elect to be treated as a partnership for tax purposes until January 1, 2007.

   I.   Saltchuk likely provided all or most of the $18.5 million paid to settle antitrust claims brought by class of Puerto Rico shippers against Saltchuk, Sea Star, ASG and Shapiro.

37.   Co-conspirator Totem Ocean was founded in 1975, and currently offers twice weekly service between the Port of Tacoma, Washington and Anchorage, Alaska.  The start of co-conspirator Totem Ocean coincided with the Prudhoe Bay/North Slope oil development in Alaska.  Sun Company of Philadelphia ("Sun Ships") initiated roll-on/roll-off service from Seattle to Anchorage on the *Great Land*.  Totem Ocean later moved to the Port of Tacoma and added a second ship to the Alaska route, the *Westward Venture*.  By October 1982, Saltchuk Resources (then known as Totem Resources) bought Totem Ocean from Sun Ships, and added a third vessel, the *Northern Lights* (which Saltchuk shifted to Sea Star in 2006 and renamed *El*

*Faro*). In 1999, National Steel Shipbuilding Company of San Diego built two new ORCA class (840 feet long and 118 feet wide) diesel-electric ships, *Midnight Sun* and *North Star*, that Totem Ocean placed in service on the Alaska route in April and August 2003, respectively.

38.   In July 2010, Saltchuk Resources, Sea Star, American Shipping Group and Leonard Shapiro agreed to pay $18.5 million (gross) to resolve claims asserted by a putative class of Puerto Rico shippers. Saltchuk provided all or most of this settlement payment. Plaintiffs are asserting claims outside of that settlement class and requested exclusion from any court-approved litigation or settlement class.

### 3.   Co-conspirators Crowley Maritime Corporation and Crowley Liner Services, Inc.

39.   Co-conspirator Crowley Liner Services, Inc. ("Crowley Liner") is a Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida. Crowley Liner is a wholly-owned subsidiary of defendant co-conspirator Crowley Maritime Corporation ("Crowley Maritime," with Crowley Liner and Crowley Maritime collectively referred to as "Crowley"). During the relevant period, one or more plaintiffs purchased cabotage shipping services directly from Crowley Liner and/or its predecessors and affiliates.

40.   Co-conspirator Crowley Maritime Corporation is a Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida. Crowley Maritime has other offices in Oakland, Anchorage and Seattle. Crowley Maritime is privately owned by the Crowley family and Crowley employees. Crowley Maritime was created in 1992 as a holding company for its six operating lines of business: Puerto Rico/Caribbean liner services, Latin America liner services, logistics, marine contract solutions, deep sea petroleum

transportation and petroleum transportation, distribution and sales in Alaska.  Another holding

company, Crowley Holdings, Inc., was formed in 2009.  According to its website, Crowley

Maritime supports its six primary business segments "with centralized corporate operations,

including purchasing, human resources, information technology" and other services.  In addition

to liner container shipping, other services Crowley Maritime offers include logistics and contract

towing and transportation; ship assist and escort; energy support; salvage and emergency

response (through its TITAN Salvage subsidiary); vessel construction and naval architecture

(through its Jensen Maritime subsidiary); and petroleum and chemical transportation.

41.    Co-conspirator Crowley Puerto Rico Services, Inc. is wholly-owned by one or more

other Crowley entities, and often was the signatory on contracts, including with Kraft Foods, to

provide liner service between the U.S. mainland and Puerto Rico.

42.    For some period prior to 2007, Crowley Maritime was publicly held, though members

of the Crowley family and Crowley employees owned and controlled most outstanding shares.

As of February 15, 2007, Crowley Maritime had 431 shareholders of record for its voting

common stock and one holder for its Class N non-voting common stock.  In or about May 2007,

Crowley became privately held (by members of the Crowley family and Crowley employees) as

a result of a tender offer by Crowley Newco Corporation to purchase all outstanding shares of

Crowley Maritime common stock that it did not beneficially own (31,289 shares as of March 16,

2007, according to the Schedule 13E-3 filed with the SEC on March 19, 2007) at an all-cash

price of $2990 per share.  At the time of the tender offer and for several previous years, co-

conspirator Thomas B. Crowley, Jr., the Chairman of the Board of Directors, President and Chief

Executive Officer of Crowley Maritime, beneficially owned more than 65% of the company's

outstanding common stock, 100% of its Class N common stock and approximately 99.9% if its outstanding Series A preferred stock. As a result of his stock ownership, Crowley Maritime stated in its SEC filings, including its 2006 Form 10-K (p. 20), that Mr. Crowley "is able to exercise control over all matters requiring stockholder approval even if the other stockholders oppose them" and "controls all matters affecting the Company."

43.    Because they are privately held, detailed financial and operating data are not available for Crowley Liner and Crowley Maritime. However, Crowley Maritime is one of the largest family-owned marine transportation businesses in the United States. According to its 2006 10-K (pp. 32, 35), Crowley Maritime's 2006 revenues were $1.467 billion, including $663.1 million for Liner Services, with pre-tax income from continuing operations of $62.95 million. The *Forbes* 2008 list of America's largest private companies stated that Crowley Maritime's 2007 revenues were $1.62 billion. In a September 20, 2009 article, the *Florida Times Union (Jacksonville)* stated that Crowley Maritime's 2008 revenues were $1.96 billion. Crowley Maritime's website states that it has "more than $1.5 billion in annual revenues and approximately 5,000 employees," with an overall fleet of 200 vessels.

44.    According to a January/February 2009 article in *The Maritime Executive*, Crowley Maritime "has steadfastly refused to go public and is the largest privately held maritime company in America." Crowley Maritime dates back to 1892 when its founder Thomas Crowley (grandfather of the current Chairman, President and CEO Thomas B. Crowley, Jr.) bought an eighteen-foot boat to transport personnel and supplies to ships moored in San Francisco Bay. Crowley Maritime states on its website that it has approximately 4,300 employees and provides marine transport services using a fleet of more than 210 vessels, consisting of roll-on/roll-off

("ro-ro") and lift-on/lift-off vessels, tankers, tugs and barges. Crowley Maritime has invested substantially in its tug-barge operations, including over $1 billion for articulated tug-barges that are used primarily as an alternative to tankers for transporting liquid petroleum products. Crowley Maritime uses Invader class (7,200 horsepower) ocean-going tugs to tow barges between the U.S. mainland and Puerto Rico and Alaska. Crowley Maritime's land-based assets include terminals, tank farms, office buildings, trucks, trailers, containers, chassis, cranes and other specialized vehicles.

45.    One or more Crowley Maritime entities have served Puerto Rico since 1954 (originally operating as TMT Trailer Ferry), with a focus on roll-on/roll-off tug-barge service since 1971. According to a *Caribbean Business* interview with Crowley Maritime's CEO Tom Crowley, Jr., Puerto Rico is a key market for Crowley Maritime that represents approximately 25% of the company's revenues. According to Crowley Maritime, its tug-barges, while slower than containerships, are more fuel efficient (and use diesel fuel rather than bunker fuel) and have a much smaller crew size and, therefore, lower fuel and labor costs than containerships. Crowley Maritime has terminals in Philadelphia/ Pennsauken, New Jersey, Jacksonville/Ft. Lauderdale (origin port for most Central America shipments) and Gulfport, Mississippi (mostly for service to Central America and Cuba).

46.    Until the early 1990s, roughly 80% of Crowley Maritime's revenues came from its liner services to South America, Central America, Puerto Rico and the Caribbean islands. When the South American economies declined, this had a significant negative impact on Crowley Maritime. In January 2000, Crowley Maritime concluded the sale of its South America liner service operations to Hamburg-Süd, and reorganized its remaining carrier operations under the

umbrella of defendant Crowley Liner Services, with Puerto Rico/Caribbean and Latin American divisions. Crowley Liner focuses on shipping department store-type dry goods, building products and automobiles as well as oversized cargo too large for containers or trailers. In 2003, Crowley Liner estimated that it had a 38% share of the Puerto Rico trade and handled 730.8 million tons of cargo (up from a 31% share in 2002 with 596.2 million tons of cargo). In its 2010 10-K (p. 8), Trailer Bridge states that based on PIERS data, as of November 2010, Crowley's container volume market share for the Puerto Rico trade route (excluding vehicles) was 29.7%.

47.    In interviews with *The Maritime Executive* in 2001 and again in 2009, co-conspirator Thomas B. Crowley, Jr. outlined the steps he took after he became CEO of Crowley Maritime in 1994 to reorganize and restructure operations. In particular, Crowley adopted "One Crowley" as the company business plan (and motto), and transferred managers among the Crowley operating units, including shifting co-conspirator Rob Grune from Manager of Contract Services in Seattle to Senior Vice President and General Manager of Puerto Rico/Caribbean Liner Services based in Jacksonville. According to Mr. Crowley, the "One Crowley" business model was based on a flat, democratic organization where the overall company (*i.e.*, Crowley Maritime) was what mattered, with all business units having a common, shared bottom line.

48.    At all relevant times, Crowley Maritime designated the persons who served as Senior Vice President and General Manager for Puerto Rico/Caribbean liner services (who reported directly to Tom Crowley, Jr., as Crowley Maritime's President, Chief Executive Officer, Chief Operating Officer and Chairman of the Board). In addition, the Crowley Maritime website (as of April 2009) referred to co-conspirator Rob Grune (in his capacity as Senior Vice President and

General Manager of Puerto Rico/Caribbean Liner Services) as part of Crowley Maritime's "Executive Staff," reporting to Mr. Crowley. As of March 2012, the Crowley Maritime website refers to Grune (since January 2010, Senior Vice President and General Manager, Petroleum Transportation) and John Douglass (since January 2010, Senior Vice President and General Manager, Puerto Rico/Caribbean Liner Services) as part of Crowley Maritime's "Senior Leadership," all of whom report to Tom Crowley, Jr., as Crowley Maritime's President, Chief Executive Officer, Chief Operating Officer and Chairman of the Board.

49.    During 2009, Crowley Liner and Crowley Maritime agreed to pay $13.75 million dollars (gross) to resolve claims asserted by a putative class of Puerto Rico shippers. Plaintiffs are asserting claims outside that proposed class and requested exclusion from any court-approved Crowley litigation or settlement class.

50.    As described in greater detail below, on July 31, 2012, Crowley Liner Services pled guilty to violating the federal antitrust laws with respect to the Puerto Rico trade and agreed to pay a $17 million fine.

### 4.    Co-Conspirator Horizon Lines

51.    Co-conspirator Horizon Lines, Inc. is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Co-conspirator Horizon Lines, LLC ("Horizon LLC") is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. Horizon LLC is the transportation operating unit and wholly owned subsidiary of Horizon Lines, Inc. Unless otherwise noted, Horizon Lines, Inc. and Horizon LLC are collectively are referred to as "Horizon" or "Horizon Lines."

52.     In an April 22, 2010 press release, Horizon Lines, Inc. describes itself as "the nation's leading domestic ocean shipping and integrated logistics company.  The company owns or leases a fleet of 20 U.S.-flag containerships and operates five port terminals, linking the continental United States with Alaska, Hawaii, Guam, Micronesia and Puerto Rico."  Since January 2009, Horizon also has been licensed by the U.S. Federal Maritime Commission to operate as a non-vessel operating common carrier ("NVOCC") for non-Jones Act international ocean shipments. During the relevant period, one or more plaintiffs purchased cabotage shipping services directly from Horizon and/or its predecessors and affiliates.

53.     Horizon predecessors, which include Sea-Land Service and CSX Lines LLC, were among the pioneers for the transition to the use of containers and intermodal transportation.  In February 2003, in return for $300 million (gross cash proceeds of approximately $240 million, with $214 million net of transaction costs and $60 million of securities), CSX Corporation conveyed most (*i.e.*, roughly 90%) of its ownership interest in CSX Lines to a new venture formed with the Carlyle Group (a private equity firm), with the name changed from CSX Lines to Horizon Lines.  In July 2004, another private equity firm, Castle Harlan, bought a majority interest in Horizon from Carlyle and CSX for approximately $676 million.  During 2005-2006, Castle Harlan terminated its ownership interest in Horizon through initial and secondary public offerings.

54.     Effective September 1, 2007, Horizon Lines, Inc. structured its transportation and logistics operations as Horizon Lines, LLC and Horizon Logistics, LLC, both of which are wholly owned subsidiaries of Horizon Lines, Inc.  In March 2010, Horizon announced that as part of an organization realignment, logistics will no longer be reported as a separate business

segment. During the relevant period, Horizon Lines, Inc. also had a wholly-owned subsidiary, Horizon Lines of Puerto Rico, Inc., that was involved in its Puerto Rico operations, including shipments for Kraft Foods. According to Horizon Lines, Inc.'s October 22, 2010 Form 10-Q (p. 4), Horizon Lines of Puerto Rico "operates as an agent for Horizon Lines in Puerto Rico and also provides terminal services in Puerto Rico."

55.   Horizon is the only Jones Act carrier that during the relevant period served all the domestic offshore Jones Act trade routes—Puerto Rico, Hawaii/Guam and Alaska. According to its 2010 Form 10-K (p. 3), Horizon "operates the largest fleet of fully qualified Jones Act container ships (15)" and accounts for "approximately 36% of total U.S. marine container shipments from the continental U.S. to Alaska, Puerto Rico and Hawaii, constituting the three non-contiguous Jones Act markets." Horizon also owns or leases several U.S.-flag containerships that are not Jones Act-qualified as well as roughly 18,500 cargo containers. Horizon reports in its 2010 10-K (p. 5) that sixteen of its twenty ships are actively deployed, and that eleven of the sixteen are Jones Act qualified. Horizon also has three Jones Act qualified vessels that "are spare vessels available for seasonal and dry-dock needs and to respond to potential new revenue opportunities," as well as a fourth Jones Act qualified vessel that "could be available for deployment after undergoing dry-docking for inspection and maintenance." (*Id.*)

56.   Horizon does not disclose revenues by trade lane. However, analysts who follow Horizon, including Morgan Keenan and Columbine Capital, have estimated that 35-36% of Horizon's revenues are attributable to shipments between the U.S. mainland and Puerto Rico, with Hawaii shipments accounting for 41% of Horizon's revenues and Alaska for 23-24%. The valuations prepared by Horizon's appraiser, Valuation Research Corporation, in connection with

Horizon's September 2005 IPO included the following breakdown of revenue by trade lane as a

percent of total company revenue: Alaska-25%, Hawaii/Guam-40.7% and Puerto Rico-34.3%.

57.    Horizon has provided marine transportation between the U.S. mainland and Puerto

Rico since 1958, and in its 2010 Form 10-K (p. 4) claims a 34% share of Puerto Rico's total

container loads from the U.S. mainland. Sea Star, Crowley and Trailer Bridge are the only other

Jones Act-qualified carriers that provide liner service on the Puerto Rico trade route. Horizon

provides liner service (*i.e.*, scheduled operations over fixed routes at regularly scheduled

intervals) between San Juan and Jacksonville, Florida, Port Elizabeth, New Jersey and Houston,

Texas using four full-time containerships. In September 2009, Horizon announced it was adding

Tampa, Florida as a port of call on its Houston-San Juan route.

58.    In its September 14, 2010 presentation at the Morgan Keenan

Industrial/Transportation Conference, Horizon noted its "diversified cargo mix," with

refrigerated (26%) and grocery/foodstuff (14%) among its largest 2009 cargo types.

59.    During the relevant periods, Horizon managed pricing for cargo shipments on a

centralized basis. In its 2010 Form 10-K (p. 8), Horizon states that its offices in Charlotte,

Irving, Texas  and Renton, Washington coordinate "[a]ll pricing activities," and that "[s]enior

sales and marketing professionals are responsible for developing sales and marketing strategies

and are closely involved in servicing our largest customers." In particular, the "marketing team

location in Charlotte is responsible for providing appropriate market intelligence and direction to

the Puerto Rico sales organization." (*Id.*) Horizon made similar statements in other SEC filings,

including, by way of example, the prospectus and other materials for its September 2005 IPO,

which included statements that "[a]ll pricing activities are also centrally coordinated from

Charlotte and Tacoma, Washington, enabling us to manage our customer relationships" and that

Horizon's "marketing team located in Charlotte is responsible for providing appropriate market

intelligence and direction to the Puerto Rico sales organization." As a result and as discussed in

detail below, the conspiracy to allocate customers, sales volumes and market shares, control and

manipulate capacity, rig bids and fix prices to which Horizon and several of its employees have

pled guilty would have involved the knowledge and participation of top executives at Horizon's

corporate headquarters, including Horizon's Chairman, CEO and President, Charles G.

Raymond, and COO John V. Keenan.

60.    During 2009, Horizon agreed to pay $20 million dollars (gross) to resolve claims

asserted by a putative class of Puerto Rico shippers. Plaintiffs are asserting claims outside that

proposed class and requested exclusion from any court-approved Horizon class settlement.

61.    As described in greater detail below, on March 15, 2011, Horizon Lines, LLC pled

guilty to violating federal antitrust laws with respect to the Puerto Rico trade lane and was

sentenced to pay a $45 million fine over five years and was placed on probation for five years.

On April 28, 2011, Horizon's fine was reduced to $15 million, payable in installments over five

years. In its motion seeking this reduction, the Justice Department stated that "[t]he requested

modification is necessary to preserve [Horizon's] continued viability and ability to pay

restitution to victims of its criminal conduct."

### 5.    Co-Conspirator Trailer Bridge, Inc.

62.    Co-conspirator Trailer Bridge, Inc. ("Trailer Bridge") is a publicly held Delaware

corporation with its principal place of business in Jacksonville, Florida. Trailer Bridge provides

tug-barge service between the U.S. mainland and Puerto Rico and the Dominican Republic.

Trailer Bridge has provided service to Puerto Rico since 1992 and, according to its 2010 10-K (p. 8), as of November 2010 accounts for approximately 14.5% of container volume (excluding vehicles) for the Puerto Rico trade. During the relevant period, one or more plaintiffs purchased cabotage shipping services directly from Trailer Bridge and/or its predecessors and affiliates.

63.    Malcolm P. McLean founded Trailer Bridge was founded in 1991. McLean invented containerization more than fifty years ago and was involved in Sea-Land Service (Horizon's predecessor). Trailer Bridge went public in July 1997, and until its November 2011 bankruptcy filing its stock was traded on NASDAQ. McLean family members have a significant ownership stake in Trailer Bridge, and Malcolm P. McLean, Jr. serves as a Trailer Bridge director. Trailer Bridge reported in its 2010 Form 10-K (p. 20) that as of March 29, 2011, it had eighty-three stockholders of record.

64.    According to Trailer Bridge's 2009 Proxy Statement (Schedule 14A, p. 8) in November 2007, members of the McLean family owning 48.9% of the company's outstanding common stock (roughly 5.8 million shares) filed an amended Schedule 13D with the Securities and Exchange Commission disclosing their intent to actively market their Trailer Bridge shares. Subsequently, as a result of the Justice Department investigation of the Jones Act carriers, including Trailer Bridge, the McLean family suspended its proposed sale of Trailer Bridge common stock. The McLean family members profited handsomely from their stake in Trailer Bridge. McLean family members received dividends on the $24 million of preferred stock they owned in Trailer Bridge. Additionally, McLean family members profited as the owners of Kadampanattu Corp. (also known as K Corp.), which received $7.3 million in annual lease

payments for the two 736-foot triple-deck roll-on/roll-off barges K Corp. leased to Trailer Bridge.

65.    According to its 2009 Form 10-K (p. 3), "Trailer Bridge was the first, and remains the only company serving markets governed by the Jones Act to exclusively operate vessels fully configured to carry 48' and 53' long, 102" wide, 'high cube' equipment. This configuration enables the Company to achieve operating efficiencies not readily available to traditional ocean carriers that primarily use smaller capacity equipment, such as 40' containers." In this connection, a major focus of Trailer Bridge's operation has been the use of 53-foot containers (it owns or leases over 3,900) and its Triplestack Box Carrier ("TBC") single-deck barges that are specially designed to handle those larger containers. Trailer Bridge built five of those TBC barges in/about 1997, and as of year-end 2010, operated three of these TBC barges on its Puerto Rico route and offered the other two for charter to third parties. Trailer Bridge reported in its 2010 10-K that one of these two TBCs was chartered to a third party during the first quarter of 2011 for a 300-day term, with an option for two additional 90-day extensions. Trailer Bridge also owns and operates two large (736' by 104') triple-deck roll-on/roll-off barges with stern ramp access. Trailer Bridge stated in its 2010 10-K that as of year-end 2010, one of these ro-ro barges was drydocked. Trailer Bridge does not transport refrigerated containers.

66.    According to Trailer Bridge, fifty-three-foot "high cube" containers have 3,850 interior cubic feet of space—61% more than the 2,390 cubic feet for a 40-foot container. Trailer Bridge asserts that larger containers are supposed to provide additional efficiency based on fewer loads to move the same amount of cargo and lower fees and expenses that are assessed on a per container basis resulting in lower cost per cubic foot of cargo.

36

67.   As described above, until late 2004-early 2005, Trailer Bridge leased most of its

equipment, including containers and barges, from Kadampanattu Corp. ("K Corp."), an affiliate

controlled by members of the McLean family, at a cost of $7.3 million per year.  On December

1, 2004, Trailer Bridge completed the sale of $85 million of secured senior notes that matured in

2011.  Trailer Bridge used the net proceeds (approximately $81.5 million) to buy all the

outstanding shares of K Corp. and to retire certain K Corp. and Trailer Bridge indebtedness.

This also resulted in the cancellation of the $24 million of preferred Trailer Bridge stock that K

Corp. (and ultimately McLean family members) had owned.  Trailer Bridge estimated that this

transaction saved millions of dollars annually in charter costs and dividend payments on the

preferred stock K Corp. owned.  As then CEO John McCown stated in the December 2, 2005

edition of *Journal of Commerce Online*:  "The net effect is that our fixed cash expenses have

decreased by approximately $5 million per year and $2 million in annual preferred stock

dividends have been eliminated."  In November 2011, Trailer Bridge filed for bankruptcy,

largely (according to Trailer Bridge) because it was unable to reach agreement with its senior

bond holders on a financial restructuring of the $85 million of senior secured notes that Trailer

Bridge issued and sold in 2004.  Trailer Bridge's Plan of Reorganization was confirmed on

March 16, 2012.

68.   During the relevant period, Trailer Bridge chartered the tugs that pulled its barges,

including a charter agreement with Crowley Marine Services, an affiliate of co-conspirator

Crowley Maritime.  In July 2001, Trailer Bridge announced long-term agreements for Moran

Towing and Crowley Marine Services to provide tugs to tow Trailer Bridge's barges between the

U.S. mainland and Puerto Rico.  According to a July 11, 2001 Moran Towing press release,

Trailer Bridge entered into a long-term agreement for Moran to use its Heidi class 4350 horsepower tugs to tow Trailer Bridge's four TBC barges. At the same time, Trailer Bridge announced a long-term agreement for Crowley Marine Services to tow Trailer Bridge's two ro-ro barges on the Puerto Rico route using Crowley's Invader class 7200 horsepower tugs. Co-conspirator Crowley Liner Services uses these same Invader class tugs to tow its barges on the Puerto Rico and Alaska trade routes. Trailer Bridge states in its 2010 10-K (p. 4) that it currently uses chartered 7200 horsepower diesel-powered tugs to tow its multi-deck ro-ro barges and chartered 5000 horsepower diesel-powered tugs to tow its single-deck TBC barges.

69.    During the relevant period, Trailer Bridge also had ties to the U.S. mainland-Hawaii trade route through its Board of Directors. During the relevant period, Nickel Van Reesema was a Trailer Bridge director and also was a director and COO of Pasha Hawaii Transport Lines LLC ("Pasha Hawaii"). Van Reesema is or has been President of Strong Vessel Operators LLC, which is a joint venture participant in Pasha Hawaii and is a Jones Act carrier that since March 1995 has transported vehicles and equipment between the West Coast and Hawaii.

70.    At various times, Trailer Bridge has been a defendant in actions brought on behalf of a proposed class of Puerto Rico shippers. Plaintiffs are asserting claims outside of that putative class.

## 6.    Co-Conspirator Matson Navigation Company, Inc.

71.    Co-conspirator Matson Navigation Company, Inc. ("Matson Navigation") describes itself as "the principal carrier of containerized freight and automobiles between the West Coast and Hawaii, Guam and Mid-Pacific." Until 2012, Matson Navigation was the largest subsidiary of Honolulu-based Alexander & Baldwin, Inc. Founded in 1882, Matson Navigation provided

the first container service to Hawaii in 1958, and when Matson's *Hawaiian Citizen* entered

service in April 1960 (with capacity for 436 24-foot containers), it was the first all-container ship

in the Pacific service. From 1969 until 2012, Matson was a wholly owned subsidiary of

Alexander & Baldwin, Inc., a Honolulu-based company with extensive transportation, real estate

and agribusiness interests, primarily in Hawaii and California. In December 2011, Alexander &

Baldwin announced plans to create separate transportation and logistics (Matson) and real estate

development, commercial real estate and agriculture (Alexander & Baldwin) companies. Matson

has its headquarters in Oakland, California, and owns thirteen Jones Act-qualified containerships

and four Jones Act barges as well as approximately 23,500 cargo containers and 14,300

container chassis and generators. Matson began serving Guam in or about 1996. During 2003-

06, Matson added four new diesel-powered Jones Act containerships to its fleet.

72.    As discussed in detail above, during the relevant period, Matson (along with defendant

Saltchuk Resources) had a significant ownership interest in defendant Sea Star Line. Matson

owned a 45% interest (later reduced to 20%) in defendant Sea Star. In this connection, one or

more Matson executives often accompanied Saltchuk's Leonard Shapiro when he visited Sea

Star's Jacksonville office to conduct pricing and other management reviews.

**B.    Defendant and Co-Conspirator Industry Trade Associations and Individuals**

**1.    Co-Conspirators Maritime Cabotage Task Force and Transportation
Institute**

73.    During the relevant period, the corporate defendants and co-conspirators were

members of co-conspirators Maritime Cabotage Task Force ("MCTF") (known as the American

Maritime Partnership since February 22, 2011) and the Transportation Institute, entities devoted

to protecting and promoting their interests as Jones Act carriers. Horizon, Crowley, Sea Star and

Trailer Bridge also were members of the Puerto Rico Maritime Alliance which, among other things, sponsored a 2001 report by Reeve & Associates regarding the impact of the Jones Act that downplayed the effect of shipping costs on retail prices.  Senior executives of the corporate defendants and co-conspirators, including co-conspirators Thomas B. Crowley, Jr. (Crowley), Charles Raymond (Horizon) and Robert Magee (Saltchuk/ASG), served as officers and directors of the MCTF and the Transportation Institute, and met and communicated with each other frequently.  Co-conspirators Mark Tabbutt (Saltchuk), Charles Raymond (Horizon) and Thomas Crowley, Jr. (Crowley) were the sole members of the Transportation Institute's Domestic Shipping Council which provided them with cover for additional rump meetings and discussions in furtherance of the conspiracy.  In its 2010 Form 10-K (p. 5), co-conspirator Matson Navigation noted that the American Maritime Partnership "supports the retention of the Jones Act and other cabotage laws that regulate the transport of goods between U.S. ports," stating:

> Repeal of the Jones Act would allow foreign-flag operators, which do not have to abide by U.S. laws and regulations, to sail between U.S. ports in direct competition with Matson and other U.S. operators, which must comply with such laws and regulations.  The American Maritime Partnership seeks to inform elected officials and the public about the economic, national security, commercial, safety and environmental benefits of the Jones Act and similar cabotage laws.

### 2.    Co-Conspirator Peter Baci

74.    During the relevant period, co-conspirator Peter Baci ("Baci") was defendant Sea Star's Senior Vice President-Yield Management and was responsible for Sea Star's pricing on the Puerto Rico trade route.  Baci joined Sea Star in 1998 as Vice President for Marketing, and was promoted to Senior Vice President in or about July 2001.  Starting in or about 1977 and continuing to in or about 1998, Baci worked for co-conspirator Crowley Maritime in a variety of positions, including senior marketing and pricing positions for Crowley's Puerto Rico

operations. Baci developed close personal and professional relationships with Crowley and Trailer Bridge personnel who were responsible for pricing for shipments on the Puerto Rico trade route including, but not limited to, co-conspirator Thomas Farmer who at various times was Crowley's Vice President-Pricing and Yield Management for Puerto Rico, and Trailer Bridge's David Miskowiec. Before joining Sea Star, Baci also worked for Navieras/NPR. Baci was charged with and pled guilty to a criminal antitrust felony for his role in the overall conspiracy to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices for cabotage shipping services including, but not limited to, for shipments between the U.S. mainland and Puerto Rico. On January 30, 2009, Baci was sentenced to forty-eight months in prison and fined $20,000. Baci was in federal custody from or about April 15, 2009 until mid-2011. During all or part of the relevant period, Baci resided in Jacksonville, Florida.

75.    Baci was a key and very active participant in discussions with all other defendant carriers in furtherance of the conspiracy including, but not limited to, with Kevin Gill and Greg Glova of Horizon Lines, Tom Farmer of Crowley and David Miskowiec at Trailer Bridge. In this connection, Baci prepared and maintained numerous contemporaneous records that contain and reflect meetings and discussions with the other defendant carriers in furtherance of the overall agreement to fix prices and allocate customers. These materials include detailed annual "Yield Plans" as well as approximately twenty spiral notebooks that contain notes of literally hundreds of price-fixing discussions with Horizon, Crowley and Trailer Bridge.

### 3.    Co-Conspirator Alexander G. Chisholm

76.    Co-conspirator Alexander G. Chisholm ("Chisholm") is an individual who during all or part of the relevant period resided in Jacksonville, Florida. During the relevant period,

Chisholm was defendant Sea Star's Assistant Vice President-Yield Management and Pricing Director/Manager. Chisholm assisted co-conspirator Baci and others on pricing for shipments on the Puerto Rico trade route. Chisholm worked for co-conspirator Crowley Maritime before joining Sea Star and developed close personal and professional relationships with Crowley personnel who were responsible for pricing for shipments on the Puerto Rico trade route including, but not limited to, co-conspirator Thomas Farmer who at various times was Crowley's Vice President-Pricing and Yield Management for Puerto Rico. Chisholm was charged with and pled guilty to obstruction of justice for attempting to delete and destroy email and other conspiratorial documents and data in April 2008 shortly after Chisholm learned that the FBI had visited Sea Star's Jacksonville office to serve a grand jury subpoena. On May 12, 2009, Chisholm was sentenced to seven months in prison and fined $4,000. Chisholm has completed his prison term and is no longer in federal custody.

### 4.    Co-Conspirator R. Kevin Gill

77.    Co-conspirator R. Kevin Gill ("Gill") was co-conspirator Horizon's Vice President-Marketing for Puerto Rico from May 2002 to December 2005, when he was succeeded by co-conspirator Gregory Glova. Thereafter, Gill was Horizon's Vice President-Marketing. Gill assisted co-conspirator Gabriel Serra (also of Horizon) and others in setting pricing for shipments, including on the Puerto Rico route. Gill signed the December 2002 amendment to the Kraft Foods agreement with one of Horizon's predecessors, CSX Lines of Puerto Rico, as well as other Kraft Foods-Horizon contracts. Gill was charged with and pled guilty to a criminal antitrust felony for his role in the overall conspiracy to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices for cabotage shipping

services including, but not limited to, for shipments between the U.S. mainland and Puerto Rico. On May 12, 2009, Gill was sentenced to twenty-nine months in prison and fined $20,000. Gill has completed his prison sentence and is no longer in federal custody. During all or part of the relevant period, Gill resided in Charlotte, North Carolina.

### 5. Co-Conspirator Gregory Glova

78.    Co-conspirator Gregory Glova ("Glova") was co-conspirator Horizon's Marketing and Pricing Manager for Puerto Rico from December 2005 (when he succeeded co-conspirator Gill) until April 2008. Glova assisted co-conspirator Serra and others in setting prices for shipments, including on the Puerto Rico route. Glova, as "Director, Puerto Rico Trade Lane" and "Director, Puerto Rico Pricing & Marketing," signed Horizon contracts with Kraft Foods. Glova was charged with and pled guilty to a criminal antitrust felony for his role in the overall conspiracy to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices for cabotage shipping services including, but not limited to, for shipments between the U.S. mainland and Puerto Rico. On May 12, 2009, Glova was sentenced to twenty months in prison and fined $20,000. Glova has completed his prison sentence and is no longer in federal custody. During all or part of the relevant period, Glova resided in Charlotte, North Carolina.

### 6. Co-Conspirator Gabriel Serra

79.    Co-conspirator Gabriel Serra ("Serra") was co-conspirator Horizon's former Senior Vice President and General Manager for Puerto Rico who had supervisory responsibility for pricing for shipments on the Puerto Rico trade route, and was frequently involved in Kraft's Puerto Rico shipments. Serra reported directly to Horizon senior management including co-conspirator Charles G. Raymond, President and CEO of Horizon Lines, and John W. Handy,

Executive Vice President of Horizon Lines whose responsibilities included enhancement of trade lane profitability. Serra was charged with and pled guilty to a criminal antitrust felony for his role in the overall conspiracy to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices for cabotage shipping services including, but not limited to, for shipments between the U.S. mainland and Puerto Rico. On May 12, 2009, Serra was sentenced to thirty-four months in prison and fined $20,000. Serra has completed his prison sentence and is no longer in federal custody. During all or part of the relevant period, Serra resided in San Juan, Puerto Rico.

### 7.    Co-Conspirator Charles G. Raymond

80.    During the relevant period, co-conspirator Charles G. Raymond was Horizon Lines' President and Chief Executive Officer. As stated in the April 19, 2010 Horizon Lines, Inc. Proxy Statement, from 1994 to 2003, Raymond was an executive officer of CSX Corporation. From 1994-99, Raymond also was Group Vice President-Operations and Chief Transportation Officer of Sea-Land Service, Inc. From 1999 to 2003, Raymond was President and CEO of Sea-Land Domestic Shipping, LLC and CSX Lines, LLC. Raymond started at Sea-Land in 1965. As described in greater detail below, Raymond participated in meetings and other communications in furtherance of the overall conspiracy to allocate customers, market share and sales volumes, control and manipulate capacity, rig bids and fix prices. Raymond abruptly "retired" from Horizon in February 2011 at the same time Horizon announced its agreement to plead guilty to criminal antitrust violations, and was succeeded by a Horizon director who began serving as Horizon's interim President and Chief Executive Officer on March 11, 2011. As disclosed in Horizon's 2010 10-K (p. 2), on February 23, 2011, Horizon entered into a Separation Agreement

with Raymond which provides, in part, that Raymond will receive approximately $2.3 million in severance payments over a period of twenty-five months as well as other consideration. Raymond is also entitled to indemnification and advancement of legal expenses under Horizon's charter and bylaws. At the same time Raymond "retired," Horizon granted a fully paid "leave of absence" to its long-time chief operating officer, co-conspirator John V. Keenan. At the same time, Horizon modified Keenan's employment agreement to provide that it automatically renews for one-year terms during his leave of absence and to increase (to $510,000) the amount Horizon will pay Keenan if he is terminated other than for cause.

### 8.   Defendant Leonard H. Shapiro

81.   Defendant Leonard H. Shapiro ("Shapiro") is one of the founding partners of defendant Saltchuk. During the relevant period, Shapiro was a Saltchuk principal and director and one of its major shareholders and an officer of co-conspirator Totem Ocean, including Totem Ocean's Vice President-Pricing from at least as early as 1998 and continuing until at least 2004. During all or most of the relevant period, Shapiro resided in the Seattle, Washington area, and came to Jacksonville frequently to meet with Sea Star personnel. As described in detail below, Shapiro was a key high-level participant in the conspiracy acting on behalf of defendants Saltchuk and Sea Star and co-conspirator Totem Ocean and with their knowledge and approval. In this connection, Shapiro provided existing and potential Sea Star customers with a business card that identified him as "Principal and Director" of "Saltchuk Resources, Inc."

### C.   Other Co-Conspirators

82.   Various other persons, entities, companies and corporations not named as defendants in this Complaint, including some whose identities are presently unknown, participated with

defendants in the antitrust conspiracy alleged herein, and made statements and performed acts in furtherance of the overall conspiracy to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices for cabotage shipping services for shipments between the U.S. mainland and Puerto Rico. The co-conspirators include, but are not limited to Crowley Liner, Crowley Maritime, Crowley Puerto Rico Services, Horizon Lines, Horizon Lines of Puerto Rico, Trailer Bridge, Matson Navigation Company, Totem Ocean Trailer Express, American Shipping Group, the Maritime Cabotage Task Force (now known as the American Maritime Partnership) and the Transportation Institute as well as numerous individuals including, but not limited to, Charles G. Raymond, John V. Keenan, Thomas Cowan, Gabriel Serra, R. Kevin Gill, Gregory Glova, Karen Haines, Adriano Conti and Thomas Lorenzo of Horizon Lines, Thomas B. Crowley, Jr., Robert E. ("Rob") Grune and Thomas Farmer of Crowley Maritime and Crowley Liner Services, Mark N. Tabbutt, Robert P. Magee, Frank Peake, Peter Baci, Alex Chisholm, Edward Pretre and Michael Nicholson of Saltchuk Resources, TOTE and Sea Star Line, W. Allen Doane of Matson Navigation and John D. McCown, Robert Van Dijk and David A. Miskowiec of Trailer Bridge.

## V.    Trade and Commerce

### A.    Overview of Jones Act Carriers

83.    Defendants and their co-conspirators are engaged in providing maritime cabotage liner service between the U.S. mainland and Puerto Rico, Hawaii/Guam and/or Alaska, which is also often referred to as the "domestic offshore trades" or as "noncontiguous domestic trades." Under 46 U.S.C. § 13102 (15), "noncontiguous domestic trade" is defined as domestic water carrier

transportation "involving traffic originating in or destined to Alaska, Hawaii, or a territory or possession of the United States."

84.    Defendants typically refer to themselves as Jones Act carriers. Section 27 of the Merchant Marine Act of 1920 (formerly 46 U.S.C. § 883, now codified as 46 U.S.C. § 55102), often referred to as the Jones Act, requires that merchandise transported entirely or partially between U.S. ports (whether directly or via a foreign port) must travel on ships built in the U.S. and owned by U.S. citizens that are U.S. documented (by the U.S. Coast Guard) and with crews that are predominantly U.S. citizens. As Horizon Lines states in its 2010 10-K (p. 3): "Under the Jones Act, all vessels transporting cargo between covered U.S. ports must, subject to limited exceptions, be built in the U.S., registered under the U.S. flag, manned predominantly by U.S. crews, and owned and operated by U.S.-organized companies that are controlled and 75% owned by U.S. citizens." Horizon also notes in the same 2010 10-K (p. 4) that "[o]ther U.S. maritime laws require vessels operating on the trade routes between Guam, a U.S. territory and U.S. ports to be U.S.-flagged and predominantly U.S.-crewed, but not U.S.-built."

85.    The Jones Act does not provide any statutory or other antitrust immunity for the *per se* unlawful agreements by defendants and their co-conspirators to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices for maritime cabotage liner service.

86.    There are only a handful of Jones Act carriers that provide liner service (*i.e.*, scheduled operations by a water common carrier whose ships operate on a predetermined and fixed itinerary over a given route at regular intervals) between the U.S. mainland and Puerto Rico: defendants and co-conspirators Horizon Lines, Sea Star, Crowley and Trailer Bridge. As

Horizon noted in its September 14, 2010 presentation at the Morgan Keenan Industrial/Transportation Conference (p. 7), Horizon serves a "unique industry niche."

87.    Overall, the defendant and co-conspirator Jones Act carriers are a very small and close knit group, with overlapping ownership and extensive commercial relationships including capacity sharing and vessel charter agreements.  Top executives often worked for two or more of the Puerto Rico carriers.  Peter Baci, for example, worked for Crowley and Sea Star and Frank Peake worked for Horizon before becoming president of Sea Star.  Carl Fox started at Crowley, went to Sea Star, and returned to Crowley in 2010.  As described below, defendants and their co-conspirators used capacity sharing and other agreements to control, stabilize and limit capacity and market shares as part of their overall conspiracy to increase and maintain prices.

88.    In addition, senior executives of the defendant and co-conspirator cabotage carriers, including coconspirators Thomas Crowley (Crowley), Mark Tabbutt (Saltchuk), Robert Magee (Saltchuk/ASG) and Charles Raymond (Horizon), actively and extensively participated in trade groups, such as the co-conspirator Maritime Cabotage Task Force (now known as the American Maritime Partnership) and Transportation Institute, that are devoted to protecting and promoting the interests of Jones Act carriers.

### B.    Defendants and Their Co-Conspirator Jones Act Carriers Dominate Shipments Between the U.S. Mainland and Puerto Rico

89.    At all relevant times, defendants and their co-conspirators accounted for all or nearly all maritime cabotage liner service between the U.S. mainland and Puerto Rico.

90.    In particular, defendants and co-conspirators Horizon Lines, Crowley, Sea Star and Trailer Bridge were the only cabotage carriers providing liner service between the U.S. mainland and Puerto Rico.  According to Trailer Bridge's 2010 Form 10-K (p. 8), based on PIERS data),

as of November 2010 estimated shares for container shipments (excluding vehicles) on the

Puerto Rico trade route were as follows:  Horizon, 32.0%; Crowley, 29.7%; Sea Star, 23.8%; and

Trailer Bridge, 14.5%.  In its 2010 Form 10-K (p. 4), Horizon states that it is the largest provider

of marine container shipping to Puerto Rico, "accounting for approximately 34% of Puerto

Rico's total container loads from the continental U.S."

91.    A March 25, 2010 *Philadelphia Inquirer* article reports that approximately 75% of

Puerto Rico cargo shipments move in and out of Jacksonville, Florida, 5% from the Gulf of

Mexico (*i.e.*, Houston) and 15-20% from ports in the Northeast (*e.g.*, Port Elizabeth-Newark and

Philadelphia-Pennsauken).

92.    According to the Government Development Bank for Puerto Rico, during 2007,

Puerto Rico imported more than $22 billion of products from the U.S. mainland, nearly all of

which had to be transported by ship from the U.S. mainland to Puerto Rico.  As of 2010, Puerto

Rico was one of the United States' largest trading partners, with a total trade relationship

exceeding $68 billion annually, according to the U.S. Department of Commerce.  An internal

Horizon analysis of the Puerto Rico trade lane identified the following key southbound market

segments and overall volume shares: dry foodstuffs-19%, refrigerated foodstuffs-14%,

miscellaneous retail-14%, NVOCC (non-vessel operating common carriers)-11%, beverages-6%,

chemicals and petroleum-5% and other-31%.

### C.    Lack of Substitutes and Stable Demand for Cabotage Shipping Services to Puerto Rico

93.    Maritime cabotage liner service is essential to the economy of Puerto Rico.  Defendant

cabotage carriers and their co-conspirators transport the vast majority of medicine, foodstuffs,

grocery products, consumer goods as well as cars, trucks and heavy equipment, building supplies

and raw materials between the U.S. mainland and Puerto Rico.  As Crowley notes on its website, Crowley has "literally served as a lifeline to [Puerto Rico], delivering groceries, department store merchandise, building materials, automobiles and more."  In its presentation at the September 14, 2010 Morgan Keenan Industrial/Transportation Conference (p. 7), Horizon similarly stated that it serves as a "lifeline to offshore consumers, industries, [and] military."  In the first earnings conference call (on November 2, 2005) after Horizon's September 2005 IPO, in his closing remarks, Horizon's CEO (and co-conspirator) Charles Raymond emphasized that "[t]his is a life-line business to Alaska, Hawaii, Puerto Rico and Guam.  We move products that people are going to consume regardless of economic conditions."  During the relevant period, total annual revenues for shipments on Jones Act carriers were approximately $2.5 billion.  Defendants' sales for cabotage shipping services to Puerto Rico alone are hundreds of millions of dollars each year.

94.    There are few or no viable substitutes for the maritime cabotage liner services provided by defendants and their co-conspirators.  For domestic offshore trade routes, shipping most goods, and especially heavy or bulky goods, by air is prohibitively expensive.  There are no road or rail routes between the U.S. mainland and Puerto Rico.

95.    There are extensive financial, operational and other overlaps among the three primary Jones Act trade routes (*i.e.*, Puerto Rico, Alaska and Hawaii/Guam).  For example, in its 2010 Form 10-K (p. 9), Horizon states that "[a]pproximately 56% of our transportation revenue in 2010 was derived from customers shipping with us in more than one of our markets and approximately 36% of our transportation revenue in 2010 was derived from customers shipping with us in all three domestic markets."  Horizon highlighted the same overlap of revenues and customers across routes in the prospectus for its September 26, 2005 initial public offering,

50

stating: "Approximately 59% of our revenue in 2004 was derived from customers shipping with us in more than one of our geographic markets and approximately 29% of our revenue in 2004 was derived from customers shipping with us in all of our geographic markets." Likewise, in 2000, Matson Navigation had plans to use two new ships built with construction subsidies in a new West Coast-Hawaii service (with a call at Vancouver, British Columbia). William Gotimer, Jr., General Counsel of Kadampanattu Corp., which at the time operated Trailer Bridge, opposed the proposed Matson service even though Trailer Bridge operated only on the Puerto Rico route. As reported in the *Journal of Commerce* (February 24, 2000), in comments submitted to the U.S. Maritime Administration opposing the proposed Matson service, Gotimer noted that all the offshore domestic trades are interrelated, and any action on the Hawaii route had an impact on ship operators, like Trailer Bridge, serving Puerto Rico or Alaska.

96.    Demand for shipping services provided by defendants and their co-conspirator carriers tends to be stable. As Horizon Lines states in its 2009 Form 10-K (p. 3):

> Although the U.S. container shipping industry is affected by general economic conditions, the industry does not tend to be as cyclical as other sectors within the shipping industry. Specifically, most of the cargos shipped via container vessels consist of a wide range of consumer and industrial items as well as military and postal loads. Since many of these types of cargos are consumer goods vital to the populations in our markets, they provide us with a stable base of demand for shipping and logistics services.

**D.    High Barriers to Entry and Jones Act Protection**

97.    The Jones Act insulates defendants and their co-conspirator carriers from competition from foreign carriers. Beyond the Jones Act requirements (*i.e.*, ships must be built and licensed in the U.S. and operated with crews of predominantly U.S. citizens), there are significant barriers to entry to provide maritime cabotage liner services including (a) the entrenched positions and

very high market shares of the defendant and co-conspirator incumbent carriers, (b) the

significant capital requirements and long lead times to construct a new containership in U.S.

shipyards, (c) the substantial investment in transportation and terminal infrastructure necessary to

transport containerized shipments.  Under the heading **"Repeal, Substantial Amendment, or**

**Waiver of the Jones Act or its Application Could Have a Material Adverse Effect on Our**

**Business"** (2009 Form 10-K, p. 15; emphasis in original), Horizon noted:

> If the Jones Act was to be repealed, substantially amended, or waived and, as a
> consequence, competitors with lower operating costs were to enter any or our
> Jones Act markets, our business would be materially adversely affected. In
> addition, our advantage as a U.S. citizen-operator of Jones Act vessels could be
> eroded by periodic efforts and attempts by foreign interests to circumvent certain
> aspects of the Jones Act.  If maritime cabotage services were included in the
> General Agreement on Trade in Services, the North American Free Trade
> Agreement or other international trade agreements, or if the restrictions contained
> in the Jones Act were otherwise altered, the shipping of maritime cargo between
> covered U.S. ports could be opened to foreign-flag or foreign-built vessels.

98.    Defendants and their co-conspirators are well aware that the Jones Act creates

substantial barriers to entry that insulate them from competition from foreign carriers on the

domestic offshore routes between the U.S. mainland and Puerto Rico.  As stated in the

November 30, 2004 and May 15, 2007 video interviews of Saltchuk's founding partner and

retired former chairman Michael Garvey on Saltchuk's website, in choosing businesses,

including Sea Star, to acquire, Saltchuk looks for niche businesses with barriers to entry and low

technology requirements.  Horizon Lines similarly noted in its 2010 Form 10-K (p. 4):

> Given the limited number of existing Jones Act qualified vessels, the high capital
> investment and long delivery lead times associated with building a new
> containership in the U.S., the substantial investment required in infrastructure and
> the need to develop a broad base of customer relationships, the markets in which
> we operate have been less vulnerable to over capacity and volatility than
> international shipping markets.

99.    In its 2006 Form 10-K (p. 12) and in many previous SEC filings, Crowley Maritime stated: "Our Liner Services ... which are conducted between United States ports including Puerto Rico, are protected from foreign competition by the Jones Act.  While there have been unsuccessful attempts in the past to broaden access to the Jones Act trade and to modify, limit or abolish the Jones Act, we believe it is unlikely that the Jones Act will be rescinded or materially modified in the foreseeable future."

100.    Trailer Bridge's former CEO (John McCown) also noted in comments published in the *Journal of Commerce* (May 17, 2004) that there is no possibility that a non-U.S. flag carrier can enter the Puerto Rico trade and add capacity or undercut the other carriers, stating: "It's a closed loop, because the trade is protected by the Jones Act."  Trailer Bridge's former CEO (Ivy Barton Suter) similarly touted the "high barriers to entry" for the Puerto Rico route at the February 11, 2010 Stifel Nicolaus Transportation Conference.

E.    **The Conspiracy Had a Direct and Substantial Effect on Interstate Commerce**

101.    Defendants' illegal conduct was intended to have, and did have, a direct, substantial and reasonably foreseeable effect upon business and commerce in the United States and in this District.  In particular, as the result of their unlawful combination and conspiracy, defendants and their co-conspirators (a) eliminated and suppressed competition, and (b) artificially inflated prices that plaintiffs and others paid for Puerto Rico maritime cabotage liner services.

102.    Throughout the relevant period, defendants and their co-conspirators received bid solicitations or pricing requests from and negotiated with plaintiffs and other customers to provide Puerto Rico maritime cabotage liner services.  In this connection, defendants and their co-conspirators prepared bids and price quotations which they transmitted in interstate commerce

to plaintiffs and other customers using the United States mails and other interstate communication and financial facilities.

103.   Throughout the relevant period and continuing to the present, defendants and their co-conspirators provided Puerto Rico maritime cabotage liner services in interstate commerce.  The Puerto Rico maritime cabotage liner services defendants provided involved a substantial and continuous flow of commodities, payments and personnel in, and that directly affect, interstate commerce, including at least the following.

A.   Defendants sold and provided Puerto Rico maritime cabotage liner services in a continuous and uninterrupted flow of interstate commerce to plaintiffs and other customers located through the United States.

B.   Defendants purchased and used substantial quantities of raw materials, equipment and supplies in connection with their selling and providing Puerto Rico maritime cabotage liner services, and those materials were transported and moved in a continuous and uninterrupted flow of interstate commerce from the points of origin to the points where they were used or consumed.

C.   Plaintiffs and other customers paid defendants and their co-conspirators for Puerto Rico maritime cabotage liner services with checks, wire transfers and other financial instruments that were negotiated, communicated and transported in interstate commerce.

D.   As a result of defendants' multistate operations, corporate structure and ownership, on a daily basis defendants transfer funds and exchange data between and among offices and facilities that are engaged in interstate commerce.

E.   Defendants and their co-conspirators' officers, employees, agents and other representatives traveled regularly in interstate commerce and used interstate mail, telephone and wire facilities in furtherance of their illegal combination and conspiracy.

## VI.   Criminal Antitrust Proceedings

104.  Beginning at some date presently unknown to plaintiffs, the U.S. Department of Justice's Antitrust Division along with other federal law enforcement authorities, apparently with the cooperation of one or more insiders, conducted an undercover investigation of criminal antitrust violations and other unlawful conduct by the defendants and co-conspirators.  The Justice Department's undercover investigation reportedly included audio and video surveillance recordings.  The Justice Department has issued press releases as recently as July 31, 2012, stating that its criminal antitrust investigation is ongoing.

105.  As part of this criminal antitrust investigation, the Antitrust Division also convened a federal grand jury in the U.S. District Court for the Middle District of Florida in Jacksonville, Florida.  On or about April 17, 2008, the Antitrust Division, assisted by the FBI, executed search warrants and served grand jury subpoenas on the corporate defendants, co-conspirators and others, including at the Jacksonville headquarters for Sea Star, Crowley and Trailer Bridge. Several of the corporate defendants and co-conspirators (*e.g.*, Horizon, Trailer Bridge and Matson Navigation) acknowledged in press releases and SEC filings that they had been served with grand jury subpoenas.  The Justice Department subsequently convened a federal grand jury in San Juan, Puerto Rico and, in November 2011, that grand jury returned an indictment against defendant Sea Star's former president, Frank Peake.

A.    **Horizon Lines**

106.  In its 2009 10-K (F-37), co-conspirator Horizon disclosed that on April 17, 2008, the Justice Department served it with a search warrant and grand jury subpoena.

107.  On February 24, 2011, the Antitrust Division filed a one-count criminal information in the United States District Court for the Middle District of Florida in Jacksonville charging Horizon Lines as a participant in a conspiracy to eliminate competition by allocating customers, rigging bids and fixing prices in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

108.  The February 24, 2011 Information charged that "[f]rom at least as early as May 2002 and continuing until at least April 2008, the exact dates being unknown to the United States, [Horizon] and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services" in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

109.  The Information further charged that for purposes of forming and carrying out the conspiracy, Horizon and its co-conspirators engaged in at least the following unlawful conduct in connection with providing marine transportation between the U.S. mainland and Puerto Rico ("Puerto Rico freight services").

A.   Participated in meetings, conversations and other communications to discuss customers, rates, surcharges and bids for the sale of Puerto Rico freight services.

B.   Agreed during those meetings, conversations and communications to allocate purchasers of Puerto Rico freight services among the conspirators.

C.   Agreed during those meetings, conversations and communications to fix, stabilize and maintain rates and surcharges charged to customers for Puerto Rico freight services.

D.   Agreed during those meetings, conversations and communications to rig bids submitted to government and commercial purchasers of Puerto Rico freight services.

E.   Engaged in meetings, conversations and communications to monitor and enforce adherence to the agreed-upon rates and surcharges for Puerto Rico freight services.

F.   Sold Puerto Rico freight services at collusive and noncompetitive rates and surcharges.

G.   Concealed the conspiracy and unlawful conspiratorial meetings, conversations, communications and agreements through various means including, but not limited to, private email accounts.

110.   Thereafter, in a Plea Agreement filed on March 15, 2011, Horizon agreed to "plead guilty to ... and ... make a factual admission of guilt to the Court" that Horizon participated in a "combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services from at least as early as May 2002 until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

111.   As part of its Plea Agreement, Horizon admitted that, for Puerto Rico freight services, it charged customers "a price that consisted of a base rate and, at times, various surcharges and fees, such as a bunker fuel surcharge" and that during the conspiracy period its sales of Puerto Rico freight services were approximately $1.4 billion.  Horizon further admitted that the meetings, conversations and communications in furtherance of the conspiracy "took place in the continental United States and Puerto Rico" and that "a representative of the defendant participated in such discussions in Puerto Rico."

57

112.  In its March 9, 2011 Sentencing Memorandum, the Justice Department stated that under the Sentencing Guidelines, Horizon's fine range was $336 to $672 million. The total fine imposed was $45 million, payable in installments with the first installment to be paid thirty days after the March 15, 2011 imposition of sentence, $1 million at the first anniversary of imposition of sentence ("anniversary"), $3 million at the second anniversary, $5 million at the third anniversary, $15 million at the fourth anniversary and $20 million at the fifth anniversary. The sentence imposed also includes a five-year probation term.

113.  On April 28, 2011, Horizon's fine was reduced to $15 million, payable in the following installments:  $1 million during the first thirty days of probation, $2 million on or before completion of the first year of probation, $3 million during each of the second, third and fourth years of probation, and a final payment of $3 million prior to the expiration of the five-year probationary period. In its motion seeking this fine reduction, the Justice Department stated that "[t]he requested modification is necessary to preserve [Horizon's] continued viability and ability to pay restitution to victims of its criminal conduct."

**B.    Sea Star Line**

114.  On November 17, 2011, the Antitrust Division filed a one-count criminal information charging Sea Star Line as a participant in a conspiracy to eliminate competition by allocating customers, rigging bids and fixing prices in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

115.  The Information charged that, "[f]rom at least as early as May 2002 and continuing until at least April 2008, the exact dates being unknown to the United States, [Sea Star] and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and

eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services" in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

116.  The Information further charged that that, for purposes of forming and carrying out the conspiracy, Sea Star and its co-conspirators engaged in at least the following unlawful conduct in connection with providing marine transportation between the U.S. mainland and Puerto Rico ("Puerto Rico freight services").

    A.  Participated in meetings, conversations and other communications to discuss customers, rates, surcharges and bids for the sale of Puerto Rico freight services.

    B.  Agreed during those meetings, conversations and communications to allocate purchasers of Puerto Rico freight services among the conspirators.

    C.  Agreed during those meetings, conversations and communications to fix, stabilize and maintain rates and surcharges charged to customers for Puerto Rico freight services.

    D.  Agreed during those meetings, conversations and communications to rig bids submitted to government and commercial purchasers of Puerto Rico freight services.

    E.  Engaged in meetings, conversations and communications to monitor and enforce adherence to the agreed-upon rates and surcharges for Puerto Rico freight services.

    F.  Sold Puerto Rico freight services at collusive and noncompetitive rates and surcharges.

    G.  Concealed the conspiracy and unlawful conspiratorial meetings, conversations, communications and agreements through various means including, but not limited to, private email accounts.

117. Thereafter, in a Plea Agreement filed on December 19, 2011, Sea Star agreed to "plead guilty to ... and ... make a factual admission of guilt to the Court" that Sea Star participated in a "combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services from at least as early as May 2002 until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." Under Section 5(a) of the Clayton Act (15 U.S.C. § 16(a)), the Sea Star guilty plea is admissible in subsequent civil litigation as *prima facie* evidence of Sea Star's liability.

118. As part of its Plea Agreement, Sea Star admitted that, for Puerto Rico freight services, it charged customers "a price that consisted of a base rate and, at times, various surcharges and fees, such as a bunker fuel surcharge" and that during the conspiracy period its sales of Puerto Rico freight services were approximately $1.1 billion. Sea Star further admitted that "[Sea Star], through certain of its officers and employees, including high-level personnel of [Sea Star], participated in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the rates and surcharges charged to customers for Puerto Rico freight services." Sea Star further admitted that "[i]n furtherance of the conspiracy, [Sea Star], through certain of its officers and employees, engaged in discussions and attended meetings with other representatives of other providers of Puerto Rico freight services," and that "[d]uring these discussions and meetings, agreements were reached to fix the rates and surcharges to be charged to customers for Puerto Rico freight services."

119. In its December 6, 2011 Sentencing Memorandum, the Justice Department stated that under the Sentencing Guidelines, Sea Star's fine range was $264 to $528 million. The total fine imposed was $14.2 million, payable in installments with the first installment of $1 million to be

paid thirty days after the December 19, 2011 imposition of sentence, $1 million at the first anniversary of imposition of sentence ("anniversary"), $2 million at the second anniversary, $3 million at the third anniversary, $4 million at the fourth anniversary and $3.2 million at the fifth anniversary.

### C.   Frank Peake (Sea Star)

120.   On November 17, 2011, Frank Peake, Sea Star's former Chief Operating Officer and President, was indicted for participating in "a combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services." Peake's trial is currently scheduled for January 2013.

### D.   Peter Baci (Sea Star)

121.   On October 1, 2008, the Justice Department filed a one-count criminal information in the United States District Court for the Middle District of Florida in Jacksonville charging co-conspirator Peter Baci with a felony in violation of Section 1 of the Sherman Act.

122.   Thereafter, in a Plea Agreement filed on October 20, 2008, Baci agreed to plead guilty to a "conspiracy to suppress and eliminate competition in the market for coastal water freight shipments between the United States and Puerto Rico by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; from at least as early as May 2002 and until at least April 2008." (Baci Plea Agreement ¶ 2) Baci further agreed that for purposes of the Sentencing Guidelines, the volume of attributable commerce was more than $1 billion, which increased the offense level by 14. (Baci Plea Agreement ¶ 8(e))

123.  On October 20, 2008, Baci waived indictment and entered his guilty plea before U.S.

Magistrate Judge Thomas E. Morris of the U.S. District Court for the Middle District of Florida

in Jacksonville.  As part of his Plea Agreement, co-conspirator Baci admitted that from at least as

early as May 2002 until at least April 2008, he participated in a conspiracy with other providers

of Puerto Rico water freight services and that he "was a manager or supervisor in the

conspiracy." (Baci Plea Agreement ¶¶ 4(a)-(b))

124.  In his January 23, 2009 Sentencing Memorandum, Baci admitted that he "participated

in a serious antitrust conspiracy that continued for many years." (Section IV, p. 4)  Baci also

made the following statements regarding the inception and conduct of the conspiracy among Sea

Star, Horizon, Crowley and Trailer Bridge.  (Section V(D)(1), pp. 8-9)

    A.   Baci's cooperation as part of his guilty plea "will include not only the companies

involved with antitrust violations, including Sea Star, Horizon, Crowley and Trailer Bridge,

but also those individuals responsible for supervising and implementing the criminal

violations."

    B.   Defendant Leonard Shapiro was a major shareholder of defendant Saltchuk and

an officer of co-conspirator Totem Ocean.  Although Shapiro was never an elected officer

of Sea Star, "he was someone of massive authority who inserted himself into the operations

of Sea Star" where Shapiro "threatened and directed the termination of others at Sea Star

and ... significantly intimidated Mr. Baci."

    C.   Defendant Shapiro "hatched the idea of collusion with other carriers." Shapiro

"ordered [Baci] to collude with his counterpart at Horizon (Gill and, later, Glova) to

participate in the antitrust conspiracy AFTER Shapiro and Serra reached an operational agreement."

    D.  Baci further stated that defendant Shapiro "hatched" the unlawful "scheme" which "became operational after discussions between Leonard Shapiro and Gabriel Serra (Horizon), who represented the higher level of authority at the respective companies." Baci "was ordered to implement the illegal agreement after the operational agreement between Shapiro and Serra."

    E.  Baci "was a manager or supervisor in the conspiracy."

    F.  Baci further represented that he "was a participant at the inception of the illegal agreement" and "is familiar with every participant, whether [at] Sea Star, or at Horizon, Crowley and Trailer Bridge."

    G.  Baci also confirmed the existence of contemporaneous records that he and others prepared as part and in furtherance of the conspiracy including "contemporaneous notes contained in his personal notebooks" that Baci maintained from 2002 through 2008 as well as "an enormous collection of emails substantiating the conspiracy" and related "travel vouchers and airline and hotel records."

    H.  Baci also admitted that immediately after he first learned that the FBI was investigating wrongdoing by the cabotage carriers, he attempted to obstruct the government's investigation by calling his assistant, Alex Chisholm, and instructing him to take down the Gmail email system that defendants and co-conspirators had maintained and used to implement the conspiracy on a daily basis.

125. As part of the January 30, 2009 Baci sentencing hearing, the Justice Department provided the following additional details describing the participation of Baci and others in the conspiracy and the timing and value of Baci's cooperation. When publicly disclosed through discovery in this litigation or otherwise, the full details of Baci's cooperation are likely to implicate others at Sea Star and Saltchuk as well as other defendants and co-conspirators in the overall agreement to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices of cabotage shipping services.

A. Baci came forward and began to cooperate with the Justice Department only "after the government had completed a very lengthy, covert investigation, after [Baci] had taken steps to obstruct the government's investigation, and further, after what the government will submit is conclusive evidence of his guilt, which included, among other things, hundreds of documents evidencing his participation in the conspiracy, tape-recordings evidencing his participation in the conspiracy, and, more importantly, the fact that others had already agreed to cooperate." (Jan. 30, 2009 Sentencing Tr. 24)

B. At the time Baci came forward to cooperate, the Justice Department already had knowledge and evidence of the participation in the conspiracy by others at Sea Star, both above and below Baci. (*Id.* at 31)

C. With respect to the email system that Baci instructed Chisholm to shut down, "[Baci] was the guy that ran the—the email system where they—they actually agreed to do this stuff" and was able to explain "how the agreement arose within Sea Star and who was involved had how it developed, and how it—it grew over the years." (*Id.* at 51, 55-56)

D.   Baci implicated other corporate defendants in the conspiracy. In particular, Baci

provided the Justice Department "with specific instances of conduct" against defendants

Crowley and Trailer Bridge. (*Id.* at 56)

E.     **Gabriel Serra (Horizon)**

126.   On October 1, 2008, the Justice Department filed a one-count criminal information in

the United States District Court for the Middle District of Florida in Jacksonville charging co-

conspirator Gabriel Serra with a felony in violation of Section 1 of the Sherman Act.

127.   Thereafter, in a Plea Agreement filed on October 20, 2008, Serra agreed to plead

guilty to a "conspiracy to suppress and eliminate competition in the market for coastal water

freight shipments between the United States and Puerto Rico by agreeing to allocate customers;

agreeing to rig bids submitted to government and commercial buyers; and agreeing to fix the

prices of rates, surcharges and other fees charged to customers; from at least as early as May

2002 and until at least April 2008, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."

(Serra Plea Agreement ¶ 2)

128.   On October 20, 2008, Serra waived indictment and entered his guilty plea before U.S.

Magistrate Judge Thomas E. Morris of the U.S. District Court for the Middle District of Florida

in Jacksonville.

129.   As part of his Plea Agreement, co-conspirator Serra admitted that:

A.   From at least as early as May 2002 until at least April 2008, he participated in a

conspiracy with other providers of Puerto Rico water freight services and "was an organizer

or leader of the conspiracy." (Serra Plea Agreement ¶¶ 4(a)-(b))

B.   For purposes of the Sentencing Guidelines, the volume of attributable commerce was more than $1 billion, which increased the offense level by 14.  (Serra Plea Agreement ¶ 8(e))

130.  In entering his guilty plea on October 20, 2008, Serra further admitted that he "knowingly became a member of the conspiracy alleged in the information by, for example, participating in meetings, conversations, and communications with competitors to discuss customers' rates and bids for the sale of ... coastal water freight transportation services between the United States and Puerto Rico." (*United States v. Serra, et al.*, Oct. 20, 2008 Tr. 76)

131.  As part of the May 12, 2009 sentencing hearing for Serra, Gill, Glova and Chisholm, the Justice Department provided the following additional details describing the participation of Serra and others in the conspiracy and the timing and value of Serra's cooperation.  When publicly disclosed through discovery in this litigation or otherwise, the full details of Serra's cooperation are likely to implicate others at Horizon as well as other defendants and co-conspirators in the overall agreement to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices of cabotage shipping services.

A.   Serra was a senior-level executive at Horizon Lines and was the direct manager-supervisor of co-conspirators Gill and Glova.  In his role as a senior Horizon executive, Serra "had direct communications [during and in furtherance of the conspiracy] with a number of other executives, both within [Horizon] and at other companies." (May 12, 2009 Sentencing Tr. 28)

     B.  Personal materials that Serra used in furtherance of the conspiracy and that he turned over to the Justice Department include a laptop (which the government imaged) and a notebook. *(Id.* at 39)

     C.  Serra was "one of the leaders and organizers of the conspiracy, and, in fact, was one of the principal architects of the illegal agreement." (*Id.* at 48)

**F.    Kevin Gill (Horizon)**

132.  On October 1, 2008, the Justice Department filed a one-count criminal information in the United States District Court for the Middle District of Florida in Jacksonville charging co-conspirator R. Kevin Gill with a felony in violation of Section 1 of the Sherman Act.

133.  Thereafter, in a Plea Agreement filed on October 20, 2008, Gill agreed to waive indictment and plead guilty to a "conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition." (Gill Plea Agreement ¶ 4(b))

134.  In that same October 20, 2008 Plea Agreement, Gill further admitted that from at least as early as May 2002 until at least April 2008, he participated in a conspiracy with other providers of Puerto Rico water freight services and that:

     A.  He was a "manager or supervisor in the conspiracy."

     B.  He "committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services. During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services

to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers...."

C.  For purposes of the Sentencing Guidelines, the volume of attributable commerce was more than $1 billion, which increased the offense level by 14. (Gill Plea Agreement ¶¶ 4(b), 8(e))

135.  In its May 4, 2009 Sentencing Memorandum, the Justice Department further noted that Gill was "integral to the formation of the conspiracy"; provided the government with "contemporaneous documents evidencing his and others' involvement" in the conspiracy; and further provided "evidence in the form of statements and documents, against his superiors within [Horizon], including presently uncharged co-conspirators."

136.  As part of the May 12, 2009 sentencing hearing for Serra, Gill, Glova and Chisholm, the Justice Department provided the following additional details describing the participation of Gill and others in the conspiracy and the timing and value of Gill's cooperation.  When publicly disclosed through discovery in this litigation or otherwise, the full details of Gill's cooperation are likely to implicate others at Horizon as well as other defendants and co-conspirators in the overall agreement to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices of cabotage shipping services.

A.  At the time that Gill began cooperating, the Justice Department already had ample evidence of Gill's involvement in the conspiracy up to and including the day (April 17, 2008) when the government's investigation went overt, including consensually monitored phone calls. (May 12, 2009 Sentencing Tr. 60)

B.   Gill "can provide evidence dating back to the early days of the conspiracy, when

he was the individual who was the day-to-day organizer for [Horizon]." Gill saved

contemporaneous documents from that early period of the conspiracy which he produced to

the Justice Department. (*Id.*)

### G.     Gregory Glova (Horizon)

137.   On October 1, 2008, the Justice Department filed a one-count criminal information in

the United States District Court for the Middle District of Florida in Jacksonville charging co-

conspirator Gregory Glova with a felony in violation of Section 1 of the Sherman Act.

138.   Thereafter, in a Plea Agreement filed on October 20, 2008, Glova agreed to waive

indictment and plead guilty to participating in a "conspiracy to suppress and eliminate

competition in the market for coastal water freight shipments between the United States and

Puerto Rico, which began at least as early as May 2002 and continued until at least April 2008,

by agreeing to allocate customers; agreeing to rig bids submitted to government and commercial

buyers; and agreeing to fix the prices of rates, surcharges and other fees charged to customers; in

violation of the Sherman Antitrust Act, 15 U.S.C. § 1." (Glova Plea Agreement ¶ 4(a))

139.   In that same October 20, 2008 Plea Agreement, Glova further admitted that:

A.   He joined and began participating in the conspiracy at least as early as December

2005 and continuing until at least April 2008 when he worked for Horizon Lines as

Marketing and Pricing Director for the Puerto Rico Division. (Glova Plea Agreement

¶ 4(a))

B.   From at least May 2002 until at least April 2008, Horizon Lines "participated in a

conspiracy with one or more providers of Puerto Rico freight services, a primary purpose of

which was to suppress and eliminate competition by allocating market shares and customers for, and fixing the prices of, Puerto Rico freight services." (Glova Plea Agreement ¶ 4(b))

C. Between December 2005 and April 2008, Glova committed acts in furtherance of the conspiracy, including "engaging in discussions and attending meetings with one or more competing providers of Puerto Rico freight services." During and as a result of such discussions and meetings, Glova (on behalf of Horizon Lines) reached agreements with other providers of "Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers...." (Glova Plea Agreement ¶ 4(b))

D. Glova was a "manager or supervisor in the conspiracy." (Glova Plea Agreement ¶ 4(b)) In its May 4, 2009 sentencing submission (p. 7), the Justice Department further noted that "as a manager within the conspiracy," Glova was "integral to the implementation" of the conspiracy and "had a working knowledge of all key aspects of the illegal agreements."

E. For purposes of the Sentencing Guidelines, the volume of attributable commerce was more than $500 million, which increased the offense level by 12. (Glova Plea Agreement ¶ 8(e))

140. As part of the May 12, 2009 sentencing hearing for Serra, Gill, Glova and Chisholm, the Justice Department provided the following additional details describing the participation of Glova and others in the conspiracy and the timing and value of Glova's cooperation. When publicly disclosed through discovery in this litigation or otherwise, the full details of Glova's cooperation are likely to implicate others at Horizon as well as other defendants and co-

conspirators in the overall agreement to allocate customers, sales volumes and market shares,

control and manipulate capacity, rig bids and fix prices of cabotage shipping services.

A.  On the day (April 17, 2008) the Justice Department investigation went overt, FBI

agents met with Glova who started cooperating immediately. (May 12, 2009 Sentencing Tr.

79-80)

B.  Glova's cooperation included making approximately five consensual calls to other

co-conspirators on April 17, 2008, that the FBI orchestrated and monitored. The Justice

Department held off executing other search warrants until the calls Glova initiated had been

completed.  (*Id.* at 79-81)

### H.    Alexander Chisholm (Sea Star)

141.  On October 1, 2008, the Justice Department filed a one-count criminal information  in

the United States District Court for the Middle District of Florida in Jacksonville charging co-

conspirator Alexander Chisholm with a felony (obstruction of justice) in violation of 18 U.S.C.

§ 1512(c)(1).  In particular , the Justice Department charged that:

A.  From in or about February 2008 to the date of the information, a federal grand

jury sitting in the Middle District of Florida, with the assistance of the Justice Department's

Antitrust Division and the Federal Bureau of Investigation, was investigating, among other

things, possible federal antitrust offenses in the coastal freight industry which provides

water freight shipments between the U.S. mainland and non-contiguous states and

territories, including Puerto Rico.

B.  On about April 17, 2008, the FBI executed search warrants and served grand jury

subpoenas on "Corporation A" (*i.e.*, defendant Sea Star Line) in Jacksonville, Florida and

San Juan, Puerto Rico, in connection with the grand jury investigation of the coastal freight industry.

      C.   On about April 17, 2008, Chisholm became aware of the coastal freight grand jury investigation. Thereafter, on April 17, 2008, Chisholm used his home computer to access a remote computer server to "alter, delete and conceal documents relevant and material to the grand jury's investigation and responsive to the grand jury's subpoena." (Oct. 1, 2008 Alexander Chisholm Criminal Information ¶¶ 2-4)

142.  Thereafter, in a Plea Agreement filed on October 20, 2008, Chisholm agreed to waive indictment and plead guilty to obstruction of justice in violation of 18 U.S.C. § 1512(c)(1), in particular that "[o]n or about April 17, 2008, after becoming aware of the grand jury investigation, [Chisholm] corruptly altered, destroyed and concealed records and documents with the intent to impair the availability of the records and documents for use in the federal investigation."

143.  In its May 4, 2009 Sentencing Memorandum (pp. 5-6), the Antitrust Division noted that Chisholm had "already received a very significant benefit" for his assistance "because, although it could have, the United States did not charge him in connection with the underlying antitrust conspiracy, which would have resulted in a substantially higher sentence." The Antitrust Division further noted that Chisholm was "one of the key implementers of the charged conspiracy and, therefore, has detailed insight regarding the nature, scope and functioning of the conspiracy" and "is a significant source of information regarding corporate conspirators that remain to be charged for their role in the charged conspiracy and other offenses."

144.  Chisholm's May 5, 2009 Sentencing Memorandum contains additional details regarding both his attempts to destroy and delete conspiratorial records and his role in the underlying antitrust conspiracy, including the following.

A.  Chisholm joined the conspiracy in or about April 2003 when he began working as a Director of Pricing for defendant Sea Star.  Chisholm previously had worked for Hamburg Süd, a major open ocean carrier.  Chisholm's position was eliminated when Hamburg Süd acquired Crowley Maritime's South American liner services.  Chisholm was one of three Pricing Directors who reported directly to co-conspirator Peter Baci, Sea Star's "Senior Vice President in Charge of Pricing."  According to Chisholm (p. 5), his "role in the underlying conspiracy to violate the antitrust laws was that of a numbers cruncher."  As one of Sea Star's three Directors of Pricing, Chisholm "put into action plans made by others," which included receiving pricing information for Sea Star's competitors from Baci who was in direct contact with the other carriers.  "Using the competitors' pricing information and following directions from Baci, Mr. Chisholm would re-do the bid for his customers."

B.  In his Sentencing Memorandum, Chisholm further admitted that following the execution of the search warrant at Sea Star's office on April 17, 2008, and knowing that there was a federal grand jury investigation of the coastal shipping industry, Chisholm "later that [same] night, used a computer in his home to access a remote server and delete files that were relevant and material to the grand jury's investigation."  Thereafter, Chisholm realized he had "made a bad situation even worse" and restored and retrieved the deleted data which he put on a disk that was provided to Sea Star's attorneys.  On June 6,

2008, when Mr. Chisholm's attorney met with the Justice Department, he also gave the

Antitrust Division lawyers a copy of the disk with the deleted information.

145.  As part of the May 12, 2009 sentencing hearing for Serra, Gill, Glova and Chisholm,

the Justice Department provided the following additional details describing the participation of

Chisholm and others in the conspiracy and the timing and value of Chisholm's cooperation.

When publicly disclosed through discovery in this litigation or otherwise, the full details of

Chisholm's cooperation are likely to implicate others at Sea Star and Saltchuk as well as other

defendants and co-conspirators in the overall agreement to allocate customers, sales volumes and

market shares, control and manipulate capacity, rig bids and fix prices of cabotage shipping

services.

A.        A.        Chisholm was Peter Baci's "right-hand man and essentially the

numbers cruncher for Mr. Baci." (May 12, 2009 Sentencing Tr. 104)

B.        B.        Chisholm has "direct knowledge of the participation of certain

corporate co-conspirators who have yet to be charged in the investigation." (*Id.*)

C.        C.        The spreadsheets that Chisholm was responsible for preparing and

the emails that he admitted deleting are key documents to understand the nature of the

conspiracy and how it operated. As the Justice Department stated: "This was a conspiracy

that was conducted in significant part through emails and spreadsheets. And the

spreadsheets contained detailed market share information, customer information, and

contact information that were circulated between the co-conspirators." Based on the data in

the spreadsheets, "the decision makers made the decisions about the steps the conspiracy

would take…. Additionally, the information contained in those spreadsheets was used as

a—as a method of policing the conspiracy, to make sure that everybody was doing what they committed to do as part of the conspiratorial agreement." (*Id.* at 104-05)

    D.  Though Chisholm did not make decisions for the conspiracy, "he provided information that allowed the decision makers to operate and to make informed decisions." (*Id.* at 105)

    E.  Chisholm's personal attorney also confirmed that the Gmail account that Chisholm took down as instructed by co-conspirator Baci "was the account that Mr. Baci uses to communicate with his counterpart at Horizon and his counterpart at other— companies who may be involved in this conspiracy." (*Id.* at 107)

    F.  Chisholm's attorney also described how Chisholm had assisted the Justice Department in reviewing approximately 8,000 documents and identifying roughly 100 "hot button" documents. As part of this review, Chisholm showed the Justice Department how documents were formatted or encrypted to conceal additional incriminating documents and data. "Some of those documents, in fact, were concealed, hidden, in the documents they were look[ing] at. And Mr. Chisholm showed the [Justice Department] paralegal how to look behind the document to find the actual document that was incriminating." (*Id.* at 110-11)

146.  Chisholm later submitted an affidavit in connection with the November 12, 2009 hearing on the motion for preliminary approval of the Horizon class settlement stating (¶ 14) that the conspiracy "affected prices and surcharges across the board" and that "differences among customers and the types of goods shipped had no bearing on whether they suffered damages." In his March 10, 2010 Supplemental Affidavit (¶¶ 5, 7-8), which supplemented his November 2009

Affidavit, Chisholm stated that he has "personal knowledge" based on his participation in the conspiracy that defendant "Sea Star fixed prices with defendants Horizon and Crowley," that most of Sea Star's Top 150 accounts (which he referred to as "Hall of Fame" accounts) were subject to the price-fixing conspiracy, and that "fixing prices on larger accounts impacted the negotiated prices on smaller accounts because the fixed price on larger accounts created a floor for negotiating prices for the smaller accounts.

**I.     Crowley Liner Services**

147.  On July 31, 2012, the Justice Department filed a one-count criminal information in the United States District Court for the District of Puerto Rico in San Juan charging Crowley Liner Services as a participant in a conspiracy to suppress and eliminate competition by allocating customers, rigging bids and fixing prices for shipments between the U.S. mainland and Puerto Rico in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

148.  The July 31, 2012 Information charged that "[f]rom at least as early as January 2006 and continuing until at least April 2008, the exact dates being unknown to the United States, [Crowley Liner Services] and its co-conspirators entered into and engaged in a combination and conspiracy to eliminate competition by agreeing to fix base rates for certain Puerto Rico freight services" in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

149.  The Information further charged that for purposes of forming and carrying out the conspiracy, Crowley Liner and its co-conspirators engaged in at least the following unlawful conduct in connection with providing marine transportation between the U.S. mainland and Puerto Rico ("Puerto Rico freight services").

A.   Participated in meetings, conversations and other communications to discuss base rates for Puerto Rico freight services.

B.   Agreed during those meetings, conversations and communications to allocate customers for Puerto Rico freight services.

C.   Agreed during those meetings, conversations and communications to fix, stabilize and maintain base rates for Puerto Rico freight services.

D.   Agreed during those meetings, conversations and communications to rig bids submitted to commercial purchasers of Puerto Rico freight services.

E.   Engaged in meetings, conversations and communications to monitor and enforce adherence to agreed upon base rates.

F.   Sold Puerto Rico freight services at collusive and noncompetitive base rates.

G.   Concealed the conspiracy and unlawful conspiratorial meetings, conversations and communications through various means, including private email accounts.

150.  In its Plea Agreement filed on July 31, 2012, Crowley Liner Services agreed to "plead guilty to ... and ... make a factual admission of guilt to the Court" that Crowley Liner "participated in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the base rates charged" to commercial purchasers of Puerto Rico freight services.

151.  The total fine imposed for Crowley Liner's criminal antitrust violations was $17 million, payable in installments, with the first installment of $2 million to be paid within thirty days of sentencing and the remaining $15 million in five annual payments of $3 million each.

152.   The Justice Department has represented in judicial proceedings that its criminal

antitrust investigation is continuing and that it expects to bring criminal charges against other

individuals and entities.  During a January 16, 2009 telephonic conference with U.S. District

Court Judge Timothy J. Corrigan of the Middle District of Florida (who presided over the

criminal proceedings and sentencings for Peter Baci, Gabriel Serra, Kevin Gill, Gregory Glova

and Alexander Chisholm), the lead attorney for the Justice Department stated (*United States v.*

*Gill* Jan. 16, 2009 Status Conference Tr. 18-19):

> [T]here are numerous other individuals and entities who remain to be prosecuted
> for the charged offense that's currently pending against these defendants. And,
> also, those similar defendants will likely face other charges outside of the one-
> count Sherman Act that has been charged against these particular defendants.

153.   In a November 17, 2011 press release announcing Sea Star's agreement to plead

guilty, the Justice Department stated that the criminal charges arose "from an ongoing criminal

investigation into price fixing, bid rigging and other anticompetitive conduct in the coastal water

freight transportation industry."  Subsequently, the Justice Department has issued additional

press releases, including as recently as July 31, 2012 (in connection with the Crowley Liner

Services guilty plea), stating that its criminal antitrust investigation is ongoing.

154.   Defendants and their co-conspirators are well aware of the nature and scope of the

conspiracy.  When publicly disclosed through discovery in this litigation or otherwise, the full

details will establish defendants' and their co-conspirators' knowing participation in a *per se*

unlawful scheme to allocate customers, sales volumes and market shares, control and manipulate

capacity, rig bids and fix prices that directly impacted and inflated the prices that plaintiffs and

other shippers paid for cabotage shipping services on shipments between the U.S. mainland and

Puerto Rico.

155.  The corporate defendants also are well aware of efforts to conceal the existence of the conspiracy and to obstruct the Justice Department's criminal antitrust investigation.  For example, following the April 17, 2008 raids, counsel for Saltchuk and Sea Star interviewed all the same Sea Star personnel whom the Justice Department and FBI had interviewed.  In addition, after co-conspirator Chisholm deleted (and later restored) conspiratorial data that he kept on his home computer and a related remote server, Chisholm provided a copy of the data from his home computer to Sea Star's lawyers and most likely Saltchuk's counsel as well.  When publicly disclosed through discovery in this litigation or otherwise, the statements and documents that Chisholm and others provided to the Justice Department are likely to implicate defendants and their co-conspirators in the overall agreement to allocate customers, sales volumes and market shares, control and manipulate capacity, rig bids and fix prices of cabotage shipping services.

156.  In early 2011, at the same time that Horizon agreed to plead guilty to criminal antitrust violations, Horizon's long-time CEO Charles G. Raymond abruptly "resigned" and its long-time COO John V. Keenan took a fully paid "leave of absence."  In its 2011 Proxy Statement, Horizon states that pursuant to its certificate of incorporation, bylaws and certain indemnification agreements and contracts, Horizon has advanced legal fees for the representation of Raymond and Keenan "in connection with various litigation matters pending against us related to possible antitrust violations in the domestic shipping business and shareholder litigation for alleged misstatements and omissions in connection with such possible antitrust violations."

## VII.   Implementing the Conspiracy

### A.   Defendants and Their Co-Conspirators Competed Intensely Prior to the Start of the Conspiracy

157.   There was a period of intense competition among Jones Act carriers on the Puerto Rico route from approximately 1999 to early 2002.  During this period, rates declined at the same time that the volume of shipments increased and there was significant excess liner capacity. That excess capacity undercut defendant and co-conspirator carriers' ability to increase and maintain prices and led to rate cutting by the defendant and co-conspirator carriers in an attempt to retain and maintain their market shares and sales volumes, especially in response to aggressive rate reductions by Navieras de Puerto Rico.

158.   In an April 2001 presentation to securities analysts, Trailer Bridge's then CEO John D. McCown (who abruptly left Trailer Bridge soon after the Department of Justice investigation of the Jones Act carriers was publicly disclosed in April 2008) asserted that in 2000 the Jones Act carriers collectively had lost $100 million, losses which McCown stated are "in large part an actual transfer of value from carriers to shippers that is not equitable."

159.   In a first quarter 2001 *Maritime Executive* interview, Crowley Maritime CEO and co-conspirator, Thomas B. Crowley, Jr., noted that a primary issue was that the Puerto Rico trade route was "overtonnaged" and that carriers' capacity exceeded cargo volumes by "approximately 22-25%" which created "constant pressure on rates."

160.   Likewise, in early 2001 when disclosing its financial results for the fourth quarter of 2000, Trailer Bridge (as reported in the April 16, 2001 *Journal of Commerce*) stated that the "market participants are in a brutal price war and are experiencing extraordinary losses in the end-game of the long overdue market shakeout."  In 1999, co-conspirator Trailer Bridge even

had asserted predatory pricing claims against defendant Sea Star and sought to recover over $25 million in damages in a proceeding filed before the Surface Transportation Board ("STB"). *See, e.g., Trailer Bridge, Inc. v. Sea Star Line LLC*, STB Docket No. WCC-104, 1999 WL 1133302 (STB Dec. 10, 1999) and 2000 WL 1616612 (STB Oct. 27, 2000).  After the STB administrative law judge granted Trailer Bridge's motion to compel Sea Star to produce detailed cost data, in April 2002 (which coincides with the admitted start of the conspiracy), Trailer Bridge moved to dismiss because the parties had executed a confidential settlement agreement and release.

161.  As the largest and most aggressive carrier, Navieras/NPR was primarily responsible for the high capacity and low rates on the Puerto Rico trade route.  As co-conspirator Trailer Bridge, Inc. explained in a February 14, 2005 SEC filing, prior to mid-2002, "the sustained volume-driven business strategy of NPR, the then-largest operator in the market, led to the poor pricing environment and low capacity utilization."

   **B.     Defendants and Their Co-Conspirators Eliminated Navieras/NPR's Capacity**

162.  The ultimate demise and dismemberment of Navieras de Puerto Rico and its successor Navieras/NPR, Inc. played a key role in how defendants and their co-conspirators implemented their agreement to allocate customers, control and manipulate capacity, rig bids and fix prices on the Puerto Rico route.

   **1.     The Puerto Rico government started Navieras/NPR in response to the lack of competition for cabotage shipping services.**

163.  In or about 1974, the government of Puerto Rico started Navieras de Puerto Rico (the trade name that Puerto Rico Marine Management, Inc. adopted, and also known as the Puerto Rico Maritime Shipping Authority), largely because of the lack of competitive maritime transportation services between Puerto Rico and the U.S. mainland.  Navieras de Puerto Rico

was formed through a "merger of services" to Puerto Rico operated by Sea-Land Service, Seatrain Line and Transamerican Trailer Transport Train.  However, because Sea-Land was not required to provide a covenant not to compete as part of the transaction, it was quickly back in operation and successfully taking market share at Navieras de Puerto Rico's expense.  As a government-owned entity, Navieras de Puerto Rico was often used for political patronage purposes, lost money in seventeen of its twenty years of operation, accumulated operating deficits in excess of $350 million and required over $125 million in cash infusions by the Puerto Rico government. Because Navieras de Puerto Rico was aggressive in cutting rates in an attempt to retain market share and volume for the Puerto Rico route, defendants and co-conspirators Horizon, Sea Star, Crowley and Trailer Bridge had to reduce their prices as well.

## 2. Private owners purchased Navieras/NPR and eventually filed for bankruptcy in 2001.

164.  By 1994, the Puerto Rico government had enough, and the Puerto Rico Senate approved the sale of Navieras de Puerto Rico by the government development bank (Banco Gubernamental De Fomento Para Puerto Rico) to BT Investment Partners, Inc., a wholly owned subsidiary of Bankers Trust New York (at the time one of the ten largest U.S. banks).  At the time, Navieras de Puerto Rico's market share was roughly 28%, down from as much as 80% in 1974 and 40% in 1991, and its primary rivals were Horizon's predecessor Sea-Land Service, Crowley American Transport and Trailer Bridge.  BT agreed to pay $29.5 million in cash for Navieras de Puerto Rico and to assume only a fraction (roughly $100 million) of its total $300 million debt.

165.  In December 1994, less than two weeks before the closing, BT Investment pulled out of the deal to buy Navieras de Puerto Rico.  With the Republican landslide in the 1994

congressional elections, BT said it was concerned that the Republican Congress might repeal the Jones Act provisions that would open the Puerto Rico route to competition from foreign-flag operators with lower rates and costs. However, after receiving assurances that the Jones Act protectionist barriers were safe and secure, BT finalized the purchase of Navieras de Puerto Rico in March 1995. BT continued to operate Navieras de Puerto Rico as NPR, Inc. and with new ownership consisting of Pyramid Ventures, Inc. (a BT Investment Partner subsidiary), Berkshire Partners and members of NPR management (including its CEO, Ron Katims, who had been the head of Navieras de Puerto Rico at its outset in 1974).

166. By late November 1997, NPR changed hands again when it was acquired by Holt Hauling and Warehousing Systems, part of the Holt Group, a Philadelphia-based entity controlled by the Holt family that was a leading stevedore and terminal operator and provider of logistics and transportation services. Holt reportedly paid $109.4 million for NPR through a combination of cash, notes and assumed debt.

167. By March 2001, the Holt Group was in default on $140 million of high-yield junk bonds it issued to finance the NPR acquisition, and on or about March 21, 2001, filed for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware. Debtors included NPR Holding Corporation, NPR, Inc., NPR-Navieras Receivables, Inc., NPR Systems, Inc. and NPR S.A., Inc. As of September 2000, NPR and its affiliates had total annual combined revenues of approximately $241.9 million.

3. **In April 2002, defendant Sea Star agreed to acquire certain assets of Navieras/NPR.**

168. On April 1, 2002, debtors submitted a filing in the Bankruptcy Court proceedings announcing an agreement to sell the ships and other operating assets of Navieras/NPR and its

San Juan terminal to Sea Star Line for $32 million, subject to various adjustments at closing and subject to the receipt of higher and better offers. These offers were to be solicited via an auction to be conducted by the Bankruptcy Court at a date to be determined.

169.   Sea Star represented that the NPR deal would combine the best of its versatile ro-ro service with Navieras' market-leading container service. As Sea Star stated in an April 1, 2002 press release: "Sea Star customers will enjoy greater frequency of service including a weekly sailing between Philadelphia and San Juan, while Navieras customers will also enjoy improved frequency between Florida ports and San Juan plus access to a wider range of trailer sizes and types." At that time and subsequently (*see, e.g.*, Journal of Commerce (April 8-14, 2002)), Caribbean Business (April 5, 2002) and Florida Shipper (April 15, 2002)), Sea Star also stated that after the NPR deal closed, Sea Star would continue to offer a total of five weekly sailings to Puerto Rico. This number of five weekly sailings was the combination of the NPR's twice weekly service from Florida and once weekly service from Philadelphia and the twice weekly service Sea Star offered from Florida.

170.   In articles published in the Journal of Commerce on April 2, 2002, Horizon's CEO, Chuck Raymond, stated that Horizon planned to attend the Bankruptcy Court auction and possibly bid on Navieras/NPR's assets, stating: "We are going to do that because we are operating similar assets in the trade and we see synergies."

171.   Sea Star's bid was the only one submitted by the court-ordered April 22, 2002 deadline. Defendant Saltchuk Resources made the decision to bid for the Navieras/NPR assets and provided the funds for the Sea Star bid.

4.     **In early 2002, defendants and co-conspirators agreed to eliminate NPR's capacity.**

172.   After Sea Star submitted its bid on April 22 and before the Bankruptcy Court approved the Sea Star offer (on April 25), top executives from defendants Saltchuk/Sea Star and co-conspirators Horizon and Totem Ocean met at the Park Hotel (now known as the Marriott South Park) in Charlotte, North Carolina on April 24, 2002.  The purpose of this meeting was to conclude an agreement to eliminate the Navieras/NPR capacity from the Puerto Rico trade route and, going forward, to eliminate NPR's then current three weekly sailings with Sea Star's emerging as a major Horizon customer as part of the overall conspiracy to control, limit and manipulate capacity and to maintain and increase prices.  Attendees at the Park Hotel conspiracy meeting included Leonard Shapiro of Saltchuk and Totem Ocean, Peter Baci (Sea Star's Senior Vice President-Yield Management), Phil Bates (Sea Star's Senior Vice President-Operations), Gabe Serra (Horizon's Senior Vice President & General Manager for Puerto Rico) along with Jay McKenna, Neil Perlmutter (who later became Sea Star's CFO and Senior Vice President-Finance and Information Technology) and Kevin Gill of Horizon.  Shortly after this meeting, Horizon's CEO (Charles Raymond) reported that Sea Star had inquired about the availability of slots (*i.e.*, space or "slots" for containers) on Horizon's ships, stating that Horizon "will try to accommodate [Sea Star] to make sure the market is served without trauma."

173.   On April 26, 2002, with the capacity sharing deal with Horizon in place, Sea Star closed on the purchase of the Navieras/NPR assets, including four ships (*Carolina, Mayaguez, Humacao* and *Guayama*) that Navieras had used to provide service between the U.S. mainland and Puerto Rico.  As directed by Saltchuk and agreed at the Park Hotel meeting, Sea Star quickly scrapped three of the four ships (so no one else could operate these Jones Act-qualified vessels

on the Puerto Rico or any other Jones Act domestic offshore routes), and sold the fourth (the *Mayaguez)* to Horizon for $5.05 million. Horizon kept the *Mayaguez* as a spare and never deployed the vessel on the Puerto Rico route, ultimately scrapping the ship for spare parts. At the same time, notwithstanding Sea Star's earlier public representations, Sea Star and Horizon agreed to eliminate NPR's three weekly sailings, thus greatly reducing capacity on the Puerto Rico route. At the time of its successful bid for the Navieras/NPR assets, Sea Star was a joint venture of defendant Saltchuk Resources and co-conspirator Matson Navigation, each of which owned a 45% stake. Matson declined to meet a capital call to provide its share of the funding for the Navieras/NPR acquisition. As a result, Saltchuk funded the deal and its ownership interest in Sea Star increased to 70% and Matson's declined to 20%.

174. Based on discussions at the April 2002 Park Hotel meeting as well as numerous other meetings and discussions, Sea Star and Horizon also agreed to allocate sailing days and schedules from Jacksonville to Puerto Rico. Before Sea Star bought the Navieras/NPR assets, both Horizon and Navieras sailed from Jacksonville on Tuesday and Friday and Sea Star sailed on Thursday and Saturday. After the Park Hotel meeting, Sea Star and Horizon agreed that Horizon would continue to sail on Tuesday and Friday, that Sea Star would drop the overlapping Navieras sailings, and that Sea Star would sail on Thursday and Saturday.

175. Although Sea Star issued statements and press releases assuring customers that there would be no reductions in service to Puerto Rico, and that Sea Star would continue all five of the combined NPR and Sea Star sailings, by May 1, 2002, as part of the agreements to limit and control capacity and to maintain and increase prices, Sea Star announced that "after evaluation of both the customer service and economic benefits, [Sea Star] has decided to operate from Port

Elizabeth, New Jersey as opposed to Philadelphia." Sea Star omitted key facts from its press

release, including that (a) it was scrapping the ships NPR had used to provide service from

Philadelphia, and (b) the Sea Star "operations" from Port Elizabeth were on Horizon ships

pursuant to the conspiratorial Park Hotel capacity sharing agreement.  The result was an

immediate and drastic (roughly 25%) reduction in capacity on the Puerto Rico route.  The

existing barriers to entry were further reinforced because Sea Star scrapped three of the four

ships Navieras/NPR had operated, and sold the fourth to its co-conspirator Horizon Lines.  Only

after the conspiracy was publicly disclosed did Sea Star terminate this capacity-sharing

agreement with Horizon and in April 2010 re-instituted direct service between Philadelphia and

San Juan on Sea Star's own ships.

> **5.    By agreeing to orchestrate NPR's demise, defendants and co-conspirators took the first step for their overall agreement to control and manipulate capacity, allocate customers, rig bids and fix prices.**

176.  Shortly after Sea Star (as directed and financed by Saltchuk) and Horizon had

dismantled NPR (*i.e.*, "the long overdue market shakeout"), Trailer Bridge's then CEO John D.

McCown said that he expected the NPR/Sea Star consolidation to reduce excess capacity and

improve the remaining carriers' profits, stating: "With the physical removal several weeks ago

of a large portion of the excess capacity in the Puerto Rico trade, more sustainable conditions are

returning, and will continue to return, to the sector" rather than "the hypercompetitive,

nonsustainable conditions of this past couple of years."

177.  With NPR eliminated once and for all and the conspiracy in place, not surprisingly, it

did not take long for McCown's predictions to come true.  By fall 2002, as described in a

September 27, 2002 *Trade Winds* article, Trailer Bridge had successfully implemented

substantial rate increases, including a 30% increase for used cars and an 11% hike for "not-in-trailer" goods such as larger vehicles. CEO McCown also noted that higher utilization rates and increased rates would generate profits in the coming quarter. In reporting financial results for the third quarter of 2002 (the first quarter after NPR's exit from the Puerto Rico trade) in November 2002, Trailer Bridge issued a release stating that "the previous level of excess capacity has been the root cause of hyper-competitive conditions in the Puerto Rico market." Referring to the excess capacity that predated Sea Star's purchase and scuttling NPR's ships, Trailer Bridge further stated:

> [T]his changed significantly in April 2002 when a competitor with a 27 percent market share discontinued operations and sold its vessel assets to another competitor. The vessels have since been withdrawn from the Puerto Rico trade lane.... With this change, Trailer Bridge believes it and the other remaining carriers in the lane will ultimately benefit from greater asset utilization and an unwinding of the unsustainable pricing characteristic of recent years.

178.   Trailer Bridge's CEO McCown similarly noted the positive impact of NPR's demise (which he noted resulted in a "permanent" 25% capacity reduction in the *Journal of Commerce* (May 17, 2004)) on Trailer Bridge's bottom line in the August 4, 2004 *Journal of Commerce Online*.

179.   Crowley (through its Director of Corporate Communications, Mark Miller) similarly praised NPR's demise as resolving the severe overcapacity situation that had existed in years past (in a November 26, 2001 *Shipping Digest* article, Miller stated that there was 25% excess capacity in the Puerto Rico trade lane which "has put a lot of pressure on the rates"), allowing Crowley to increase and maintain its share of Puerto Rico shipments to 36% for southbound and 34% for northbound shipments. Crowley also noted that with reduced vessel capacity, rates had stopped the downward spiral seen for the ten years prior to NPR's demise and that it expected

rates to increase.  As reported in the Journal of Commerce (August 12-18, 2002), John Douglass,

Crowley's Senior Vice President and General Manager for Puerto Rico/Caribbean services, also

noted a significant change in Crowley's capacity utilization once Navieras/NPR's ships were

removed from operations in the Puerto Rico trade lane.  Douglass said that Crowley had sailed at

less than full capacity for about two years "but after Navieras went belly-up, the services

'immediately booked up to 100%.  We've been slightly overbooked since mid-May [2002].'"

180.  Horizon's Kevin Gill also noted that one less carrier helped all the remaining carriers,

including Horizon which increased its share of Puerto Rico shipments by roughly 9% after

NPR's exit.  Gill also noted that post-NPR rates had increased significantly, though Sea Star's

chief operating officer, Frank Peake, noted that rates were still hundreds of dollars per container

below where they needed to be.

### C.    Defendants and Co-Conspirators Implemented Their Agreements to Allocate Customers, Rig Bids and Fix Prices for Cabotage Shipping Services

181.  After agreeing to eliminate the Navieras/NPR capacity, defendants and their co-

conspirators carried out their scheme to control and manipulate capacity and maintain and

increase prices for Puerto Rico liner services.

#### 1.    Defendants and their co-conspirators began carrying out their conspiracy shortly after eliminating the Navieras/NPR capacity.

182.  By spring 2002, NPR was history along with its ships that had been the primary source

of excess capacity and aggressive rate-cutting on the Puerto Rico route.  Defendants and their co-

conspirators universally acclaimed this abrupt and very substantial reduction in capacity as the

key to higher rates and profits for Sea Star, Horizon, Crowley and Trailer Bridge.  At the same

time, the defendant carriers and their co-conspirators used NPR's demise to implement their

agreement to allocate customers, sales volumes and market shares, control, limit and manipulate capacity, rig bids and fix, maintain and increase prices.

183.  Shortly after the April 24, 2002 Park Hotel meeting, Horizon's Kevin Gill and Sea Star's Peter Baci met at a Horizon corporate apartment in Charlotte to discuss price increases, including that rates needed to increase by 10% per year across the board.  Gill and Baci also discussed the need to generate additional revenue by, among other things, raising the bunker fuel surcharge ("BSC") and/or eliminating exceptions, as well as increasing rates for refrigerated containers and for FAK (freight all kinds) cargo shipments.  Horizon later announced an immediate 10% increase in its tariff rates after Navieras/NPR was liquidated, and similarly increased contract rates by 10% as customers' old agreements with NPR expired.  This was the same 10% rate increase that Sea Star's Baci and Horizon's Gill discussed as the target at their April 2002 meeting.

184.  Horizon and Sea Star also agreed to split 50/50 (based on the number of containers) "blue water" container shipments from "southeast" ports, i.e., Jacksonville and Port Everglades, to Puerto Rico.  Shortly after the April 2002 Park Hotel meeting, during a meeting in Jacksonville, defendant Leonard Shapiro told Baci that Shapiro had met with Horizon's Gabe Serra and that Sea Star and Horizon had agreed to divide the Puerto Rico trade 50/50.  As discussed below, Shapiro met with Horizon's Gabe Serra in Dallas in June 2003 and confirmed this market allocation agreement.

### 2.   Defendants and co-conspirators sought to equalize and stabilize market shares for the Puerto Rico trade lane.

185.  Based on his work for defendant Saltchuk and co-conspirator Totem Ocean, defendant Leonard Shapiro was familiar with the Alaska trade lane, which was characterized by relatively

equal and stable market shares. In connection with the Puerto Rico trade lane, Shapiro told Peter

Baci and others that the Puerto Rico route should be more like Alaska where Saltchuk/Totem

Ocean and Horizon had equal and stable market shares. Saltchuk/ASG's Bob Magee made the

same point regarding Totem Ocean's and Horizon's equal and stable Alaska market shares in an

August 19, 2005 email to Horizon's Chuck Raymond and Saltchuk's Mark Tabbutt to assure

Horizon that Sea Star would be "responsible" on rates if it added a third ship to its Puerto Rico

service.

186. All or most of these same executives were actively involved in meetings and

discussions regarding the Saltchuk/Sea Star-Horizon market allocation agreement for equal and

stable market shares on the Puerto Rico route. For example, Horizon's CEO Chuck Raymond

brought Tom Cowan, who had held senior positions with Horizon on the West Coast, back from

retirement as a "consultant" to facilitate communications on Puerto Rico. At the same time,

Cowan was working as a paid consultant for Saltchuk and Totem Ocean, and attended meetings

(and was reimbursed by Totem Ocean for related expenses) that related to the Puerto Rico trade

route even though Totem Ocean operated exclusively on the Alaska route. Saltchuk's Leonard

Shapiro and Bob Magee actively participated in discussions concerning the Sea Star-Horizon

capacity-sharing agreements with both Cowan and senior Horizon executives, including

Horizon's CEO Chuck Raymond and COO John Keenan. Magee also was extensively involved

in Sea Star's purchase of the Navieras/NPR assets.

**3.    Defendants and their co-conspirators carried out and furthered their
conspiracy through numerous communications and meetings.**

187. During the 2002-2003 time frame, defendant Shapiro visited Jacksonville

approximately every two months (and for several days for each visit) and met with Baci to

discuss pricing as part of the overall Sea Star pricing reviews that Shapiro conducted.  At all

relevant times, Shapiro was acting on behalf of and with the knowledge and approval of

defendant Saltchuk and co-conspirator Totem Ocean.  During a business meeting with Sea Star

customer Caribbean Shipping in Jacksonville, Shapiro provided to Caribbean Shipping his

business card, which identified Shapiro as "Principal and Director" for "Saltchuk Resources,

Inc."  Shapiro gave Baci his Seattle work and cell numbers.  Baci also had email addresses for

both Magee and Shapiro.  In February 2004, Saltchuk directed Baci to collect detailed Puerto

Rico market share information regarding vessel versus barge and Sea Star versus Horizon for a

meeting with Saltchuk.  Based on Shapiro's pointed questions and comments (*e.g.*, don't you talk

with these guys [referring to Horizon]?), Baci understood that Shapiro expected Baci to

communicate with the other carriers regarding prices for Puerto Rico shipments.  Shapiro knew

that Baci was having such communications, and at one point, instructed Baci not to tell others at

Sea Star about Baci's meetings and discussions with Horizon's Kevin Gill, an admonition that

Baci did not abide by because he frequently discussed his pricing contacts and agreements with

other carriers with his staff, including Alex Chisholm, Ed Pretre and Mike Nicholson.  During a

meeting in Jacksonville, Shapiro also told Baci that he and Horizon's Gabe Serra had agreed to

split shipments on the Puerto Rico route 50/50, and directed Baci to take steps to implement this

agreement.  At the time, Baci did not know that Shapiro and others at Saltchuk, including Bob

Magee and Mark Tabbutt, regularly met and communicated with top executives at other carriers,

including in particular Horizon's CEO Chuck Raymond, as part of the overall scheme to fix

prices and allocate customers.  In a quarterly meeting in April 2004, Magee discussed with Sea

Star management the corporate philosophy of Saltchuk and made clear that Sea Star needed to

increase its rates at least 20%. As directed by Shapiro, Baci also organized separate lunches in Jacksonville for Shapiro to meet Baci's counterparts at Crowley (Tom Farmer) and Trailer Bridge (David Miskowiec). Shapiro also met with Sea Star's Vice President of Sales Bill Stallings on at least three occasions in Jacksonville in 2001 and encouraged him to conspire with counterparts at Horizon. Sea Star recognized Shapiro's extensive work for Sea Star during this period with the Sea Star Navigator Award, which is given to those "individuals who through performance and assistance have had a positive impact on the development and growth" of Sea Star Line.

188.   In carrying out the conspiracy, peers typically dealt with peers. Saltchuk's Magee often dealt with Horizon's CEO, Chuck Raymond, and Raymond dealt with Saltchuk's Magee, Mark Tabbutt and Leonard Shapiro as well as Crowley's Tom Crowley. For example, in a June 17, 2003 handwritten note (on Totem Ocean letterhead), Magee sent Raymond a recap for each carrier's Puerto Rico volumes to help track "actuals" against the agreed to allocations. Magee explained that the figures were derived from publicly available sources (PIERS) "and manipulated as honestly as possible." Top executives at the defendant and co-conspirator carriers met and communicated throughout the conspiracy, including to address issues flagged by their subordinates. For example, in May 2003, as directed by Horizon's Chuck Raymond for his meeting with Tom Crowley, Jr. during the week of May 5, Kevin Gill prepared a list of actions that Crowley had taken that cost Horizon business on the Puerto Rico route, including instances where Horizon's ability to raise rates even higher was affected. Likewise, Frank Peake of Sea Star (who previously worked for Horizon) often met and communicated with Horizon's Gabe Serra in furtherance of the conspiracy. Serra also acted as a conduit to pass on information

regarding Horizon's conspiratorial contacts with others. For example, as part of the negotiation of the Horizon-Sea Star capacity sharing agreement, Serra told Sea Star that Horizon's CEO Chuck Raymond had contacted Saltchuk's Bob Magee. Sea Star's Peter Baci's usual contacts in furtherance of the conspiracy included Kevin Gill and Greg Glova at Horizon, Tom Farmer at Crowley and David Miskowiec at Trailer Bridge.

189.   Meetings and communications in furtherance of the conspiracy took place at three basic levels, with interaction among the levels as necessary. At the day-to-day level, Horizon's Kevin Gill and Greg Glova regularly met and communicated by phone and email with Sea Star's Peter Baci and Crowley's Tom Farmer, with Baci often acting as the primary contact with Farmer. If there were issues that could not be resolved at this level, the topics were elevated to the next level—Gabe Serra (Horizon), Frank Peake (Sea Star) and Rob Grune (Crowley)—or if necessary to the top level—Mark Tabbutt, Bob Magee and Leonard Shapiro (Saltchuk/Sea Star), Tom Crowley, Jr. (Crowley) and Chuck Raymond (Horizon)—for discussion and agreement.

190.   If Baci had a problem with Horizon that he could not resolve with Gill or Glova, he discussed the situation with Frank Peake so Peake could resolve the issue with Gabe Serra or others at Horizon. For example, at one point, Sea Star's share of southeast container shipments dropped to 46% compared with 54% for Horizon. At the time, a large military contract was up for bid, and Baci asked Glova to allow Sea Star to win the award to bring the Sea Star-Horizon shares back to 50/50 balance. When Glova refused, Baci raised this with Peake, and Sea Star submitted the winning bid. Similarly, if Horizon's Gabe Serra had issues that he could not resolve with Sea Star's Frank Peake, Serra passed these on to Chuck Raymond to discuss with Saltchuk/ASG's Bob Magee.

191.  By 2003, as part and in furtherance of the conspiracy, Baci and Gill spoke on the phone two to three times per week and also emailed pricing and other information to each other using both office and hotel computers.  Starting in or about 2003, Baci and Gill set up and used personal Gmail accounts for many of their conspiratorial emails to make it more difficult to trace these communications.  Baci's Gmail alias was Lighthouse123 (_lighthouse123@gmail.com_) while Gill (and later Greg Glova) used Ann Clark (_southorange@gmail.com_ or _annclark@gmail.com_).  Baci often sent blind copies of his emails to Gill to his boss, Frank Peake, until Peake told Baci not to do so any longer.

192.  Horizon's Raymond likewise communicated often with top executives at Saltchuk, Totem Ocean and Crowley.  For example, on December 11, 2003, Raymond sent a handwritten letter (with Raymond's notation "Please read and destroy") to Horizon trade lane managers to report on the assurances Raymond had received in recent discussions with Saltchuk regarding the ongoing role of defendant Leonard Shapiro in the management and operation of defendant Sea Star:

> I had a recent discussion with Saltchuk folks, telling me Len Shapiro is moving from an employee of [Totem Ocean] to the Board of Saltchuk–sort of like Ed Trout did several years ago.
>
> I was reassured this has no impact whatsoever on their Corporate pricing philosophy.  Also, Saltchuk will buy out Matson's piece (20%) of Sea Star in March and Len will serve on the Sea Star Advisory Board which will be set up at that time.

193.  In a July 26, 2005 email to Gabe Serra, Horizon's CEO Chuck Raymond summarized the discussion he had that same day with Saltchuk's Bob Magee in Washington, D.C. (most likely when both attended a Maritime Cabotage Task Force meeting) regarding Saltchuk's plan

to add a third Sea Star ship on the Puerto Rico route. Raymond told Magee that he "was concerned that the good progress that has been made in the [Puerto Rico] trade could be at risk going forward. [Magee] said whatever we need to do is split the benefits as we go forward. I said that made sense. No other comments were made."

194.   Thereafter, on August 8, 2005, Sea Star's Frank Peake sent Horizon's Gabe Serra an email stating that the Saltchuk Board had approved a third Sea Star ship for the Puerto Rico route.

195.   In an August 19, 2005 email to Raymond (with a copy to Saltchuk's Mark Tabbutt), Saltchuk/ASG's Bob Magee assured Raymond that Sea Star would be "responsible" on rates if it added a third ship to its Puerto Rico service. In his October 14, 2005 email to Tabbutt and Magee, Raymond referred to Horizon as a "loyal long-term customer" of Saltchuk. Raymond also reminded Tabbutt and Magee of the positive impact of the conspiracy for Sea Star (and Saltchuk), stating: "Over the period from May 2002 through today the Puerto Rico trade has stabilized and been well served. Thereafter, on October 26, 2005, Saltchuk's Mark Tabbutt and Bob Magee met with Horizon's Chuck Raymond and John Keenan (Horizon's COO) in Ponte Vedra, Florida, and agreed to extend the Sea Star-Horizon capacity sharing agreement for 2006. As directed by Saltchuk, Sea Star also quickly withdrew its third ship (*El Faro*) from the Puerto Rico route and chartered the ship to the Military Sealift Command to transport materials to Kuwait.

196.   Subsequently, Raymond sent a November 17, 2005 email to Cowan regarding Horizon's negotiations with Sea Star to extend their capacity sharing agreement. At the time, Sea Star had outlined plans to add an extra ship to the Puerto Rico route. Raymond felt that this

would undermine the agreement to control and limit capacity that had enabled all carriers to

significantly increase prices on the Puerto Rico route even as volumes declined. Raymond

explained to Tom Cowan, the dual Horizon and Saltchuk/Totem Ocean "consultant" who helped

deal with Mark Tabbutt, Bob Magee, Frank Peake and others at Saltchuk/Sea Star on the

agreement to share, limit and control capacity, that Sea Star's plan was very different from the

situation during the summer of 2005 when Horizon had temporarily added a fourth ship (*Horizon*

*Fairbanks*) on the Alaska route because Sea Star's suggestion to add capacity to the Puerto Rico

route required shifts in market shares among carriers, stating:

> When we deployed the HORIZON Fairbanks into Alaska as a 4th vessel it was for
> a very limited duration–only about 11weeks that represented a true peak in market
> need. There was no required shift in market share. We handled just enough cargo
> (actually at a net loss–as this was also a time when bunkers peaked) to make sure
> there was no cargo backlog in the trade. Had we not made the call we ([Totem
> Ocean] and Horizon Lines, Inc.) would collectively have backed up 1008 loads
> that would have eroded carrier support and supported add'l capacity by others.
> Contrast this to [Sea Star] who admit they will require a market share shift to
> 'make it work.' This is not a productive strategy for the trade and will trigger
> traditional and historical price pressures from other carriers in the trade. This has
> always happened in the PR trade and I don't see any reasons why it would not be
> any different this time.

Raymond further noted that Horizon had explained its view both to Sea Star and to Mark Tabbutt

and Bob Magee at Saltchuk/American Shipping Group.

197. Raymond's contacts with his counterparts at other Jones Act carriers included 2008

meetings to discuss the idea that Horizon would end service from Port Elizabeth and Houston to

Puerto Rico, and offer service only from Jacksonville. This included Raymond's driving to

Aspen, Colorado with Tom Crowley, Jr., and a related ski outing in Aspen during February 2008.

Shortly thereafter, Raymond had similar conversations with Saltchuk's Mark Tabbutt in Renton,

Washington and/or Anchorage, Alaska when Raymond visited Alaska in mid-February for the

Iditarod sled dog race.  Subsequently, Raymond, Crowley and Bob Magee all attended the
April 9, 2008 Transportation Institute board of directors meeting at the Army and Navy Club in
Washington, D.C.  Raymond also discussed this potential reduction in service with Kevin Gill.
Gill asked Raymond whether he had concerns about competing carriers taking advantage of this
and offering services on the lanes that Horizon vacated.  Raymond responded that two weeks ago
he had spent six hours with Tom Crowley during a Colorado ski outing and later met with
Saltchuk's Mark Tabbutt.  Gill noted that "[t]his was Chuck's way of telling me that he has
covered that issue with our competitors and there will be an understanding that they should go
along with our plan (or will go along with our plan)."

198.  Raymond previously suggested that Horizon buy Sea Star.  On April 19, 2007,
Raymond advised other Horizon executives (Serra, Urbania, Taylor, Handy and Zuckerman) that
Raymond had spoken with Saltchuk's Tabbutt twice on April 18-19, and that "they (Saltchuk
Board) responded they have no interest in selling SEST."

199.  Raymond also used his subordinates at Horizon to communicate information to
Horizon's co-conspirators in furtherance of the conspiracy.  For example, on February 26, 2003,
Horizon's "consultant" Tom Cowan called Kevin Gill and asked for information, including Sea
Star's rates for Wal-Mart and Walgreen's and the impact Sea Star rates had on Horizon's rates
for the same customers.  Based on the nature and timing of the request (*i.e.*, Cowan said to email
him the information which he needed by early morning on February 27), Gill concluded Cowan
was meeting with Saltchuk/Sea Star in Seattle on February 27.  This was confirmed the next
morning when Chuck Raymond stopped by Gill's office and asked whether Cowan had called

Gill. When Gill said he had heard from Cowan and passed on the requested information,

Raymond said "Good. I wanted Tom to pass that along to our friends in Seattle."

200.  On February 28, Cowan called Gill and said he, in fact, met with Saltchuk's Bob

Magee (and possibly Leonard Shapiro, based on Gill's contemporaneous summary of his

conversation with Cowan).  Among other things, Saltchuk said that Horizon was pushing too

hard on its bunker fuel cost surcharge, and that Horizon should put more of the increase in base

rates which the carriers would not have to give back to customers if fuel costs later dropped.

Cowan also told Gill that Saltchuk's Magee was aware of the situation with Walgreen's and

Wal-Mart and that there was not much more he could do "other than make sure these old

practices (pricing like NPR) would stop."

201.  During this same February 28, 2003 conversation with Gill, Cowan said that there had

been a discussion during a golf outing in Puerto Rico a couple weeks earlier that included

Horizon's John Keenan and Gabe Serra as well as Saltchuk's Robert Magee and possibly another

person to discuss rate and trade practice issues.  Later that same day, Serra told Gill that he

needed to set up another meeting in mid-March in Florida and that Serra was going to discuss

this with both Cowan and Raymond.

202.  Serra also had frequent conversations and meetings with Frank Peake regarding rates

once Peake took over as Sea Star's president.  Serra and Peake were friends from the time when

Peake had worked at Horizon.

203.  Likewise, in or about May 2005, Baci and Gill, using their alias Gmail accounts,

exchanged and agreed on pricing (including separate prices for 40' and 45' containers) for

shipments to Puerto Rico from multiple Nestlé locations including Modesto, California,

Allentown, Pennsylvania, Dunkirk, New York, Mechanicsburg, Pennsylvania and Union City, Georgia.

204. Baci met at least twice with Gill or Glova to discuss "Yield Plans" (*i.e.*, pricing and profit plans) for the upcoming year. The first meeting was in 2005 at the Hyatt Hotel at the Orlando, Florida airport. The second was in or about September 2007 at the World Golf Village near St. Augustine. Baci also had reviewed the 2004 Sea Star Yield Plan with Gill, and had agreed to several steps to increase rates and related charges (often referred to collectively as accessorials), including agreements to reduce and eliminate exceptions to the BSC, to increase the Port Security Charge ("PSC") from $30 to $50 per container effective April 1, 2004, to increase FAK tier rates by 10% effective May 15, 2004, and to increase refrigerated container rates by $300 per container effective September 1, 2004.

205. In or about December 2006, Baci and Frank Peake of Sea Star met in Orlando with Horizon's Gabe Serra and Greg Glova to discuss the 2007 Sea Star Yield Plan, and agreed to higher port security charges as well as higher rates for refrigerated containers. The participants also spent considerable time discussing their capacity sharing agreement.

206. Peake, Baci, Serra and Glova also met in Orlando in August 2006, and discussed the 50/50 market allocation agreement, and in particular how it applied to refrigerated containers (often referred to as "reefers"). Because historically Horizon had more than a 50% share of reefer shipments, Horizon's view was that the 50/50 split applied to the overall number of containers and, therefore, no downward adjustment in its reefer share was necessary. Peake agreed to keep each company's share as is.

207. Peake, Baci, Serra and Glova also met on October 24, 2006, at the Hyatt at the Orlando airport (Orlando was a convenient location for Serra because of direct flights to and from San Juan). The attendees exchanged and discussed lists of allocated customers as well as names of contested accounts which Sea Star also referred to internally as its "who shot John" list. In connection with this meeting, Horizon's Sam Raymond sent an "urgent" fax to Greg Glova at the Hyatt Orlando Airport Hotel on October 24, with 2006 JOC/PIERS data for Horizon, Sea Star, Crowley and Trailer Bridge along with handwritten notations regarding each carrier's identified customers and market shares. Sea Star also faxed pricing information to Peake and Baci at the Hyatt for use in this meeting.

208. During 2006, Baci also reached agreements with Crowley and Trailer Bridge on higher rates for used car shipments and with Crowley for a 10% increase for NIC (not in container) shipments. On March 18, 2006, Crowley (Farmer) also forwarded to Sea Star (Baci) Crowley's new FAK (freight all kinds) rates. In or about March 2006, Crowley also gave Horizon its new, 8-9% higher prices for multiple Kraft locations, including Bethlehem and Fogelsville, Pennsylvania, Hurlock, Maryland, Winchester, Virginia and Indianapolis.

209. Although the Horizon-Saltchuk/Sea Star market allocation agreement did not expressly include Crowley, both Sea Star and Horizon had ongoing contacts with Crowley to discuss and agree on pricing and bids for specific customers and groups of customers. Baci's contact at Crowley to discuss pricing and agreements to increase rates and rig bids was Tom Farmer. Baci and Farmer knew each other from the many years when Baci worked at Crowley, including a period when Farmer reported to Baci. Initially, Baci discussed rates for used-car shipments with Farmer. With the August 2005 arrival of Robert E. ("Rob") Grune as the Senior

Vice President and General Manager for Crowley's Puerto Rico/Caribbean Liner Services

Division, the quantity and quality of Baci's contacts with Farmer increased, including

agreements on increased rates and surcharges for specific customers. Farmer also was aware of

the Horizon-Sea Star pricing agreements and knew that if Crowley increased prices, Horizon and

Sea Star would not undercut the higher prices. Baci and Farmer also agreed to higher fuel

surcharges and port security charges. Crowley also implemented an intermodal fuel surcharge

after Baci discussed this with Farmer. Before Grune took over as Crowley's General Manager

for Puerto Rico, Crowley was always informed of Sea Star-Horizon rate increases, and after

Grune became General Manager, Crowley consistently adopted the Sea Star-Horizon rate hikes.

210. Shortly after Grune took over as Crowley's Senior Vice President and General

Manager for Puerto Rico, Horizon's Kevin Gill sent an update to Gabe Serra noting that Grune

had told his VP Pricing that he needs to be more aggressive because "Crowley needs to be more

willing to give up some volume for [the] sake of higher rate increases"; that Crowley will go

with a $300/container increase on all future reefer contracts; that 10% is the minimum price

increase threshold; and that Crowley was okay with a 5-day reduction in customer payment

terms whenever Horizon makes this move. In April 2006, Glova reported to Serra and others at

Horizon that "Grune was expected to bring a bottom lines earnings approach to the trade" and

that "[s]o far Grune has shown good discipline in this regard. More to be done." Serra added

that "Grune has been in place for almost a year, and the positive signals have been followed up

by more responsible actions at the negotiating table."

211. Crowley's Rob Grune and Horizon's Gabe Sera met on a regular basis to discuss the

status of the conspiracy and to address and resolve any issues that were flagged by their

subordinates.  Serra and Grune met several times in Florida and Puerto Rico when Grune visited

San Juan or Serra was in Jacksonville, including in April 2006 (San Juan), July 2006 (San Juan),

January 2007 (San Juan), and late March-early April 2008 (Orlando).  At a meeting in late 2007,

in response to Serra's comments, Grune said that Crowley would be more "responsible" (*i.e.*,

keep rates higher).

212.  Serra knew that Grune also was having discussions in furtherance of the conspiracy

with Sea Star's Frank Peake.  For example, in 2008, Peake told Serra that Grune had called

Peake to raise issues about Serra and Horizon's rates.  As a result, Grune, Peake and Serra agreed

to meet on April 1, 2008, at a golf course outside Orlando to iron out any differences.  They

chose a golf course to address Grune's concerns for secrecy.  As discussed more fully below, this

planned golf meeting did not go forward because Grune and Serra met on or about March 31 at a

Starbuck's in Orlando to discuss each other's concerns.

213.  During 2007, Crowley, Sea Star and Horizon agreed that Crowley's rates for

transporting refrigerated containers by barge would not be more than $300 per container below

the Sea Star and Horizon reefer rates.

214.  As reflected in Baci's notebooks, Baci exchanged pricing information with Crowley

(Tom Farmer), Horizon (Kevin Gill and Greg Glova) and Trailer Bridge (David Miskowiec) for

numerous shippers, including by way of example T.J. Maxx, Payless, Bumblebee, Plaza Foods,

Aqua Gulf, Western Hay, Sears, ATEC, Johnny Fruits, Mr. Price, Toys-R-Us, Footstar, Home

Depot and Procter & Gamble.  These price exchanges and related agreements not to bid on or to

provide purposely high cover bids on each other's accounts were facilitated by personal

relationships.  Crowley's Tom Farmer and Sea Star's Frank Peake were friends.  Farmer and Trailer Bridge's David Miskowiec were friends from when Miskowiec worked for Crowley.

215.  Horizon's Greg Glova also prepared extensive notes of his contacts with Sea Star, Crowley and Trailer Bridge to discuss bids and prices for customers and groups of customers. Glova's 2006 calendar, for example, includes dozens of entries for discussions with both Sea Star (Peter Baci) and Crowley (Tom Farmer).

216.  Crowley's Tom Farmer also discussed rates with other carriers before Grune became Crowley's General Manager for Puerto Rico in or about August 2005.  For example, in late 2004, Farmer called Sea Star's Peter Baci to discuss Farmer's rate philosophy, including an across-the-board rate increase of at least $150 for all 40- and 45-foot containers.

217.  Serra's contacts with the other Jones Act carriers in furtherance of the conspiracy continued right up to the point in April 2008 when the Justice Department and FBI executed search warrants.  For example, on January 30, 2008, Frank Peake, Peter Baci and Greg Glova met in New York City.  Serra planned to attend but was not able to because of a family emergency.  Sea Star (Peake and Baci) and Horizon (Serra and Glova) also met in Orlando on February 20, 2008.  Serra also met with Saltchuk's president Tim Engle in Puerto Rico shortly before the FBI raids.  Likewise, Horizon's John Keenan had planned to meet with Crowley's Rob Grune in Dallas on the evening of the same day (April 17, 2008) the search warrants were executed.  Saltchuk's President, Tim Engle, also met with Crowley's Rob Grune in Fort Lauderdale, Florida, on or about April 12, 2008.

218.  Baci's contact at Trailer Bridge to discuss pricing and agreements on rate increases was David Miskowiec.  As with Crowley's Tom Farmer, Miskowiec and Baci knew each other

from the time when they worked together at Crowley. Baci reached agreements with Miskowiec for higher used car rates and for increased fuel surcharges, and also discussed pricing for specific customers, including Anthem. Crowley's Tom Farmer also told Baci that Farmer discussed pricing with Miskowiec.

219. At least one of the conspirators had misgivings about the unlawful agreements and discussions. During his 2003 annual review with Gabe Serra (at the Park Hotel in Charlotte on or about February 27), Horizon's Kevin Gill told Serra that Gill was "very uncomfortable" with his role in "these competitive issues" and told Serra that he "wanted out" and wanted to "focus on the Marketing side of the business and not be in the information exchange program." Serra said that he would give this some thought. In fact, nearly two years later, in December 2005, Greg Glova took over as Horizon's Marketing and Pricing Director for the Puerto Rico Division and Gill moved to Vice President-Marketing. To insure an orderly transition for communications in furtherance of the conspiracy, Gill introduced his successor, Greg Glova, to Sea Star's Peter Baci at a meeting at the Lodge Alley Inn in Charleston, South Carolina. Gill previously had summarized the agreements with other carriers as part of Glova's transition as Gill's successor. In this connection, Gill offered to introduce Glova to Crowley's Tom Farmer, but Glova contacted Farmer directly. Subsequent to the Lodge Alley Inn meeting, Baci and Glova also met at the Holiday Inn in Charleston and spent several hours discussing pricing issues for specific customers.

### 4. Defendants and their co-conspirators agreed to allocate and rig bids to customers.

220. On June 26, 2003, Saltchuk/Totem Ocean's Shapiro met with Horizon's Gabe Serra in Dallas to discuss and clarify aspects of the conspiracy agreements. This meeting took place in

the lobby of the Omni Dallas Hotel at Park West near the airport and lasted several hours. Serra was in Texas at the time for business meetings at Horizon's operations center in Arlington, and stayed over an extra night (and switched hotels) to meet with Shapiro. Serra understood that Shapiro was acting (and authorized to act) for Sea Star. Shapiro told Serra that Sea Star and Horizon "should not go after each other rate wise," and both sides confirmed the agreement to allocate 50/50 the number of containers shipped southbound between Jacksonville and Puerto Rico (also referred to as "blue water"). Among other things, Shapiro and Serra agreed that the guiding principle for the allocation agreement was that Sea Star and Horizon would not compete on rates. At various times before and after this meeting, Shapiro gave customer names to Serra so that Horizon could submit purposely high cover bids for accounts allocated to Sea Star. Likewise, Frank Peake (Sea Star) and Gabe Serra (Horizon) exchanged information to coordinate bids to customers. In June 2005, for example, Peake emailed Serra to expect to be contacted by an existing Sea Star account. Serra assured Peake that Horizon's quote would not even be close to Sea Star's price. Likewise in a September 2005 email exchange with Serra, Peake wanted to make sure that the customer believed its price was negotiated when, in fact, it was the result of collusion.

221. As noted above, at one point, Sea Star's share of southeast container shipments dropped to 46% compared with 54% for Horizon. At the time, a large military contract was up for bid, and Baci asked Glova to allow Sea Star to win the award to bring the Sea Star-Horizon shares back to 50/50 balance. When Glova refused, Baci raised this with Peake, and Sea Star submitted the winning bid.

222. To facilitate and carry out their agreements to control and manipulate capacity, to allocate customers, rig bids and maintain and increase prices, defendants and their co-conspirators routinely exchanged lists of customer contracts and renewal dates so that they knew when to discuss and agree on bids to customers as their contracts came up for renewal. For example, on June 28, 2006, Horizon faxed to Sea Star (Peter Baci) a five-page list of Horizon customers with current contract start and expiration dates as well as the minimum quantity commitments for each account. Thereafter, in February 2007, Sea Star's Peter Baci sent Horizon's Greg Glova a log of Sea Star customer contracts and exceptions that were the subject of subsequent discussions and pricing agreements. Likewise, on or about March 18, 2008, Sea Star gave Horizon a list of the Top 100 southbound accounts that included handwritten notations (e.g., "HL") that identified customers, including Kraft/Nabisco, that defendants and co-conspirators had allocated to particular carriers. Similarly, on or about September 21, 2006, Crowley gave Horizon a eleven-page list of Crowley customers from the "CMT PR Contract Database" that included detailed information for Crowley customers, including the start and original and current expiration dates for each customer's contract as well as the control location for each customer's purchasing decisions (i.e., U.S. mainland or Puerto Rico). Horizon also prepared an October 17, 2006 list of Top 100 southbound accounts with handwritten notations identifying how each customer was allocated, including HL, SS, CMT Shared, Tier and Barge, which again identified Kraft as allocated to Horizon.

223. The defendant and co-conspirator carriers typically agreed to have the existing carrier submit pricing first to customers to establish a floor so that the other carriers could protect the incumbent by submitting higher cover bids. The discussions among defendants and co-

conspirators to allocate customers, rig bids and fix prices were pervasive and included virtually every major contract for literally hundreds of shippers, including plaintiffs Kraft and Kellogg.

224. The overall agreement among Horizon, Sea Star, Crowley and Trailer Bridge to allocate customers and not to compete based on price for each other's existing accounts included what Baci, Chisholm and others at Sea Star referred to as "Hall of Fame" or "house" accounts. As part of the conspiracy, Sea Star and Horizon exchanged information regarding upcoming responses to customers' bid requests so that Sea Star could submit purposely high cover bids for Horizon customers and Horizon could do the same for Sea Star customers. As part of this customer allocation scheme, the defendant and co-conspirator carriers also carried out sham negotiations with customers to convey the false impression of competition.

225. By way of example, Baci and Glova communicated on the telephone during the Walgreen's reverse auction to coordinate bids at each step of the on-line auction. Before the auction, Baci and Glova had agreed to keep their respective shares at 50/50. Because the bidding was for 40' and 45' containers, they agreed to coordinate pricing and bids so that each carrier would get the entire Walgreen's volume for a particular sized container (*e.g.*, one would get all of the 40' cargo and the other all the 45' shipments). Notwithstanding the Sea Star-Horizon concerted efforts to rig the bids, Walgreen's awarded all the volume to Horizon. However, Horizon agreed to make Sea Star whole for the lost volume (roughly 20 loads/week) by buying slots from Sea Star. In addition, for the following year, Baci told Walgreen's that Sea Star would not participate in its auction. Baci provided this same information to Horizon's Greg Glova before he advised Walgreen's.

226.  Defendants and co-conspirators also discussed situations if one carrier inadvertently bid too close to the incumbent.  For example, in an October 23, 2006 email to Sea Star using his Gmail account Horizon's Glova explained how Horizon had mistakenly bid $15 less than Sea Star at an account allocated to Sea Star (Western Hay) and also too close on the all-in price for forty-foot containers ($1795 v $1810).  Glova advised how Horizon would deal with the customer to protect Sea Star and support a price increase, noting: "We will hold firm at our $1795, so you can go below and get your position back, while still getting an increase.  We haven't quoted on the 45' [container]."

227.  Defendants and co-conspirators also gave each other guidance on how prices could be increased further.  For example, Sea Star (Peter Baci) gave Horizon (Greg Glova) a spreadsheet with Sea Star's proposed pricing for Procter & Gamble.  In an January 28, 2006 email (using their Gmail alias accounts), Glova advised Baci that Sea Star was $150 below Horizon for a 40-foot container "so you have more room to bring up" Sea Star's rate.  At the same time, Glova asked Baci to "relook" at Sea Star's price to P&G-Fairburn, Georgia because Sea Star was $50 lower than Horizon which was the primary carrier for this location.  Glova also noted that both Horizon and Sea Star generally had increased P&G's rates by 10% and that Horizon would "hold firm" to allow Sea Star to successfully raise rates.

228.  Crowley participated in similar discussions and agreements to coordinate and rig bids to allocate customers.  For example, on November 26, 2007, Horizon's Greg Glova sent Crowley (most likely Tom Farmer) an email stating, in part:  "The following is a list of info that I need for upcoming contracts.  Would like to know your current and proposed rates please.  The most urgent is your current and proposed Frito/Pepsi rates.  Please advise what you need from me."

The identified accounts identified who was the incumbent (and designated "lead") carrier for each customer. Examples include Con Agra "believe you [Crowley] are the lead"; Goya "realize that you are done, but wanted to confirm rate levels, so we don't go too far"; Masterfoods/Mars "we are the lead here. Attached is my current and proposed rates"; Matosantos "believe you are the lead. Please advise current and proposed [rates]; Suiza Dairy "believe you have the lead"; B. Fernandez "we are the lead. Have you made offer yet? If so, please advise." The recap also included handwritten notations for Kraft and ATEC. Glova sent a similar request to Sea Star on December 4, 2007, using his Gmail account.

229.  In 2007, Crowley gave Horizon its pricing for the upcoming Kraft contract renewal, including prices for multiple Kraft locations (e.g., Bethlehem PA, Chicago, Norcross GA and Winchester VA), with a detailed breakdown including base rate, bunker and intermodal fuel surcharges and port and security charges.

230.  Sea Star's Peter Baci acted as intermediary for three-way exchanges among Sea Star, Crowley (Farmer) and Horizon (Glova) for bids and pricing for multiple Baxter locations (both southbound and northbound) in January 2006.  Both Baci and Glova used their Gmail alias accounts for these exchanges.

231.  The communications to allocate customers and rig bids were frequent and very detailed. For example, as part of the October-November 2006 bids to Nestlé, Crowley (Farmer) gave Horizon (Glova) detailed information regarding the pricing Crowley submitted for multiple Nestlé locations (e.g., Allentown and Mechanicsburg PA, Dunkirk NY and Modesto CA) for both dry and refrigerated containers that generally increased the prices for all Nestlé locations by $150/container. Crowley and Horizon also exchanged pricing data to rig bids for shipments by

Kimberly-Clark (Chester PA and Graniteville SC) so that Horizon could increase its pricing by $75 to $125/container and cover Crowley's bids.

232. Crowley's bid rigging continued in 2007 and 2008. In April 2007, in response to Horizon's request, Crowley provided pricing information for upcoming bids for multiple accounts and locations, including U.S. Salt (Watkins Glen, New York), Hill's Pet Food (Richmond, Indiana), Kraft (Winchester, Virginia), Bacardi (numerous locations) and Grande. On November 13, 2007, Crowley (Farmer) and Horizon (Glova) also discussed pricing and bids for multiple customers, including CompUSA, Rainbow Apparel and Coke. On or about December 1, 2007, Crowley gave Horizon detailed information regarding its pricing for ATEC, including a breakdown with base rate, BAF and other charges. In addition, Crowley gave Horizon its 2007 and proposed 2008 pricing for an account in Fairburn, Georgia (most likely Nestlé or Procter & Gamble), including Crowley's 12.5% increase for 2008 (from $2555 to $2875/container). Crowley also exchanged pricing information to rig bids for shipments by Procter & Gamble's Fairburn, Georgia and Mehoopany, Pennsylvania locations.

233. On or about March 31, 2008, Grune and Serra met at a Starbuck's in Orlando to discuss rate issues as well as various customers. The discussions included Kraft and Nestlé, which Horizon claimed Crowley "stole" in 2007, and Burger King that Crowley said Horizon had taken. Grune and Serra also discussed bunker fuel surcharges, including for Nestlé. After this meeting, on April 1, 2008, Serra emailed Grune market share data for Horizon and Crowley to make the point that Horizon simply wanted to get back the share it had lost.

234. Co-conspirator Baci personally handled many of Sea Star's contacts with Horizon, Crowley and Trailer Bridge to exchange and agree on pricing. Baci had meetings and

discussions in furtherance of the conspiracy with a variety of personnel at other carriers including Tom Farmer at Crowley, David Miskowiec at Trailer Bridge and Kevin Gill and Greg Glova at Horizon. Many of these meetings and discussions took place in Jacksonville or elsewhere within the Middle District of Florida. Baci also instructed his pricing managers—including Alex Chisholm, Ed Pretre and Mike Nicholson (all of whom worked at Sea Star's Jacksonville headquarters)—what rates should be provided to specific accounts as Baci had agreed upon with the other defendant and co-conspirator carriers. In this connection, Baci instructed his pricing managers at Sea Star to submit purposely high and non-competitive pricing and bids to accounts that were allocated to other defendant and co-conspirator carriers. Gill and Glova had similar communications with the Horizon pricing managers—Karen Haines, Adriano Conti and Thomas Lorenzo—to allocate customers and rig bids.

### 5. Defendants and their co-conspirators agreed to fix, increase and maintain fuel cost and other charges.

235. As part of their overall conspiracy, defendants and co-conspirators Horizon, Crowley, Sea Star and Trailer Bridge agreed to and did fix, increase and maintain fuel cost and other surcharges and fees at inflated levels. For example, in its December 19, 2011 Plea Agreement, Sea Star admitted that it participated in a "combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services from at least as early as May 2002 until at least April 2008." Horizon made the same admission as part of its guilty plea.

236. Baci also reached agreements with the other defendant and co-conspirator carriers to increase accessorial charges. For example, Baci and Horizon's Glova often agreed to increase the intermodal fuel surcharge ("IFC") for particular customers. Sea Star began breaking out the

IFC as a separate charge only after first discussing this change with Horizon. Sea Star later packaged its various surcharges as a "total accessorial charge" to make the amounts of the individual surcharges (and the fact that the carriers were increasing these in lockstep) less transparent.

237. Sea Star, Crowley and Horizon had extensive discussions regarding the amounts charged to customers as fuel cost surcharges (also referred to as "bunker adjustment factor," "BAF," or "BSC"), including agreements on when and how much to increase these charges. Horizon's CEO Chuck Raymond was especially interested in fuel charges, and pressed Kevin Gill to increase the BAF for Puerto Rico, which prompted references to Raymond as a "Bunker Bulldog." Sea Star, Crowley and Horizon usually agreed that one carrier would take the lead in announcing a higher BSC and others followed with identical (or nearly so) increases.

238. At one point, Sea Star's Baci and Horizon's Glova agreed to charge a different BAF for each leg of the Puerto Rico route so Horizon could charge a higher BAF on longer legs (e.g., Port Elizabeth to San Juan) while Sea Star and Horizon charged the same BAF on the Jacksonville-San Juan leg.

239. If one carrier increased its BAF and the others did not follow, the lead carrier followed up to get the others to impose similar increases. For example, in August 2005, Sea Star was reluctant to match Horizon's BAF increase. When Gill was unable to get Sea Star to go along with the increase, Gill elevated the issue to Serra and Sea Star subsequently matched the Horizon increase.

240. If need be, top executives also got involved to facilitate BAF increases. For example, Horizon's Greg Glova reported to Gabe Serra and Chuck Raymond that Crowley and Trailer

Bridge had both matched Horizon's announced BAF increase effective mid-May 2007.  At the same time, Glova noted that Sea Star had not yet matched which could jeopardize the increase. Raymond forwarded Glova's recap to Saltchuk's Bob Magee, stating "Bob is this Sea Star's policy?"  Magee responded, "No, it's not.  Sea Star is reviewing the math vs the policy." Raymond replied noting that bunker fuel "prices today up to $360/ton at NY and JAX.  Bunker brokers don't see this changing."

241.  Defendants and co-conspirators agreed to increase various accessorial charges, including port security charges and intermodal fuel surcharges.  For port security charges, Horizon and Sea Star typically agreed to higher rates, which were communicated to and implemented by Crowley and Trailer Bridge.  The fuel surcharge was an artifice that defendants and their co-conspirators used to increase and maintain overall rates that had no correlation to each defendant's actual fuel and other costs, fuel type or the fuel efficiency for the particular vessels that each operated on the Puerto Rico trade route.  Typically, defendants and their co-conspirators increased their fuel cost surcharges with only a few days' notice.  Examples of such collusive fees and charges include, but are not limited to, the following.

A.  In or about May 2003, Horizon, Crowley, Sea Star and Trailer Bridge imposed a fuel cost surcharge of $225 per container.

B.  In mid-March 2005, Horizon, Crowley, Sea Star and Trailer Bridge all imposed a fuel cost surcharge of $280 per container effective the first week of April.  Thereafter, in mid-April, all increased this surcharge to $310 per container.

C.  In late June 2005, Horizon, Crowley, Sea Star and Trailer Bridge once again uniformly increased their fuel cost surcharges to $340 per container, effective mid-July.

All carriers subsequently increased this surcharge to $375 per container effective mid-September 2005.

D.   In late July and again in August 2006, Horizon, Crowley, Sea Star and Trailer Bridge further increased their fuel cost surcharge by $15 per container on each occasion. The increases were effective between late July and early September 2006.

E.   Horizon, Crowley, Sea Star and Trailer Bridge uniformly increased their fuel cost surcharges by approximately $25 per container effective mid-May 2007.

F.   Effective in early April 2003, Horizon, Crowley, Sea Star and Trailer Bridge imposed a "security" fee per container.

G.   Effective in February-March 2003, Horizon, Sea Star and Trailer Bridge imposed a $40 per container terminal handling fee.

242.  All the defendants and their co-conspirators participated in and actively furthered and supported an overall *per se* unlawful agreement to allocate customers, sales volumes and market shares, control, limit and manipulate capacity, rig bids and fix prices for shipping services by, among other things, agreeing not to use their Jones Act-qualified vessels to serve additional routes.

243.  Revenue from fuel surcharges for all defendants and their co-conspirators significantly exceeded any actual increases in fuel costs.

244.  As part of its global requests for proposals for shipping services, Kraft Foods included a bunker adjustment formula for quarterly fuel cost adjustments.  While all or most open ocean carriers accepted and adopted this formula for Kraft's shipments, during the conspiracy period, all Jones Act carriers (*i.e.*, defendants and their co-conspirators) refused to accept the Kraft

formula. In 2010, only after their *per se* unlawful scheme had been publicly disclosed, carrier

defendants finally agreed to accept the Kraft BAF formula.

>    6.    **Defendants and their co-conspirators agreed to and did ensure that compliance with the conspiracy could be monitored and trued-up as necessary.**

245. PIERS was a valuable tool for the conspirators to monitor and enforce their

conspiratorial agreements. Though sometimes incomplete (and not in real time), PIERS

provided a big picture view of shipment volumes by carrier (typically including size, weight and

type of container and cargo type and value) and by route that the conspirators used to monitor

for, detect and resolve any deviations from the agreement whether unintentional or purposeful

cheating. Defendants and co-conspirators routinely exchanged JOC/PIERS data with

handwritten notations and adjustments to track allocated and actual volumes for each carrier.

Baci and others also used frequent updates from sales personnel to monitor for and detect any

anomalous pricing, which Baci typically included in a "who shot John" list that he shared with

superiors, including Frank Peake, to include in discussions with other carriers, in particular

Horizon's Gabe Serra. Baci and his staff also developed "slap strategies" to identify other

carriers' accounts to be targeted if another carrier strayed from the conspiracy or mistakenly

targeted Sea Star accounts. In this same connection, Baci instructed his sales personnel to

maintain contacts at other carriers' allocated accounts as an implied threat that Sea Star would

retaliate for any departures from the customer allocation or other agreements.

246. As part of and in furtherance of the conspiracy, defendants and their co-conspirators

also agreed on true-ups to compensate for volume or customers that switched carriers. For

example, after the 2007 Walgreen's on-line auction where Horizon received 100% of the volume

despite the agreement and efforts to split the volume 50/50 with Sea Star, Horizon's Greg Glova

prepared a "Sacrificial Lamb List" of Horizon accounts (*e.g.*, Baxter, Ace, Office Max, Del

Monte, Bumble Bee) that Horizon was prepared to shift to Sea Star to compensate for the lost

Walgreen's volume.  In his related talking points, Glova noted situations where Horizon's

pricing was undercut and "I never retaliated," and that "[i]f share gets out of whack, we'll

adjust."  Glova further noted concessions that Horizon had made to benefit Sea Star, including a

military contract where Horizon gave Sea Star 500 loads per year and ATEC's shipment of 500

refrigerated containers per year where "we [Horizon] stayed away," allowing Sea Star to get the

ATEC business.  Co-conspirators Frank Peake (Sea Star) and Gabe Serra (Horizon) ultimately

agreed on compensation for Walgreen's.  Likewise, in January 2007, Baci sent Glova (with a

blind copy to Frank Peake) an analysis of the northbound shares for Sea Star (approximately

40%, according to Baci) and Horizon.  Baci noted that need to discuss and agree on a true-up,

stating: "When we meet next week we need to review this and agree on a corrective course of

action."

### D.    Defendants and Their Co-Conspirators' Conspiracy Artificially Increased and Maintained Rates

247.  As a result of their conspiracy, including agreements to control, limit and manipulate

capacity and to maintain and increase prices, defendants and their co-conspirators were able to

increase and maintain prices for shipments on the Puerto Rico trade route.

248.  For example, Baci understood that Sea Star and the other defendant and co-conspirator

carriers were able to increase prices because of the conspiracy, and that as a result of these

agreed-to rate and other price increases, Sea Star was profitable as early as 2003.  This is

confirmed by the fact that between 1Q2003 and 3Q2007, as a result of conspiratorial rate

117

increases (and agreed to BSC increases), Sea Star's NTV (net to vessel) increased nearly $800 per container or over 45%. Sea Star's and its co-conspirators' financial success is more remarkable because starting as early as 2005, the volume of shipments to Puerto Rico steadily declined because of the deteriorating economy in Puerto Rico that significantly reduced discretionary income and related consumer purchases.

249. Additionally, in an August 4, 2004 *Journal of Commerce Online* article, Trailer Bridge's CEO McCown stated: "It's an entirely different sector today as the effects of an improving supply/demand equation continue to roll out. We are now beginning to experience the more pronounced bottom line effect from increased rates...." This echoed McCown's comments in the May 11, 2004 *Journal of Commerce Online* touting the unqualified opinion from Trailer Bridge's new auditors and noting that "the improving supply and demand dynamics on Trailer Bridge's routes to Puerto Rico had resulted in higher freight rates and improved performance." This pattern of higher rates and inflated profits for the defendant and co-conspirator carriers continued throughout the conspiracy. As reported in *Marine Log* (March 5, 2007), McCown noted that Trailer Bridge's earnings for the fourth quarter of 2006 "are the best quarterly financial results that Trailer Bridge has reported in its history."

250. In an internal analysis of the Puerto Rico route, Horizon also noted that "[o]ur rates have shown a dramatic improvement," with RPB increasing from $2272 at the time of NPR's 2002 exit to $2687 by September 2004, an increase of $415 or more than 18%. This included a 10% ($175 per container) increase for Kraft shortly after NPR's demise.

251. Further, Valuation Research Corporation, the appraiser Horizon retained in connection with its September 2005 IPO, confirmed that Horizon's finances had improved dramatically

118

following the Navieras/NPR liquidation as market conditions "improved drastically" and rates also increased as old contracts with unfavorable rates expired.

252.  Defendants and their co-conspirators' conspiracy was successful despite a significant decline in the Puerto Rico economy that began as early as 2005 and continued for the remainder of the conspiracy and that resulted in a significant decline in the volume of containers shipped on the Puerto Rico route.  As reported in the *Journal of Commerce* (January 22, 2007), container volume on the Puerto Rico dropped 8-12% for 2006 while rates increased over 5%.  This was just the opposite of the pre-conspiracy era when rates consistently fell despite significant annual increases in container volumes.  Between 1994 and 2002, rates fell by roughly 30% because of excess capacity at the same time the container volume increased nearly 15%.  Absent the conspiracy, defendants' consistently higher rates in the face of this significant and persistent downturn in volume would be contrary to the economic self-interest of each carrier.

253.  With NPR's demise and the unlawful scheme with Sea Star, Crowley and Trailer Bridge in place, Horizon Lines was able to impose a series of general rate increases.  Horizon's revenue from general rate increases was $16,700,000 in 2004 and thereafter increased to $42,345,000 in 2005, $44,443,000 in 2006 and $51,578,000 in 2007, before falling off to $29,918,000 in 2008 when the Justice Department's raids interrupted the conspiracy.  Horizon and its co-conspirators were able to impose and sustain these substantial rate increases notwithstanding significant decline in the volume of containers shipped on the Puerto Rico route.

254.  Once the conspiracy had been uncovered, however, co-conspirator Horizon recognized that it could not sustain the financial success it had achieved during the conspiracy.  The Justice Department executed search warrants and served grand jury subpoenas on April 17, 2008.  A

week later—on April 25—Horizon revised downward substantially its financial projections for 2008, stating that "its revenue and earnings were not sustainable." When asked about this downgraded forecast, Horizon Lines LLC's President, John Keenan, explained that Horizon had decided to be "less aggressive" in setting rates. Similarly, in a related press release Horizon CEO Raymond noted that the outlook for Puerto Rico was now "somewhat softer than we had originally anticipated." More recently, unlike the relentless rate increases and controlled capacity that permeated the conspiracy period, in the July 23, 2010 press release and conference call for its second quarter 2010 earnings, Horizon lamented the downward pressure on rates (and earnings) because "vessel capacity was added to the Puerto Rico tradelane by a competitor in the second quarter," referring to the direct service from Philadelphia that Sea Star launched in April 2010 using its own ship rather than the Horizon-Sea Star capacity-sharing arrangement during the conspiracy where Sea Star shipped containers on Horizon ships from Port Elizabeth.

255. With Navieras/NPR's demise and the start of the conspiracy, defendants greatly expanded their already extensive commercial relationships. Sea Star, which along with Horizon was the prime mover in removing Navieras/NPR's excess capacity from the market, was short of capacity for shipments from Jacksonville to San Juan. Sea Star was buying up to 400 FEUs (*i.e.*, each FEU is the equivalent of a standard 8-foot by 8-foot by 40-foot container) from Horizon as well as additional capacity from Crowley and Trailer Bridge. Likewise, Crowley, which provided the tug boats for Trailer Bridge's tug-barge operations, chartered a barge from Trailer Bridge for the Puerto Rico route.

## VIII.  Offenses Charged

256.  As set forth in detail above, which allegations are incorporated by reference and repeated here, beginning at least as early as May 2002 and continuing until at least April 2008, defendants and their co-conspirators engaged in a continuing combination, conspiracy and agreement to allocate customers, sales volumes and market shares and to control, limit and manipulate capacity, rig bids and fix, maintain and raise prices for maritime cabotage liner services for shipments between the U.S. mainland and Puerto Rico.  Defendants' and their co-conspirators' horizontal combination and conspiracy are a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

257.  Defendants and their co-conspirators' combination and conspiracy consisted of a continuing understanding, agreement and concerted action by and among each defendant and co-conspirator, the material terms of which included:

   A.  To fix, raise and maintain prices for maritime cabotage liner services for shipments between the U.S. mainland and Puerto Rico;

   B.  To allocate customers, sales volumes and market shares for maritime cabotage liner services for shipments by plaintiffs and others between the U.S. mainland and Puerto Rico;

   C.  To control, limit and manipulate capacity for maritime cabotage liner services for shipments by plaintiffs and others between the U.S. mainland and Puerto Rico;

   D.  To rig bids to provide maritime cabotage liner services for shipments by plaintiffs and others between the U.S. mainland and Puerto Rico; and

E.   To affirmatively conceal the existence of their illegal understanding and agreement.

258.   As set forth above, defendants and their co-conspirators engaged in a variety of acts to facilitate the formation, implementation, operation, enforcement and concealment of their combination and conspiracy, including the following.

A.   Defendants and their co-conspirators exchanged and shared data regarding sales volumes and market shares and capacity for maritime cabotage liner services for shipments between the U.S. mainland and Puerto Rico to monitor and enforce adherence to their agreed upon scheme to allocate customers, sales volumes and market shares and to control, limit and manipulate capacity, rig bids and fix prices of maritime cabotage liner services.

B.   Defendants and their co-conspirators exchanged and shared data regarding prices and price increases (including fuel cost and other surcharges and fees) for maritime cabotage liner services to fix, increase and maintain prices and other rates and charges for maritime cabotage liner services between the U.S. mainland and Puerto Rico.

C.   Defendants and their co-conspirators exchanged and shared data regarding customers' requests for bids or quotations and proposed and actual bids and quotations to customers in furtherance of their overall agreement to allocate customers, rig bids and fix prices for maritime cabotage liner services between the U.S. mainland and Puerto Rico.

D.   Defendants and their co-conspirators controlled and manipulated capacity for Puerto Rico maritime cabotage liner services, including by buying and destroying or selling with use restrictions vessels engaged in providing Puerto Rico maritime cabotage liner

services, by engaging in a variety of capacity sharing agreements and by acting in concert to thwart entry and operations of new entrants and fringe carriers.

## IX.    Effects of Unlawful Conduct

259.  The purpose and effect of defendants and their co-conspirators' unlawful combination and conspiracy were to fix, raise, maintain and stabilize the prices that plaintiffs and other shippers paid for Puerto Rico maritime cabotage liner services, to deprive plaintiffs and other shippers the benefit of free and open competition in their purchases of maritime cabotage liner services, and to restrain, suppress and eliminate competition for maritime cabotage liner services by, *inter alia*:

A.  Fixing, raising, maintaining, stabilizing  and otherwise manipulating prices (including fuel cost and other surcharges and fees) and rigging bids for Puerto Rico maritime cabotage liner services;

B.  Allocating customers, sales volumes and market shares for Puerto Rico maritime cabotage liner services;

C.  Restricting, delaying or preventing entry by other firms or acquiring firms engaged in providing Puerto Rico maritime cabotage liner services; and

D.  Controlling, manipulating and limiting capacity for Puerto Rico maritime cabotage liner services.

## X.    Fraudulent Concealment

260.  At all relevant times, defendants and their co-conspirators engaged in an affirmative course of conduct to create and maintain the illusion of competition and to conceal their unlawful conspiracy to allocate customers, sales volumes and market shares, control and manipulate

capacity, rig bids and fix prices for cabotage shipping services, including for plaintiffs' shipments, between the U.S. mainland and Puerto Rico. Plaintiffs did not know, and through the exercise of due diligence (which they exercised) could not have known, about the existence of the conspiracy because the nature of defendants and their co-conspirators' unlawful conduct was self-concealing and because defendants and their co-conspirators engaged in affirmative and deceptive acts to conceal the conspiracy.

261. As purchasers of Puerto Rico maritime cabotage liner services, Kraft Foods, Kellogg and other shippers sought competitive prices for the maritime cabotage liner services they purchased, and understood and believed that defendants' and their co-conspirators' prices for maritime cabotage liner services were honestly and independently determined, regardless whether bid or negotiated. Plaintiffs did not know, and through the exercise of due diligence (which they exercised) could not have known, that defendants' prices, bids and quotations were rigged and substantially inflated pursuant to defendants and their co-conspirators' unlawful agreement. At all relevant times, plaintiffs exercised due diligence by, among other things, seeking competitive and independently determined prices from defendants and co-conspirators for Puerto Rico cabotage shipping services. Plaintiffs only learned of defendants' wrongful conduct as a result of the public disclosures concerning the execution of search warrants and service of grand jury subpoenas on or about April 17, 2008, and the subsequent guilty pleas in the criminal antitrust proceedings brought by the Justice Department's Antitrust Division, as described above. Given defendants and their co-conspirators' pervasive and affirmative acts to conceal their wrongdoing, plaintiffs did not know, and could not have known, about the

existence of the conspiracy prior to the April 2008 public disclosures concerning the Justice Department's investigation.

262.  Defendants and their co-conspirators' agreement to allocate customers, rig bids and fix prices and their related meetings and communications were by their very nature self-concealing and not discoverable by plaintiffs through the exercise of reasonable diligence.

263.  Defendants and their co-conspirators' conspiracy could not have survived absent secrecy. Plaintiffs sought competitive and independently determined prices for the Puerto Rico cabotage shipping services they purchased and used. If plaintiffs had known of the conspiracy and how it increased prices for Puerto Rico cabotage shipping services, they would have refused to buy those services at artificially inflated prices.

264.  For the purposes of forming, implementing, carrying out, enforcing and concealing their illegal combination and conspiracy, defendants and their co-conspirators—including officers and employees of the corporate defendants and co-conspirators—participated in a series of secret meetings and communications (including the routine use of a dedicated email system with alias user names) where prices and price increases (including fuel and other surcharges and fees), requests for bids or quotations by customers and the allocation of customers, sales volumes and market shares and the control and manipulation of capacity as well as affirmative acts and methods to conceal defendants' and their co-conspirators unlawful agreements were discussed and agreed upon.

265.  At all relevant times, defendants and their co-conspirators affirmatively concealed the existence of their illegal combination and conspiracy through affirmative and deceptive acts and thereby tolled the statute of limitations. At all relevant times, plaintiffs reasonably relied on

defendants' affirmative acts of concealment including their fraudulent responses to requests for

quotations for cabotage liner services as well as their false and pretextual explanations for the

reasons for and amounts of increases in rates, fuel cost adjustments and other fees and charges.

Plaintiffs did not discover, and could not have discovered, defendants' unlawful conduct at an

earlier date because defendants and their co-conspirators consistently engaged in affirmative and

fraudulent acts to conceal the existence of their combination and conspiracy from plaintiffs and

others by various acts and practices, including the following.

     A.   Defendants and their co-conspirators conducted secret meetings and discussions

in order to confine and limit knowledge of their unlawful combination and conspiracy to a

discrete group of individuals and to make it more difficult to detect their conspiratorial

communications.  Defendants and co-conspirators, including Baci, Gill and Glova, opened

and used personal email accounts under fictitious names (*e.g.*, Lighthouse123

(*lighthouse123@gmail.com* for Baci and Ann Clark (*southorange@gmail.com* or

*annclark@gmail.com*) for Gill and Glova) to conceal their identities that they routinely

used to exchange bid and pricing data in furtherance of the conspiracy.  Co-conspirator

Glova also regularly used another non-Horizon email account (*g_glova@yahoo.com*) for

conspiratorial communications.  Likewise, co-conspirator Tom Farmer of Crowley typically

used his personal Yahoo email account for conspiratorial communications.  Defendants also

acquired and used disposable "burner" personal cell phones to communicate with each

other as part of and in furtherance of the overall conspiracy, and co-conspirator Gill

charged the cost of his phone as a customer lunch.  Defendants and their co-conspirators

also created false and misleading business records to conceal their unlawful conduct.  Sea

Star's Baci, for example, typically combined his in-person meetings with other carriers' personnel with a legitimate purpose, such as a customer meeting, so that he could use the legitimate purpose on his expense reports.

B.  Defendants and their co-conspirators secretly coordinated the day-to-day conduct of the conspiracy, such as agreements and decisions to allocate customers, sales volumes and market shares, agreements to control and manipulate capacity and agreements regarding bids, quotations or prices for specific customers or transactions. As part of this active concealment, defendants and co-conspirators used code names to refer to each other when exchanging pricing and other data used to fix prices and rig bids. For example, "freight forwarder friend" was Peter Baci or Sea Star, "market" referred to Sea Star or Crowley and "barge" to Crowley. The clandestine and secretive nature of defendants' conduct is confirmed by the fact that the Justice Department was able to compile information regarding the existence and operation of the conspiracy only by conducting a lengthy covert investigation with the active assistance and cooperation of one or more insiders.

C.  Defendants and their co-conspirators as well as executives of corporate defendants and co-conspirators routinely and consistently deleted and destroyed records and notes of the conspiratorial discussions, meetings and agreements to conceal their unlawful conduct.

D.  Defendants and their co-conspirators acted affirmatively to avoid creating or maintaining written records of their conspiratorial agreements and communications. Examples include:

    i.   Charles Raymond's December 11, 2003 letter, prominently marked *"Please read and destroy,"* summarizing his recent discussions with Saltchuk regarding defendant Leonard Shapiro's move from TOTE to the Saltchuk board and Saltchuk's related assurances that this "has no impact whatsoever on their Corporate pricing philosophy."

    ii.  Co-conspirator Kevin Gill (Horizon) routinely removed address headers from emails to conceal that they were exchanged with other carriers to allocate customers, rig bids and fix prices. Gill also double deleted emails exchanged in furtherance of the conspiracy and regularly destroyed other materials that implicated him in unlawful conduct.

    E.  Defendants' and their co-conspirators' destruction of incriminating evidence continued unabated even as the Justice Department executed search warrants and grand jury subpoenas in April 2008. As described above, both co-conspirators Baci and Chisholm engaged in admitted acts to obstruct justice. Baci, for example, directed Chisholm to shut down the dedicated email system that was used for communications in furtherance of the conspiracy. Likewise, Chisholm used his home computer to access a remote server to delete and destroy data that was prepared and maintained in the course of and in furtherance of the conspiracy.

    F.  Defendants and their co-conspirators created false and misleading travel and expense reports to conceal their conspiratorial meetings. Sea Star's Peter Baci, for example, coordinated his face-to-face meetings with Horizon's Gill and Glova with

legitimate activities such as customer calls to conceal the fact of meetings in furtherance of the conspiracy.

G.   Defendants and their co-conspirators submitted prearranged rigged bids to plaintiffs and other shippers to create the false and misleading impression that bids were honest, competitive and independently determined.

H.   Defendants and their co-conspirators falsely and fraudulently represented to plaintiffs and others that their bids, quotations and prices for Puerto Rico maritime cabotage liner services were honest, competitive and independently determined.

I.   Defendants and their co-conspirators submitted sham bids and price quotations for Puerto Rico maritime cabotage liner services to mislead plaintiffs and other customers into believing that bids, quotations and prices were honestly and independently determined.

J.   Defendants and their co-conspirators agreed to rotate taking the lead to announce increases in rates, surcharges and fees to create, and maintain and convey to plaintiffs and other shippers the misleading and false impression that rates, surcharges and fees were independently and honestly determined.

K.   Defendants and their co-conspirators provided false and misleading explanations for the reasons for increases in prices and rates, including, in particular, fuel costs and other surcharges and other fees. For example, when customers questioned rate increases and suggested they might be the result of collusion, Sea Star's Baci denied collusion, and said that the price increases were to cover higher costs and so that Sea Star could re-invest in its business.

L.   Defendants and their co-conspirators created and used documents that were formatted and/or encrypted to conceal additional incriminating documents and data, including pricing data provided by co-conspirators in furtherance of the collusive scheme to rig bids to plaintiffs and other shippers.

M.   Defendants and their co-conspirators used various contractual commitments, including but not limited to non-disparagement and confidentiality provisions, to prevent former employees from disclosing information regarding their *per se* unlawful agreements to allocate customers, rig bids and fix prices.

N.   Defendants and their co-conspirators categorized and combined accessorial charges in different ways in order to conceal their coordinated increases for these charges.

266.   At all relevant times, defendants and their co-conspirators' affirmative acts of concealment were intended to conceal the existence of their unlawful conspiracy from plaintiffs and others.  At all relevant times, plaintiffs were unaware, and had no reason to be aware, of defendants and their co-conspirators' unlawful agreement and acts of concealment.

267.   Because of these acts of concealment, plaintiffs did not have knowledge of defendants and their co-conspirators' antitrust violations, or of any facts that might have led plaintiffs (or a reasonable shipper in plaintiffs' position) to discover defendants' antitrust violations prior to the public disclosures concerning the execution of search warrants and service of grand jury subpoenas on or about April 17, 2008, and the subsequent guilty pleas in the criminal antitrust proceedings brought by the Justice Department's Antitrust Division, as described above.  Prior to those disclosures, plaintiffs were not aware of any facts that should have alerted plaintiffs (or would have alerted a reasonably diligent shipper in plaintiffs' position) of the need to investigate

whether defendants were engaged in an unlawful conspiracy. Plaintiffs only became aware of the details of the conspiracy alleged in this complaint as a result of the disclosures in the criminal proceedings and based on subsequent settlement and cooperation agreements with co-conspirators Serra, Baci, Gill, Glova and Chisholm.

268. Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct has tolled the statute of limitations on plaintiffs' claims. In addition, under 15 U.S.C. § 16(i), the statute of limitations is suspended because of the Justice Department's criminal prosecution of Sea Star, Horizon, Crowley, Peake and others as part of its ongoing criminal investigation, during the pendency of those proceedings and for one year thereafter.

XI.    **Injury to Plaintiffs**

269. During the relevant period, plaintiffs purchased substantial amounts of Puerto Rico maritime cabotage liner services directly from one or more of the defendants. As a result of defendants' *per se* unlawful combination and conspiracy, plaintiffs were compelled to pay, and paid, prices for Puerto Rico maritime cabotage liner services that were substantially greater than what they would have paid but for defendants' illegal conduct. The full amount of plaintiffs' damages will be calculated after discovery and upon proof at trial.

XII.    **Injunctive Relief**

270. Defendants and their co-conspirators have engaged in a persistent and continuing pattern and practice of *per se* unlawful conduct that is likely to recur unless each is permanently enjoined from engaging in such unlawful conduct in the future.

XIII.    **Prayer for Relief**

WHEREFORE, plaintiffs request the Court to:

A.   Enter a judgment declaring that the foregoing combination and conspiracy, and the acts in furtherance thereof, were an unlawful restraint of interstate commerce in violation of Section 1 of the Sherman Act;

B.   Enter a judgment in favor of plaintiffs and jointly and severally against all defendants for treble the amount of the jury verdict and for attorneys' fees and costs and prejudgment interest as provided for in Section 4 of the Clayton Act;

C.   Enjoin each defendant from continuing the unlawful conduct alleged herein, and from entering into any other combination, conspiracy or agreement having similar purposes or efforts; and

D.   Enter, and retain jurisdiction to enter, such further orders as may be necessary or appropriate to remedy the injury to plaintiffs or as the Court deems appropriate.

Respectfully submitted,

John C. Taylor, Jr.
Trial Counsel
Florida Bar No. 125100
jct@taylordaylaw.com
Latasha A. Garrison-Fullwood
Florida Bar No. 180602
lgf@taylordaylaw.com
TAYLOR, DAY, GRIMM, BOYD & JOHNSON
Bank of America Tower
50 North Laura Street, Suite 3500
Jacksonville, FL 32202
(904) 356-0700
(904) 356-3224 Fax

John F. Kinney
(Trial Counsel)
James T. Malysiak
Richard P. Campbell
Shaun M. Van Horn
Stephen R. Brown
JENNER & BLOCK, LLP
353 North Clark Street
Chicago, IL 60654-3456
(312) 222-9350
(312) 527-0484 Fax
*jkinney@jenner.com*
*jmalysiak@jenner.com*
*rcampbell@jenner.com*
*svanhorn@jenner.com*
*stephenbrown@jenner.com*
**Counsel for Plaintiffs***

DATED: October 29, 2012

*Motions *pro hac vice* will be filed under Local Rule 2.02 for out-of-state counsel