UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ARROWPAC INCORPORATED, et al.,

      Plaintiffs,

v.                                     CASE NO.:   3:12-cv-1180-TJC-JBT

SEA STAR LINE, LLC, et al.

      Defendants.
......................................................../

MONDELÉZ INTERNATIONAL, INC. et al.,

      Plaintiffs,

v.                                       CASE NO:   3:12-cv-1181-TJC-JBT

SEA STAR LINE, LLC, et al.

      Defendants.
......................................................../

WALGREEN CO., et al.,

      Plaintiffs,

v.                                     CASE NO:   3:12-cv-1182-TJC-JRK

SEA STAR LINE, LLC, et al.

      Defendants.
......................................................../

HOME DEPOT U.S.A., INC., et al.,

      Plaintiffs,

v.                                     CASE NO:   3:12-cv-1183-TJC-MCR

SEA STAR LINE, LLC, et al.

      Defendants.
......................................................../

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ ii

MOTION TO DISMISS PURSUANT TO RULES 12(B)(1) AND 12(B)(6) BY
    DEFENDANT SEA STAR LINE, LLC ...............................................................1

INCORPORATED MEMORANDUM OF LAW IN SUPPORT OF MOTION ...........................1

MOTION SUMMARY ..................................................................................................1

NATURE OF THE CASE ...............................................................................................4

ARGUMENT ...............................................................................................................6

    A.    The Filed Rate Doctrine Bars Plaintiffs' Private Antitrust
        Damages Claims .........................................................................................6

        1.    The STB Has Jurisdiction Over All Cabotage Rates,
            Including Rates Set by Contract ................................................. 6

        2.    The Filed Rate Doctrine Prohibits Judicial Review of
            Rates Which Are Subject to Agency Regulation ..................................... 15

        3.    The Nonjusticiability Strand of the Filed Rate Doctrine
            Requires Dismissal of Damages Claims Requiring
            Judicial Rate-Making ................................................................. 19

        4.    Plaintiffs' Contracts with Sea Star and Other Carriers of
            Puerto Rican Cabotage Do Not Create Private Rights of
            Action for Damages Under the Sherman Act .......................................... 20

        5.    The Filed Rate Doctrine Does Not Bar Government
            Antitrust Enforcement Actions, Only Private Damages
            Claims ...................................................................................... 27

        6.    The Ninth Circuit's Ruling and Analysis in In re
            Hawaiian & Guamanian Cabotage Antitrust Litigation
            Supports Dismissal of the Plaintiffs' Claims ........................................... 29

        7.    The Filed Rate Doctrine Is Dispositive of All Damages
            Claims Raised by Plaintiffs' Several Complaints ..................................... 32

B.     The *Arrowpac, Home Depot,* and *Mondeléz* Plaintiffs' Claims for Injunctive Relief Fail Under the Filed Rate Doctrine and for Lack of Standing ................................................................................................. 33

        1.     Plaintiffs Lack Standing to Obtain Injunctive Relief Because They Fail to Allege Injury-in-Fact ............................................................. 33

        2.     The Filed Rate Doctrine Bars Plaintiffs' Claims for Injunctive Relief ....................................................................................................... 35

C.     The *Arrowpac* and *Mondeléz* Complaints Fail to State a Claim For Relief Because They Violate the Pleading Standards of Rule 8 ................................................................................................................. 36

CONCLUSION ..................................................................................................................... 36

CERTIFICATE OF SERVICE ............................................................................................. 37

### MOTION TO DISMISS PURSUANT TO RULES 12(B)(1) AND 12(B)(6) BY DEFENDANT SEA STAR LINE, LLC[1]

Sea Star Line, LLC ("Sea Star"), pursuant to Local Rule 3.01 and Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), requests that the Court dismiss the complaints filed in each of the above-styled actions in their entirety for the following reasons which are discussed in the incorporated Memorandum of Law:

1. Plaintiffs' damages claims allegedly arising under section 1 of the Sherman Act (whether for alleged tariff rate or contract rate overpayments) are barred as a matter of law by the filed rate doctrine;

2. The *Arrowpac*, *Home Depot* and *Mondeléz* Plaintiffs lack standing under Article III of the United States Constitution to obtain injunctive relief because they have not pled an injury-in-fact; and

3. The complaints in the *Arrowpac* and *Mondeléz* actions do not comply with the requirement of Rule 8(a), Federal Rules of Civil Procedure, that a claim for relief must be a "short and plain statement" of the grounds for the court's jurisdiction and the basis for the Plaintiffs' alleged entitlement.

### INCORPORATED MEMORANDUM OF LAW IN SUPPORT OF MOTION

### MOTION SUMMARY

Plaintiffs' claims for antitrust conspiracy damages arise out of their alleged purchases of ocean freight shipping between the United States mainland and Puerto Rico ("Puerto

---

[1] Defendant Sea Star Line, LLC files this Motion to Dismiss under multiple captions for the convenience of the Court and not to indicate to the Court that it agrees that these cases should be substantively consolidated.

Rican Cabotage") from May 2002 to April 2008.   The term "cabotage" means water transportation between states, United States territories, or United States possessions.[2] Cabotage is also called the "noncontiguous domestic trade" or the "domestic offshore" trade.[3]

In sum, Plaintiffs allege the rates they paid for Puerto Rican Cabotage were higher than rates they would have paid but for the alleged antitrust conspiracy.

The "filed rate" doctrine bars Plaintiffs' claims.   The filed rate doctrine requires a court to refrain from setting rates (in the form of damage awards) where a government agency with special competency and authority exists for the purpose of regulating those rates. Here, the United States Surface Transportation Board ("STB") was delegated authority by Congress, through the Interstate Commerce Commission Termination Act of 1995 (the "ICCTA"),[4] to regulate the rates for Puerto Rican Cabotage and to ensure those rates are reasonable.   The STB has exclusive authority to review rates, to modify unreasonable rates, and to order reparations to a shipper when the rates charged by a carrier are unreasonable. The STB does so through its complaint process.

Cabotage can be purchased from a carrier such as Sea Star in either of two ways— through a private carriage contract, or through published "tariff" rates.

---

[2] *See* 49 U.S.C. § 13102(17); *see also Gov't of Terr. of Guam v. Sea-Land Serv., Inc.,* 2001 WL 1436500, at *1 n.1 (S.T.B. 2001) ("*GovGuam 2001*").

[3] *See GovGuam 2001*, at *1.

[4] Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (codified at 49 U.S.C. § 101 *et seq.* (1995)).

Plaintiffs allege that the shipping rates contained in their private carriage contracts are beyond STB regulation and therefore the filed rate doctrine cannot bar their antitrust damage claims.   But, by statute, and as shown in the *GovGuam* decisions, *infra*, the STB has jurisdiction over all cabotage rates, including contract rates.   Consequently, the fundamental principle underlying the filed rate doctrine—the nonjusticiability of rates regulated by an agency—prevents the court from engaging in rate-making and operates to bar antitrust damage claims arising even out of Plaintiffs' contract-based cabotage purchases.   This is especially so in these cases because Plaintiffs do not allege that the contract rates they paid exceeded the filed tariff rates or that the tariff rates were unlawful.

If Plaintiffs claim their contracts have been breached, their express remedy, by federal statute, is a contract action in state or federal court – not federal antitrust actions for treble damages.

To the extent Plaintiffs allege their damages arise out of tariff-based purchases, such damage claims are also barred by the filed rate doctrine under longstanding precedent.

Additionally, Plaintiffs' claims for injunctive relief must be dismissed because Plaintiffs have not alleged any actual, ongoing, or imminent injury that could be remedied by issuing an injunction against Sea Star or any other defendant.   Rather, Plaintiffs' claims for injunctive relief seek, essentially, a guarantee of lower future rates for Puerto Rican Cabotage and, consequently, Plaintiffs' claims for injunctive relief are also barred by the filed rate doctrine.

## NATURE OF THE CASE

Sea Star is a water carrier authorized under the Jones Act[5] to provide Puerto Rican Cabotage.   (*Arrowpac* Compl., ¶¶ 168-171; *Home Depot* Compl., ¶¶ 93-96; *Mondeléz* Compl., ¶¶ 84-90; *Walgreen* Compl., ¶¶ 5(A), 20, 24)  Among its provisions, the Jones Act limits the noncontiguous domestic trade to vessels which are owned by United States citizens and registered in the United States.  *See* 46 U.S.C. § 55102(b).

Plaintiffs assert claims under section 1 of the Sherman Act arising from an alleged price fixing conspiracy in Puerto Rican Cabotage during the period from May 2002 to April 2008.   Plaintiffs assert that the alleged conspiracy caused them to pay inflated rates, surcharges and other fees to Sea Star and other providers of Puerto Rican Cabotage and they seek pre-trebled damages in the amount of those alleged rate, surcharge, and fee overpayments.  (*Arrowpac* Compl., ¶¶ 366-368; *Home Depot* Compl., ¶¶ 171-173, 184-187; *Mondeléz* Compl., ¶¶ 1, 154, 269; *Walgreen* Compl., ¶¶ 1, 56, 59, 60)[6]

Plaintiffs also allege that they (or their affiliates) entered into contracts with "one or more of the Defendants," or "Defendants and/or their co-conspirators," to purchase Puerto Rican Cabotage, and that such contracts expressly waived "**Plaintiffs'** rights and remedies under Section B of the ICCTA, including **their right** to file complaints with the Surface Transportation Board ('STB')." (*Arrowpac* Compl., ¶ 58; *Mondeléz* Compl., ¶ 15; *Walgreen*

---

[5] 46 U.S.C. § 55102(b) (originally enacted as part of The Merchant Marine Act of 1920).

[6] "Port-to-port" rates are those that do not involve the services of an inland U.S. rail or motor carrier.  *See GovGuam 2001*, at *1.  The complaints appear to challenge only Sea Star's port-to-port rates.

Compl., ¶ 12; (emphasis added))[7]   The *Arrowpac* complaint quotes from one of the contracts that "CARRIER and SHIPPER further expressly and irrevocably waive **their** respective rights to challenge the foregoing waiver of rights and remedies."  (*Arrowpac* Compl., ¶ 58 (emphasis added))

Each complaint alleges that as a consequence of this contract waiver language, the STB has "no regulatory authority" over the contracts or the rates and charges thereunder. (*Arrowpac* Compl., ¶ 58; *Home Depot* Compl., ¶¶ 12, 16; *Mondeléz* Compl., ¶ 15; *Walgreen* Compl., ¶ 12)

The complaints do not allege that the rates any Plaintiff actually paid were higher than the filed tariff rates then in effect for Puerto Rican Cabotage.  Nor do the complaints allege that the Plaintiffs ever challenged the filed tariff rates as being unreasonable or unlawful.

The *Arrowpac*, *Home Depot* and *Mondeléz* Plaintiffs also seek to enjoin Sea Star and other defendants from ongoing or future violations of the antitrust laws.  (*Arrowpac* Compl., "Relief Sought" ¶ (C); *Home Depot* Compl., "Prayer for Relief" ¶(d); *Mondeléz* Compl., "Prayer for Relief" ¶ (C))  The complaints do not allege that a conspiracy is continuing.

---

[7]   The *Home Depot* complaint alleges that the contracts waived "all rights and remedies under Section B of the Interstate Commerce Commission Termination Act . . . ." (*Home Depot* Compl., ¶¶ 12, 16)

## ARGUMENT

**A.     The Filed Rate Doctrine Bars Plaintiffs' Private Antitrust Damages Claims**

### *1.     The STB Has Jurisdiction Over All Cabotage Rates, Including Rates Set by Contract*

#### *Historical regulation of carrier rates*

Beginning in the early twentieth century, the noncontiguous domestic trade was regulated by the Shipping Act of 1916[8] and later by the Intercoastal Shipping Act of 1933.[9] These statutes required water carriers to publish their rates for port-to-port shipping and file them with the Federal Maritime Commission ("FMC") in the form of "tariffs," and prohibited carriers from charging shippers rates other than those set forth in the tariffs.[10]

This regulatory oversight largely mirrored the oversight of rail and motor carrier rates which began with enactment of the Interstate Commerce Act (the "ICA") in 1887.  *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 126-136 (1990) (general discussion of rail and motor carrier regulation under the ICA).   Under the ICA, any

---

[8] SHIPPING ACT OF 1916, 46 U.S.C. §§ 801-842 (repealed 1995).

[9] INTERCOASTAL SHIPPING ACT OF 1933, 46 U.S.C. §§ 843-850 (repealed 1995).

[10] 46 U.S.C. § 817 (repealed 1995); *see also Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 760 F. 2d 1347, 1361 n.8 (2d Cir. 1985) (noting that the Shipping Act created the United States Shipping Board whose functions were later transferred to the United States Shipping Board Bureau, to the United States Maritime Commission, to the Federal Maritime Board and, finally, to the FMC). Beginning in 1961, certain specialized cargoes were exempted from tariff requirements through a series of amendments to the Shipping Act which are now incorporated into the tariff exemption for "bulk cargo, forest products, recycled metal scrap, waste paper, and paper waste."  *See* 49 U.S.C. § 13702(a)(1); *see also* H.R. CONF. REP. No. 98-600 at 38-39 (1984).

agreement between a carrier and a shipper to a rate other than a tariff rate was unenforceable. *Id*. at 126-127.

The congressional purpose of this tariff requirement and FMC oversight in the noncontiguous domestic trade was to ensure reasonable shipping rates in an industry in which carrier competition was limited to U.S.-owned and U.S.-flagged vessels.[11]

### *STB rate regulation after the ICCTA*

In 1995, Congress passed the ICCTA, the overall purpose of which was to deregulate the transportation industry and make it more reliant on market forces.  141 CONG. REC. H12248-12312 (1995); S. REP. NO. 104-176, at 2-13 (1995); *see also Gov't of Terr. of Guam,* 2007 WL 2457445, at *3 (S.T.B. 2007) ("*GovGuam 2007 II*").[12]

The ICCTA eliminates tariff requirements for most shipping rates for rail and motor carriers, *id.; see also* 49 U.S.C., subt. IV, pt. A, ch. 107; pt. B, ch. 137, and allows these carriers to negotiate rates with shippers. *See* 49 U.S.C. §§ 10709(a), 13703.  Congress concluded that market competition had become sufficiently robust to ensure the reasonableness of shipping rates among these carriers, obviating the need to ensure rate

---

[11] *See Gov't of Terr. of Guam v. Sea-Land Serv., Inc.,* 2007 WL 295310, at *8 (S.T.B. 2007) ("*GovGuam 2007 I*") (identifying high fixed costs as a feature of the noncontiguous domestic trade); *see also* 141 CONG. REC. H15600, 15601 (1995); 46 U.S.C. § 55102(b). The *Arrowpac* complaint alleges that the Jones Act restricts competition in the Puerto Rican trade by prohibiting non-U.S. carriers from competing in the market.  (*Arrowpac* Compl., ¶¶ 166-169)

[12] Deregulation of rail and motor carriers had begun more than a decade earlier with the Railroad Revitalization and Regulatory Reform Act of 1976, PUB. L. NO. 94-210, 90 STAT. 31 (1976); the Staggers Rail Act of 1980, PUB. L. NO. 96-448, 94 STAT. 1895 (1980); and the Motor Carrier Act of 1980, PUB. L. NO. 96-296, 94 STAT. 793 (1980).  *See* 141 CONG. REC. H15600-15604 (1995).

reasonableness through filed tariffs.[13]   141 CONG. REC. H12248-12312 (1995); S. REP. NO. 104-176, at 2-13, 43 (1995).

But Congress concluded that competition among water carriers in the noncontiguous domestic trade remained limited such that continuing federal regulation of rates was necessary to ensure the reasonableness of those rates.  S. Rep. No. 104-176 at 10-11, (1995); *see also GovGuam 2007 I*, at *4 (noting "[t]he purpose of rate regulation is to simulate competitive rates that will provide a reasonable return on investment").

Consequently, the ICCTA directs that all carriers "subject to jurisdiction under chapter 135 may provide transportation or service. . . in [the] noncontiguous domestic trade" only pursuant to tariffs which are published and filed with the STB (the successor to the FMC),[14]   49 U.S.C. § 13702(a)(1),[15] and in a separate section, it requires all rates in the noncontiguous domestic trade to be reasonable.  *Id.* § 13701(a)(1)(B); *see also* 49 C.F.R. §§ 1312.1-1312.16.  Carriers providing Puerto Rican Cabotage are "subject to jurisdiction under chapter 135." 49 U.S.C. § 13521(a)(1). ("The Secretary and the Board [STB] have jurisdiction over transportation insofar as water carriers are concerned . . . between a place in

---

[13] Motor carriers remain obligated to file tariffs for the movement of household goods.  *See* 49 U.S.C. § 13702(a)(2).

[14] The ICCTA abolished the Interstate Commerce Commission ("ICC") and transferred certain ICC functions to the STB.  *GovGuam 2007 I*, at *1.  It also transferred to the STB the FMC's jurisdiction over complaints challenging the reasonableness of rates in the noncontiguous domestic trade.  *Id.*; *see also* 49 U.S.C. § 13701(c), (d)(4).

[15] The statute does not require tariffs for certain types of specialized cargo, (i.e. bulk cargo, forest products, recycled metal scrap, waste paper and paper waste) which are not alleged to be at issue in these cases.  *See* 49 U.S.C. § 13702(a)(1).

a State and a place in another State, even if part of the transportation is outside the United States.").

The ICCTA vests the STB with the authority to determine the reasonableness of any rate in the noncontiguous domestic trade, and to invalidate a filed tariff that violates section 13702 or an STB regulation promulgated under the ICCTA.  *See* 49 C.F.R. § 1312.2(f).  In the congressional debate over the ICCTA, the STB's jurisdiction over the noncontiguous domestic trade was described as "residual," *see* 141 Cong. Rec. H12248-12312, at 12253 (1995); S. Rep. No. 104-176, at 1-2, 12 (1995), and the STB has described its rate-making authority in areas "subject to our jurisdiction" as "broad."  *GovGuam 2007 II,* at *3.

The ICCTA also permits water carriers and shippers to enter into private contracts whereby carriers "provide specified services under specified rates and conditions."   49 U.S.C. § 14101(b)(1).  Under such contracts, shippers and carriers may negotiate discounts or other concessions from the filed tariff rates.  *See generally, Coal Rate Guidelines, Nationwide,* 1985 WL 56819, at *4 (I.C.C. 1985) (noting that "negotiated contracts can often produce an agreement which is more advantageous both to the railroad and to the shipper than the rate we would otherwise prescribe").[16]

Only those carriers subject to the rate reasonableness requirement of section 13701(a)(1)(B) are authorized to enter into such contracts with shippers.  *Id.* §§ 13701(a)(1)(B), 14101(b)(2); s*ee also* 49 U.S.C. subtitle IV, part B, chapter 135.

---

[16] The STB relies on methodologies set forth in the coal guidelines when reviewing water carriers' rate levels for the noncontiguous domestic trade.  *See GovGuam 2007 II,* at *2 n.4.

### *The STB regulates rates through complaints from shippers, governmental authorities, competitors, and the STB itself*

The STB primarily exercises its authority to regulate rates in the noncontiguous domestic trade through a formal complaint process. *In re Hawaiian and Guamanian Cabotage Antitrust Lit.,* 450 F. App'x 685, 688 (9th Cir. 2011).

If a shipper or a water carrier believes that another water carrier's rates are unreasonable under section 13701(a)(1)(B), the shipper or carrier may file a complaint with the STB. *See* 49 U.S.C. §§ 13701(c), (d)(4); 13702(b)(6); 14701(b); *see also Trailer Bridge, Inc. v. Sea Star Lines, LLC*, 1999 WL 1133302 (S.T.B. 1999) (complaint by one carrier against another arising from alleged rate practices in the Puerto Rican trade). If the STB finds a violation, it "shall award reparations to the complaining shipper or shippers" and "make such orders as are just." 49 U.S.C. § 13701(d)(4).

A governmental authority also is permitted to pursue a complaint with the STB on behalf of shippers within its territory affected by rates asserted to be unreasonable. *Id.* §§ 13701(d)(4), 14701(b); *see also GovGuam 2001*, at *1-2. If the STB finds a violation "[u]pon complaint from any governmental agency or authority…[it] shall make such orders as are just and shall require the carrier to return, to the extent practicable, to shippers all amounts plus interest, which the Board finds to have been assessed and collected in violation of subsection (a) [requiring rates to be reasonable]." 49 U.S.C. § 13701(d)(4).

The ICCTA also gives the STB authority to "begin an investigation . . . **on [its] own initiative** . . . that a carrier . . . is violating **this part** . . ." and to take "appropriate action." 49 U.S.C. § 14701(a) (emphasis added). The term "this part" in section 14701(a) refers to part B of subtitle IV of Title 49, which includes chapter 135 and the reasonableness requirement

for all rates in the noncontiguous domestic trade provided in section 13701(a)(1)(B).  *See* 49 U.S.C. subtitle IV, part B.

In short, under the ICCTA regulatory scheme, rate filing and rate regulation, while related, are different and wholly separate for the noncontiguous domestic trade.  In one statutory provision, Congress directed that cabotage rates must be reasonable, without regard to the type of cargo (and thus without regard to whether the cargo is exempt from the requirement of a filed tariff), and it gave the STB authority "to regulate such rates and, if necessary, to prescribe applicable rates."  *In re Hawaiian and Guamanian Cabotage Antitrust Lit.*, 754 F. Supp. 2d 1239, 1253 (W.D. Wash. 2010); *see also* 49 U.S.C. § 13701(a)(1)(B), (b), (c).  In a different section of the statute, Congress required rates for certain types of cargo to be set forth in a tariff and it delegated to the STB "a different bundle of powers, namely the authority to declare that a tariff specifies an unreasonable rate or violates a filing requirement and to invalidate such tariff."  *In re Hawaiian and Guamanian Cabotage*, 754 F. Supp. 2d at 1253-1254; *see also* 49 U.S.C. §§ 13702(a)(1), (b)(6), (d).

Consequently, "[t]he separate treatment of rate regulation and rate filing indicates unequivocally that . . . Congress intended for the STB to *regulate* domestic cabotage rates, regardless of the type of cargo and irrespective of whether the rates are filed."  *In re Hawaiian and Guamanian Cabotage*, 754 F. Supp. 2d at 1254 (emphasis in original); *see also E. & J. Gallo Winery v. Encana Corp.*, 503 F. 3d 1027, 1039-43 (9th Cir. 2007) (acknowledging that an agency may regulate rates through the complaint process without mandating that rates be filed).

*The STB retains authority to review cabotage rates set by contract*

When Congress has exempted private contracts between shippers and carriers from STB jurisdiction and oversight in other trades, it has done so expressly in the ICCTA – as is the case with private contracts between shippers and **rail** carriers.[17]   *See* 49 U.S.C. § 10709(c)(1) ("[a] contract that is authorized by this section . . . **shall not be subject to this part**, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part.") (emphasis added); *see also M&G Polymers, USA, LLC v. CSX Transp., Inc.,* 2012 WL 4469326, at *7 (S.T.B. 2012) (acknowledging that "49 U.S.C. § 10709(c) removes 'all matters and disputes arising from rail transportation contracts from the Board's jurisdiction'…").

There is no corresponding exemption from STB jurisdiction in section 14101 for contracts between shippers and **water** carriers in the noncontiguous domestic trade. Reflective of the more limited deregulation of the noncontiguous domestic trade under the ICCTA, section 14101 only allows individual shippers and water carriers to waive **their** "rights and remedies" under the ICCTA pursuant to a contract—as Plaintiffs allege occurred here.  But the ICCTA does not exempt shipments at contract rates from the reasonableness provisions of part B of subtitle IV (as private rail contracts are exempted from part A) and it does not purport to allow private parties to divest the STB of its jurisdiction over rates.  49 U.S.C. § 14101(b)(1).  Section 14101(b)(1), provides in relevant part that:

---

[17] Rail carriers are subject to certain reasonableness requirements, *see* 49 U.S.C. § 10701, and (unless carriage is under an exempt contract), STB has authority to investigate allegations that a rail carrier is violating "this part," *i.e.*, part A of subtitle IV of Title 49.  *See* 49 U.S.C. § 11701.

> [A] carrier providing transportation or service **subject to jurisdiction under chapter 135 may enter into a contract** with a shipper, other than for the movement of household goods…to provide specified services under specified rates and conditions.  If the shipper and carrier, in writing, **expressly waive any or all rights and remedies under this part** for the transportation covered by the contract, the transportation provided under **the contract shall not be subject to the waived rights and remedies** and may not be subsequently challenged on the ground that it violates the waived rights and remedies.  The parties may not waive the provisions governing registration, insurance, or safety fitness.

*Id.* § 14101(b)(1) (emphasis added).  The "rights and remedies" which may be waived by the **shipper** are the right to complain to the STB about the reasonableness of an agreed-to shipping rate, *id.* §§ 13701(a)(1), (c), 14101(b)(1), 14701(b), and the right to an award of reparations by the STB in the event it finds the rate to be unreasonable.  *Id.* § 13701(d)(4).  Instead, when a shipper and water carrier enter into a private contract, "[t]he exclusive remedy for any alleged **breach of a contract** entered into under this subsection [section 14101(b)(1)] shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree."  *Id.* § 14101(b)(2) (emphasis added).

But nothing in the ICCTA prohibits the **STB** from reviewing a contract rate pursuant to its congressional mandate to ensure that the rates of all carriers "subject to jurisdiction under chapter 135" are reasonable, *id.* §§ 13701(a)(1)(B), 14101(b), and its authority to investigate rates on its "own initiative."  *Id.* § 14701(a).  Indeed, section 13541(e)(2) of the ICCTA expressly prohibits the STB from exempting a carrier or service in the noncontiguous domestic trade from the rate reasonableness requirement of section 13701(a).  *See Id.* § 13541(e)(2) ("[t]he Secretary or Board [STB], as applicable, may not exempt a water carrier from the application of, or compliance with, section 13701 or 13702 for transportation in the

13

non-contiguous domestic trade."). That section makes no exception for transportation pursuant to negotiated contracts.

Finally, the STB may also review private contract rates pursuant to an aggregate rate review when a "governmental authority" files a complaint on behalf of shippers claiming unreasonable rates in a trade like Puerto Rican Cabotage. In those instances, the STB is permitted to review all rates in the aggregate (that is, all rates charged by all carriers) in the trade, even those contained in negotiated contracts. *See Id*. § 13701(d)(4); *see also GovGuam 2007 I,* at \*1 (the Government of the Territory of Guam "challenged the reasonableness of the rates, rules, classifications and practices for **all** transportation by water . . . in the noncontiguous domestic trade to and from Guam.") (emphasis added); *GovGuam 2007 II,* at \*2, 4-5.[18] If the STB finds a trade subject to its jurisdiction lacks sufficient competitive forces, it will undertake an *ex post* review of the reasonableness of "each

---

[18] Although its complaint referenced only tariff rates, the Government of the Territory of Guam (the "Government of Guam") argued that as part of the market dominance analysis, the STB must review, *inter alia*, the "contractual and financial arrangements . . . prevailing in the Guam trade for the last 10 years," and to enable the STB to do so, the Government of Guam needed discovery as to the shippers' "**confidential contracts**" in the Guam trade. Petition for Reconsideration of the Government of the Territory of Guam at 9-11, *Gov't of Terr. of Guam v. Sea-Land Serv., Inc.,* 2007 WL 2457445 (S.T.B. 2007) (No. WCC-101). The Government of Guam noted that among other factors, STB must consider whether "collusive behavior" had distorted rates in the market. *Id.* at 9. The defendant carriers agreed that evidence of "collusive behavior" was "relevant to competition," and that evidence about "**confidential shipper contracts**" was relevant to the STB's review of whether the carriers' "actual rates" were reasonable, but not to the threshold market competitiveness inquiry. Reply in Opposition to Petitions for Reconsideration at 9-12, *Gov't of Terr. of Guam v. Sea-Land Serv., Inc.,* 2007 WL 2457445 (S.T.B. 2007) (No. WCC-101). The STB ruled in favor of the carriers, holding that "[i]f the carriers do not make that showing [of effective competition in the market], we will then examine whether, under a cost-based analysis, each carrier's aggregate rate levels are reasonable." *GovGuam 2007 II*, at \*2, 5.

carrier's aggregate rate levels," taking into account all rates charged within the trade.  *See GovGuam 2007 I,* at *4-5, *7-8; *GovGuam 2007 II,* at *2, *4-5.[19]

The inclusion of private contract rates in an STB aggregate review of the Puerto Rico trade would be essential inasmuch as an estimated 85 percent of the cargo transported in that trade was carried pursuant to private contracts as of 2006.  *Competition in the Noncontiguous Domestic Maritime Trades* (U.S. Dep't of Transp. Maritime Admin.), May 2006, at 48.

Thus, the authority to regulate all rates in the noncontiguous domestic trade, including rates set by contract, remains fully vested with the STB.

### 2.       *The Filed Rate Doctrine Prohibits Judicial Review of Rates Which Are Subject to Agency Regulation*

In 1922, the Supreme Court fashioned what is now called the "filed rate" doctrine to prohibit challenges in court to rates charged for transportation (and certain other) services if the rates were subject to regulation by an agency charged by Congress with developing and applying an expertise to regulate that industry.  *See Keogh v. Chicago & Nw. R.R. Co.*, 260 U.S. 156 (1922).

In *Keogh*, a textiles manufacturer brought federal antitrust claims against eight railroads alleging they had conspired to fix rates for interstate shipping at inflated levels. *Keogh,* 260 U.S. at 159-160.  Pursuant to the then-existing regulatory scheme, railroads filed the rates charged to shippers with the ICC, which, at that time, had exclusive authority to

---

[19] One methodology the STB uses to assess rate reasonableness for cabotage is its "Constrained Market Pricing" ("CMP") analysis by which the STB determines a carrier's revenue needs (and therefore the rates it may charge) in order for the carrier to obtain reasonable revenue.  *GovGuam 2007 I*, at *7.  CMP principles were first developed for application to rail rates.  *Id.*; *see also M & G Polymers*, 2012 WL 4469326, at *7.

approve the rail rates in question. *Id*. The Supreme Court affirmed the district court's dismissal of the plaintiff's antitrust claims, holding that a private shipper could not recover antitrust damages. *Id*. at 162-165.

The Supreme Court identified three grounds for its ruling.[20] First, Congress delegated authority to the ICC to develop the expertise to determine the reasonableness (and thus the legality) of rates charged for interstate shipping services, and therefore "[a] rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the [Sherman Act]." *Id*. at 161-162.

Second, allowing a private shipper to recover treble damages under antitrust laws for allegedly inflated shipping rates would, in effect, give that shipper a rebate and "operate to give him a preference over his trade competitors." *Id*. at 163. This, the Court said, would defeat one of the purposes of ICC regulation, *i.e.*, to prevent price discrimination by carriers. *Id*.

Third, proving antitrust damages was problematic because any damages necessarily (i) depended upon proof of a hypothetical "but-for" rate that would have prevailed absent the alleged conspiracy and would have passed regulatory muster—an assessment better left to the ICC, *id*. at 163-164; and (ii) would be "purely speculative" because the benefit of any such hypothetical lower rate "might have gone to his customers, or conceivably, to the ultimate consumer." *Id*. at 163-165.

---

[20] The *Keogh* Court addressed private damage claims only and did not limit the government's ability to redress violations of the Sherman Act through enforcement actions. *Id*. at 161-162; *see also* subsection A5, *infra*.

This third basis for the filed rate doctrine—referred to in later cases as the "nonjusticiability" strand—seeks to preserve "the exclusive role of federal agencies in approving rates … that are 'reasonable' by keeping courts out of the rate-making process (the 'nonjusticiability strand'), a function that regulatory agencies are more competent to perform." *Marcus v. AT&T Corp.*, 138 F.3d 46, 58 (2d Cir. 1998) (citations omitted).

Sixty-four years after *Keogh*, the Supreme Court reaffirmed the filed rate doctrine when it affirmed the dismissal of antitrust conspiracy claims brought by purchasers of shipping services between the United States and Canada even though the rates at issue were never the subject of a formal hearing or a challenge before the regulator (again, the ICC). *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 413 (1986).  The Court noted that Congress could have acted to alter the Court's filed rate doctrine, but nothing "indicates that Congress intended to change or supplant the *Keogh* rule that other tariff-related claims, while subject to governmental and injunctive antitrust actions, did not give rise to treble-damages antitrust actions." *Id.* at 419.

The *Square D* court also rejected the argument that because "exemptions from the antitrust laws are strictly construed and strongly disfavored," the *Keogh* rule should give way to antitrust claims.  *Square D*, 476 U.S. at 421-422.  The court noted that, "*Keogh* represents a longstanding statutory construction that Congress has consistently refused to disturb . . . ." *Id*. at 421-422.

After *Square D*, courts have regularly applied the filed rate doctrine in a variety of regulated industries to bar claims requiring judicial review of rates that are **subject to an agency's regulation, whether or not the agency requires the rates to be filed**.  *See*

*Hawaiian and Guamanian Cabotage,* 450 F. App'x at 688 (filed rate doctrine bars antitrust claims based on cabotage rates "excepted from the ICCTA's filing requirements"); *Crumley v. Time Warner Cable, Inc.*, 556 F.3d 879, 881-882 (8th Cir. 2009) (filed rate doctrine bars consumer fraud claim brought by purchaser of cable television services subject to local regulation); *Pfeil v. Sprint Nextel Corp.*, 284 F. App'x 640, 642 (11th Cir. 2008) (filed rate doctrine bars telephone customers' challenge to interstate access surcharge); *E. & J. Gallo,* 503 F. 3d at 1035, 1048 (filed rate doctrine bars antitrust claims based on unfiled, market-based natural gas rates subject to agency complaint review); *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 508-510 (5th Cir. 2005) (filed rate doctrine bars antitrust claim brought by purchaser of energy; rates not filed, but subject to agency's "market oversight"); *Bryan v. BellSouth Commc'ns, Inc.*, 377 F.3d 424, 432 (4th Cir. 2004) (filed rate doctrine bars unfair trade practices claim brought by purchaser of services from telephone carrier subject to FCC regulation); *Hill v. BellSouth Commc'ns, Inc.*, 364 F.3d 1308, 1315 (11th Cir. 2004) (same); *In re Olympia Holding Corp.*, 88 F.3d 952, 962 (11th Cir. 1996) (filed rate doctrine precludes court from striking down motor common carrier tariffs); *Taffet v. S. Co.*, 967 F.2d 1483, 1494-1495 (11th Cir. 1992) (filed rate doctrine bars customer challenge to utility rates, even when approval of those rates was obtained by utility's fraud); *Winn v. Alamo Title Ins. Co.*, 2009 WL 7099484, at *8-9 (W.D. Tex. 2009) (filed rate doctrine bars price fixing claims brought by purchaser of title insurance subject to state regulation), *aff'd,* 372 F. App'x 461 (5th Cir. 2010).

### 3.     The Nonjusticiability Strand of the Filed Rate Doctrine Requires Dismissal of Damages Claims Requiring Judicial Rate-Making

Because carriers in the noncontiguous domestic trade may now (after the ICCTA) enter into private transportation contracts and provide services by agreement at rates different than filed tariff rates, 49 U.S.C. § 14101(b)(1), they may now discriminate between customers in the sense of offering them different rates by contract.  *Id.*; *see also DHX, Inc. v. Surface Transp. Bd.,* 501 F.3d 1080, 1082-1083 (9th Cir. 2007).

But although "nondiscrimination" among rate payers is a less prominent component of the regulatory scheme for the noncontiguous domestic trade after the ICCTA, the nonjusticiability strand of the filed rate doctrine continues to restrain courts from engaging in judicial rate-making and is alone sufficient to bar Plaintiffs' antitrust damages claims.[21]  As noted by the Eleventh Circuit, "the [filed rate] doctrine is applied strictly to prevent a plaintiff from bringing a cause of action even in the face of apparent inequities whenever **either the nondiscrimination strand or the nonjusticiability strand underlying the doctrine is implicated** by the cause of action the plaintiff seeks to pursue." *Hill*, 364 F.3d at 1316 (emphasis added) (citing *Marcus*, 138 F.3d at 59); *see also In re New Jersey Title Ins. Litig.,* 683 F.3d 451, 459 (3d Cir. 2012) (holding "the nonjusticiability policy alone warrants the doctrine's application to Appellants' treble damages Sherman Act and New Jersey Antitrust Act claims,"); *McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229, 242 (3d Cir. 2012) (affirming dismissal of Sherman Act claims based on filed rate doctrine and holding

---

[21]  Nondiscrimination has not been eliminated from the regulatory scheme for cabotage shippers who do not have contracts with carriers.  In the absence of negotiated contracts pursuant to section 14101(b)(1), a carrier may sell cabotage to shippers only at the rates in the filed tariffs.  49 U.S.C. §§ 13702(a)(1), 14903(a); *see also* 49 C.F.R. § 1312.2.

"the filed rate doctrine applies to Appellants' claims based on the nonjusticiability principle alone"); *Dolan v. Fidelity Nat'l Title Ins. Co.*, 365 F. App'x 271, 273 (2d Cir. 2010) (same).

Thus, after the ICCTA, the term "filed rate" doctrine as it applies to cabotage is something of a misnomer because shippers and carriers may now negotiate rates by private contract and thereby depart from filed tariff rates. *See* 49 U.S.C. § 14101(b). After the ICCTA, the foundation of the doctrine (for cabotage) is not that a rate is filed, but rather that an agency (STB) has regulatory authority over the rate.[22] *See In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 450 F. App'x 685, 688-690 (9th Cir. 2011) ("*Hawaiian & Guamanian Cabotage*"). As the 11th Circuit explained in *Hill,* "[t]he purpose of the nonjusticiability principle underlying the filed rate doctrine is to preserve the [agency's] primary jurisdiction over determinations regarding the reasonableness of rates charged by regulated carriers…. [and] precludes any judicial action which undermines agency rate-making authority. Thus, even if a claim does not directly attack the filed rate, an award of damages to the customer that would, in effect, result in a judicial determination of the reasonableness of that rate is prohibited under the filed rate doctrine." *Hill,* 364 F.3d at 1317 (internal citations omitted).

### 4. Plaintiffs' Contracts with Sea Star and Other Carriers of Puerto Rican Cabotage Do Not Create Private Rights of Action for Damages Under the Sherman Act

The *Mondeléz* complaint alleges that Plaintiffs purchased Puerto Rican Cabotage "pursuant to private and confidential negotiated rate agreement contracts pursuant to

---

[22] After the ICCTA, a more fitting term for the doctrine in the noncontiguous domestic trade would perhaps be the "regulated rate" doctrine.

§ 14101(b) of the Interstate Commerce Commission Termination Act," and that these agreements "waived in writing **plaintiffs'** rights and remedies under section B of the ICCTA." (*Mondeléz* Compl., ¶ 15 (emphasis added))  The complaint then seeks to leverage the Plaintiffs' contractual waiver of their right to complain to the STB about privately negotiated rates they paid for Puerto Rican Cabotage into a complete divestiture of STB jurisdiction over rates charged, alleging "the STB has no regulatory authority over any aspect of plaintiffs' contracts, including the rates, surcharges and other fees in plaintiffs' contracts," and "therefore the filed-rate doctrine does not apply." (*Id.,* ¶¶ 15, 16)  Substantively identical allegations are present in each of the three other complaints.  (*See Arrowpac* Compl., ¶¶ 58, 59; *Home Depot* Compl., ¶¶ 12, 13, 16; *Walgreen* Compl., ¶¶ 12, 13)

The essential argument Plaintiffs make under section 14101(b)(1)—*i.e.*, that a contractual waiver of **Plaintiffs'** ICCTA rights and remedies deprives the STB of its authority over contract rates in the Puerto Rican trade and permits private party antitrust damage claims otherwise barred by the filed rate doctrine—is wrong for the following reasons.

### a.   Plaintiffs' argument ignores the STB's jurisdiction and mandate

The STB has a mandate to insure the reasonableness of all rates for cabotage.  *See* 49 U.S.C. § 13701(a)(1)(B).  That mandate is carried out by a complaint system, whether the complaint is one filed by a private party, a governmental authority, a competitor, or based on the STB's own investigation.  *See* section A1, *supra*.  And, as discussed above, while these Plaintiffs have waived **their** right to file a complaint, there is nothing alleged in Plaintiffs' contracts that purports to divest a governmental authority or the STB itself of the right to

invoke the STB's authority to carry out its rate regulation mandate.  Plaintiffs' remedy under their contracts for any alleged breach is an action for breach of contract "in an appropriate State court or United States district court." 49 U.S.C. § 14101(b)(2).

> **b.**   **Plaintiffs' claims improperly ask this Court to retroactively set rates for Puerto Rican Cabotage**

The *Mondeléz* complaint alleges those Plaintiffs "were compelled to pay, and paid, prices for Puerto Rico maritime cabotage liner services that were substantially greater than what they would have paid but for defendants' illegal conduct," and seeks damages for those unspecified amounts.  (*Mondeléz* Compl., ¶ 269)  The other complaints contain substantively the same allegations.  (*Arrowpac* Compl., ¶¶ 366-368; *Walgreen* Compl., ¶¶ 56, 59, 60; *Home Depot* Compl, ¶¶ 171-173, 186)   Plaintiffs therefore ask this Court to make two retroactive determinations concerning rates charged for Puerto Rican Cabotage:  first, that the rates Plaintiffs paid were unreasonable and, second, to fix some lower rates that Plaintiffs say they would have paid but for the alleged conspiracy.

Such relief is substantively identical to what was demanded by plaintiffs in *Square D* and what the Supreme Court held was barred by the filed rate doctrine.  *See Square D*, 476 U.S. at 413 (noting "[b]ecause of respondents' unlawful conduct, the complaints continue, petitioners . . . have paid higher rates for motor carrier freight transport than they would have paid in a freely competitive market").

Plaintiffs' claims would place this Court squarely in the business of retroactive rate-making, which is prohibited by the nonjusticiability strand of the filed rate doctrine.  *Hill*, 364 F.3d at 1317 ("[t]hus, even if a claim does not directly attack the filed rate, an award of damages to the customer that would, in effect, result in a judicial determination of the

reasonableness of that rate is prohibited under the filed rate doctrine."); *see also In re Title Ins. Antitrust Cases*, 702 F. Supp. 2d 840, 851 (N.D. Ohio 2010) (noting "[t]he only way to quantify [the plaintiffs'] harm would require this Court . . . to make a determination of 'what the rate would have been.' This quantification is the very relief the filed rate doctrine *expressly forbids*.") (emphasis in original).

Ratemaking for the noncontiguous domestic trade has been described as "'an intensely practical affair' requiring the conversion of inexact data into exact rates or limits upon rates." *Matson Navigation Co., Inc. v. Fed. Mar. Comm'n*, 959 F. 2d 1039, 1043 (D.C. Cir. 1992). For this reason, the *Matson* court recognized "the expertise of the agency performing it." *Id.*

Notably, the Plaintiffs do not allege that the filed tariffs in effect between May 2002 and April 2008 (the period of the alleged conspiracy) were unreasonable or otherwise unlawful under the ICCTA or that they paid contract rates which **exceeded** the filed tariff rates. Nor do they allege that they attempted to challenge the filed rates with the STB. Plaintiffs' damages claims thus ask this Court to determine that the contract rates Plaintiffs paid were unreasonable in the absence of any allegation that those rates were higher than filed tariff rates which the STB never invalidated.

Finally, Plaintiffs' damages methodology conflicts with the STB's method. The STB's CMP method considers rates to be unreasonable only where the rates exceed the amount needed to provide the carrier with reasonable revenue. *See GovGuam 2007 I,* at *7,

10.[23]  Rates should balance the carrier's need for financial return with the shipper's need to avoid paying the cost of facilities or services from which it derives no benefit.  *Id.*  By asking for damages equal to the difference between the rate paid and the rate they allegedly would have paid in the absence of a conspiracy, Plaintiffs focus on only half of the CMP equation. And because the STB defines its standards by reference to "reasonableness" rather than "competition," a rate that results from an antitrust conspiracy might well be reasonable in the context of the STB's approach to rate regulation.  Plaintiffs' efforts to abandon the "reasonableness" standard in favor of a different approach further demonstrates that this action represents an attempt at rate regulation which is the exclusive purview of the STB.

> c.    **The regulatory system allows STB review of contract cabotage rates**

As noted above, the statute permitting private contracts between **rail** carriers and shippers expressly removes such contracts from STB's jurisdiction. 49 U.S.C. § 10709(c)(1); *M & G Polymers*, 2012 WL 4469326, at *7.  Section 14101 governing contracts with **water** carriers does not do so and where Congress speaks affirmatively in one statute and is silent in another, it must be inferred that it intended a different meaning.  *Russello v. U.S.*, 464 U.S. 16, 23 (1983).

An unambiguous statute such as section 14101 must be construed according to the plain meaning of its language.  *See CBS, Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217,

---

[23] Using the "stand alone cost" approach under the CMP analysis, the STB would compare the total revenue requirements of a "stand-alone water carrier" (SAWC) against total revenues generated by the traffic group in the market. *GovGuam 2007 I*, at *8-9.  If the present value of the revenues from the traffic group were to exceed the present value of the revenue requirements of the SAWC, then total revenues collected by the carrier would be unreasonable. *Id*. at *10.

1228 (11th Cir. 2001) (noting "[t]hose who ask courts to give effect to perceived legislative intent by interpreting statutory language contrary to its plain and unambiguous meaning are in effect asking courts to alter that language . . .").  The plain text of section 14101(b)(1) does not state—or even imply—that where a shipper waives its "rights and remedies" under the ICCTA in a contract with a carrier, the STB is thereby divested of its jurisdiction to regulate the contract and its rates.

Also, related statutes must be construed so as to be in harmony with one another.  *See Welzel v. Advocate Realty Invs., LLC*, 275 F.3d 1308, 1317 (11th Cir. 2001).  Section 14701(a) gives the STB authority on its **"own initiative"** to investigate any carrier's violation of "this part," referring to part B of subtitle IV of Title 49 which includes section 13701(a)(1)(B) and its reasonableness restriction on all rates in the noncontiguous domestic trade.  49 U.S.C. § 14701(a).  Likewise, section 13521 states that transportation subject to chapter 135 is within the STB's jurisdiction.  *Id.* § 13521.  Neither provision contains an exception for water transportation by private contract or for rates under section 14101(b)(1).  *See Id.* §§ 13521, 14701(a).

Had Congress intended to overrule the long-standing precedent of *Keogh* and its progeny and curtail the courts' deference to agency regulation through its enactment of section 14101(b), it would not have done so *sub silentio*.  *Square D*, 476 U.S. at 419 (holding "because the legislative history [of the Reed-Bullwinkle Act] reveals clear congressional awareness of *Keogh*, . . . the fact that Congress specifically addressed this area and left *Keogh* undisturbed lends powerful support to *Keogh*'s continued viability.");[24] *see also Bush*

---

[24] The legislative history of the ICCTA, which followed the *Square D* decision by

*v. Oceans Int'l,* 621 F.2d 207, 210-211 n.4 (5th Cir. 1980) (court would not infer from Congress' silence that through its amendments to the Longshoreman's and Harbor Workers' Compensation Act, it intended to eliminate the equitable doctrine of laches in compensation claims).[25]

As a consequence, the regulatory system for cabotage, including section 14101(b)(1), cannot be said to divest the STB of jurisdiction over contract rates.  Indeed, to read section 14101 as authorizing private parties to divest the STB of its rate jurisdiction would be directly counter to the express congressional determination that rate regulation remained necessary in the noncontiguous domestic trade.  The nonjusticiability strand of the filed rate doctrine therefore applies to Plaintiffs' rate-making claims under their alleged contracts and Plaintiffs' sole remedy are claims for breach of their contracts pursuant to 49 U.S.C. section 14101(b)(2).

      **d.**    **Some *Arrowpac* and *Mondeléz* Plaintiffs are not parties to carriage contracts**

The *Arrowpac* complaint alleges that Plaintiffs Cabcorp, ConAgra[26], Nestle, PepsiCo, P&G, Sears,[27] and YRCW and their respective "subsidiaries, affiliates, and other owned or

---

nearly ten years (at which time Congress was aware of *Keogh*) lacks any expression of congressional intent to revoke the *Keogh* rule by enacting the ICCTA.  *See generally*, H.R. REP. NO. 104-422 (1995) (CONF. REP.); H.R. REP. NO. 104-311 (1995); 141 CONG. REC. H12248-12312 (1995); 141 CONG. REC. S19074-19076 (1995); 141 CONG. REC. H15600-15604 (1995).

[25] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[26] ConAgra is only alleged to have purchased Puerto Rican Cabotage for itself and its subsidiaries.  (*Arrowpac* Compl., ¶ 44)

controlled entities" purchased Puerto Rican Cabotage from Sea Star and/or from its alleged co-conspirators.  (*Arrowpac* Compl., ¶¶ 41, 42, 44, 46, 48-51, 55, 56)

Likewise, the *Mondeléz* complaint alleges that Plaintiffs and their respective "predecessors and separately incorporated parents, subsidiaries and controlled affiliates" purchased cabotage shipping services.  (*Mondeléz* Compl., ¶¶ 13, 14)

The specific entities which were the contracting parties are not identified, nor are there allegations that the Plaintiffs named in the complaints are the proper parties to bring claims under the alleged carriage contracts by assignment or otherwise.  Until the Plaintiffs have pled facts showing they are the proper parties to make the claims asserted in the complaints, the complaints are defective and should be dismissed.

To the extent any of these Plaintiffs were not in privity with a carrier under a carriage contract and, consequently, shipped pursuant to a published tariff, their damage claims necessarily assert that the tariff rate was illegal.  To such claims, the filed rate doctrine undoubtedly applies, as discussed above.

### 5.   *The Filed Rate Doctrine Does Not Bar Government Antitrust Enforcement Actions, Only Private Damages Claims*

Plaintiffs will likely argue that the filed rate doctrine should be ignored because it yields what they claim would be a harsh and inequitable result—allegedly aggrieved shippers denied a remedy.  But the filed rate doctrine by no means creates antitrust **immunity** for Defendants; it operates only to bar private damages claims. *See Square D*, 476 U.S. at 422

---

[27] Sears is also alleged to have brought this action on behalf of its parent company as well as its subsidiaries, affiliates, and other owned or controlled entities.  (*Arrowpac* Compl., ¶ 51)

(distinguishing between antitrust immunity from government enforcement actions and the bar against private shipper damage claims under *Keogh* and its progeny).

To be sure, Sea Star's alleged anti-competitive conduct has been addressed by law enforcement agencies.  As Plaintiffs allege, the U.S. Department of Justice commenced an investigation that resulted in Sea Star pleading guilty to a criminal violation of section 1 of the Sherman Act and paying a fine of $14.2 million.  (*Arrowpac* Compl., ¶¶ 146-150; *Mondeléz* Compl., ¶¶ 114-119; *Walgreen* Compl., ¶ 28; *Home Depot* Compl., ¶ 81)

The Courts have consistently recognized that, for civil damage claims, "[a]pplication of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results."  *Marcus*, 138 F.3d at 58 (applying the filed rate doctrine to deny a private damages claim and referencing numerous other cases similarly applying filed rate doctrine); *see also Keogh*, 260 U.S. at 161-162 (recognizing that the filed rate doctrine did not bar government enforcement actions).

For purposes of the filed rate doctrine, the issue is not whether a plaintiff can allege wrongdoing by a defendant (even significant wrongdoing); rather, it is whether the plaintiff seeks to have a court engage in a rate-making exercise that is the exclusive province of a regulatory agency under federal statutes.  If so, the court must refrain, and leave the defendant's conduct to the appropriate enforcement agency for redress.

**6.      The Ninth Circuit's Ruling and Analysis in <u>In re Hawaiian &
Guamanian Cabotage Antitrust Litigation</u> Supports Dismissal of
the Plaintiffs' Claims**

In late 2011, the Ninth Circuit Court of Appeals affirmed the dismissal, with
prejudice, of antitrust claims arising from cabotage in the Hawaiian and Guamanian markets,
based upon application of the filed rate doctrine.

The decision demonstrates that a rate for the noncontiguous domestic trade need not
be filed with the STB for the filed rate doctrine to apply; rather, the doctrine applies when the
plaintiff's claim seeks court review of a matter within the agency's regulatory authority.

In *Hawaiian & Guamanian Cabotage*, shippers representing a putative class of direct
purchasers of cabotage between the United States mainland, Hawaii and Guam brought
federal antitrust claims against carriers based upon an alleged conspiracy to fix rates and
other charges in violation of section 1 of the Sherman Act.  *Hawaiian & Guamanian
Cabotage,* 754 F. Supp. 2d 1239, 1243 (W.D. Wash. 2010).  Like Sea Star, the *Hawaiian &
Guamanian Cabotage* carrier defendants were regulated pursuant to the ICCTA, *id*. at 1247-
1249, and like the instant Plaintiffs, the *Hawaiian & Guamanian Cabotage* plaintiffs alleged
that the defendant carriers' antitrust conspiracy resulted in price fixing and agreements to
allocate customers.  *Id*. at 1243.

The carrier defendants moved to dismiss all claims with prejudice pursuant to the
filed rate doctrine, and the district court granted the motion.  *Id.* at 1256.  Among its rulings,
the district court rejected the plaintiffs' contention that the filed rate doctrine did not apply
because some of the cargo shipped was exempt (by statute) from tariff requirements and
therefore from STB rate regulation.  *Id.* at 1253-1254.  The court held that **"Congress**

**intended for the STB to regulate domestic cabotage rates, regardless of the type of cargo and irrespective of whether the rates are filed.**" *Id.* at 1254 (reciting legislative history of the ICCTA indicating Congress intended the STB to retain regulatory authority over rates) (emphasis added).

The court noted that tariff filing requirements and rate regulation are, while related, different. *Id.* at 1253-1254. In one section of the statute, Congress directed that rates in the noncontiguous domestic trade must be reasonable "and it has vested jurisdiction in the STB to regulate such rates." *Id.* at 1253. Yet, "[i]n an entirely distinct section, Congress has required that rates for certain cargo be contained in 'a tariff that is in effect,' and it has delegated to the STB a different bundle of powers, namely the authority to declare that a tariff specifies an unreasonable rate or violates a filing requirement and to invalidate such tariff." *Id.* at 1253-1254.[28]

On appeal, the plaintiffs argued that the district court erred because, *inter alia*, not all of the rates they paid had been filed with the STB and the carriers were not required to adhere to the filed rates. *Hawaiian & Guamanian Cabotage*, 450 F. App'x at 687-688.

The Ninth Circuit disagreed and affirmed the dismissal of plaintiffs' antitrust damage claims, holding that the "filed rate doctrine bars damages actions under federal antitrust laws challenging rates authorized by an administrative agency," including "private antitrust claims challenging rates in noncontiguous domestic trade." *Id.* at 687-688. In doing so, the court

---

[28] In a footnote, the district court noted, in *dicta*, that contracts under section 14101(b)(1) could waive the "reasonableness requirement" of section 13701(a). *Id.* at 1244 n.8. The court did not address the effect of the waiver on the STB's authority to address contract rates on its own authority or as part of an aggregate rate review in response to a complaint from a governmental authority. *Id.*

recognized that (i) Congress has not overruled the filed rate doctrine as it applies to ocean shipping between the U.S. mainland and noncontiguous U.S. states and territories; (ii) rates never filed with the STB are nonetheless subject to the filed rate doctrine if they are within an agency's regulatory authority; and (iii) the STB need not conduct a "meaningful agency review" of rates for the doctrine to apply so long as the agency has not "abdicated its rate-making authority." *Id*. at 688-689.[29]

The Plaintiffs here seek to distinguish their claims from those in *Hawaiian & Guamanian Cabotage* by alleging that their shipments were made pursuant to private contracts (thereby implicating rates not actually filed with the STB), and that their contracts waived the shipper's right to challenge the contractually agreed rates before the STB.[30] Yet, the substance of those allegations is indistinguishable from the argument advanced, and rejected, in *Hawaiian & Guamanian Cabotage—i.e.*, that if a rate is not filed and the STB does not actually review the rate, the filed rate doctrine must not apply. The Ninth Circuit dealt summarily with that contention, stating the "primary justification for defensive use of the filed rate doctrine—deference to administrative agencies—is furthered by application of

---

[29] The Defendant carriers asserted in their brief that a contractual waiver pursuant to section 14101(b)(1) would deprive the STB of jurisdiction over the rates in the contracts. Brief for Appellees at 23-24, *In re Hawaiian & Guamanian Cabotage Litig.*, 450 F. App'x 685 (9th Cir. 2011) (No. 10-36165). The court did not address that issue in its decision and Sea Star disagrees with the carriers' assertion for the reasons stated in this motion.

[30] Plaintiffs assert that alleged co-conspirator Horizon Lines, LLC ("Horizon"), which is not a party to this litigation, has made public statements to the effect that the rates in its Puerto Rican Cabotage contracts with shippers are exempt from STB regulation. (*Arrowpac* Compl., ¶ 59; *Walgreen* Compl., ¶ 13; *Mondeléz* Compl., ¶ 16; *Home Depot* Compl., ¶ 13) The complaints do not attempt to reconcile these allegations with the STB's jurisdiction over all rates as discussed in section A1, *supra*. And, in any event, the scope and application of STB jurisdiction and the filed rate doctrine are decisions for this Court, not for Horizon.

the doctrine even where a filed tariff is defective.  That is so even if an administrative agency suspends literal filing requirements."  *Hawaiian & Guamanian Cabotage,* 450 F. App'x at 689.

Thus, applying *Hawaiian & Guamanian Cabotage* to the instant case, whether Plaintiffs paid for Puerto Rican Cabotage at the tariff rate filed with the STB or at negotiated rates set forth in private contracts, Plaintiffs' claims must be dismissed with prejudice because of the STB's plenary authority to regulate all Puerto Rican Cabotage rates— authority which STB has not "abdicated."  *Id.* at 687 ("[t]he filed rate doctrine bars damages actions under federal antitrust laws challenging rates authorized by an administrative agency"); *see also* 49 U.S.C. §§ 13701, 14701; *DHX,* 501 F.3d at 1082, 1088-1089, 1092-1093.

### 7. *The Filed Rate Doctrine Is Dispositive of All Damages Claims Raised by Plaintiffs' Several Complaints*

Plaintiffs may also assert that even if the filed rate doctrine applies in these four cases, it will not be dispositive of all issues.  For this proposition, Plaintiffs may rely on their allegations of joint and several liability of Sea Star for damages caused by other alleged co-conspirator carriers such as Horizon or Crowley Liner Services, Inc. ("Crowley").[31] Plaintiffs are again mistaken.

_____

[31] Six plaintiffs in *Arrowpac* allege making purchases of Puerto Rican Cabotage from carriers other than Sea Star.  They are: ConAgra Foods, Inc. (*Arrowpac* Compl., ¶ 44); Nestlé U.S.A., Inc. (*id.* at ¶ 46); Nestlé Purina PetCare Company (*id.* at ¶ 46(a)); Nestlé Puerto Rico, Inc. (*id.* at ¶ 46(b)); Payco Foods Corp. (*id.* at ¶ 46(c)); and Payless ShoeSource, Inc. (*id.* at ¶ 47).   Plaintiffs Mondeléz International, Inc. and The Kellogg Company allege purchases from other carriers and that they only "requested bids and other pricing proposals for cabotage shipping services from Sea Star." (*Mondeléz* Compl., ¶ 17)

As described in section A1, *supra*, all Puerto Rican Cabotage is subject to rate regulation by the STB.  Whether an alleged overcharge was the result of a Sea Star rate, a Crowley rate, a Horizon rate or a Trailer Bridge rate, the Court must still engage in impermissible rate-making in order to quantify and award damages, as discussed above.

Because the antitrust injuries claimed by Plaintiffs here arise from the alleged inflated rates they paid for Puerto Rican Cabotage, and because those rates have always been subject to STB jurisdiction and review pursuant to the ICCTA, Plaintiffs have not stated—and cannot state—a viable claim for antitrust damages.  Accordingly, each of the complaints should be dismissed with prejudice pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure.  *See e.g.*, *McCray*, 682 F.3d at 242 (affirming dismissal on pleadings of Sherman Act claims under Rule 12(b)(6) as barred by filed rate doctrine); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 402 (7th Cir. 2000) (affirming dismissal of Sherman Act claims under Rule 12(b)(6) as barred by filed rate doctrine); *see also In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 450 F. App'x at 690 (same).

## B. The *Arrowpac, Home Depot,* and *Mondeléz* Plaintiffs' Claims for Injunctive Relief Fail Under the Filed Rate Doctrine and for Lack of Standing

### 1. *Plaintiffs Lack Standing to Obtain Injunctive Relief Because They Fail to Allege Injury-in-Fact*

Plaintiffs' claims for injunctive relief should be dismissed because they fail to allege any injury-in-fact that is cognizable under Article III of the United States Constitution.

Standing to assert a claim in federal court under Article III requires a plaintiff to show at the outset (i) "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical,"   *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted); (ii) "a causal connection between the injury and the conduct complained of," *id.*; and (iii) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561; *see also Norfolk & W. R.R. Co. v. Bhd. of R.R. Signalmen*, 164 F.3d 847, 856-857 (4th Cir. 1998) (holding injury too speculative to warrant anti-strike injunction where union's threats to strike were conditioned on railroad merger approved by STB and proposed changes to collective bargaining agreements being carried out as a result of merger).

The *Arrowpac*, *Home Depot* and *Mondeléz* Plaintiffs' claims for injunctive relief do not meet this test.  These Plaintiffs fail to allege facts (rather than mere conclusions) showing (i) they will suffer any ongoing or future injury from the activities they seek to enjoin Sea Star from engaging in; (ii) Sea Star intends to engage in the conduct sought to be enjoyed in the future; or (iii) such injunctive relief would redress any inflated rates for Puerto Rican Cabotage that will be charged to Plaintiffs in the future.

Plaintiffs' claims for injunctive relief are like those dismissed in *McCray, supra*. There, the Third Circuit affirmed the district court's dismissal of antitrust claims pursuant to the filed rate doctrine and because the plaintiffs lacked standing to obtain injunctive relief. *McCray*, 682 F.3d at 243-244.  The *McCray* plaintiffs alleged that defendants had engaged in "*per se* illegal price-fixing [in the title insurance industry] and sought injunctive relief . . . due to the significant threat of future losses and injuries resulting from those antitrust violations."  *Id.* at 243 (internal quotation marks omitted).  The Third Circuit held it was "merely speculative that [plaintiffs'] injury will be redressed by a favorable decision"

34

granting injunctive relief because plaintiffs did not allege "when such future losses and injuries will occur," and did not allege any "actual or imminent plans to purchase title insurance" or that defendant "intend[ed] to file new rates in the future" that could cause any injury. *Id*. at 243-244. (internal quotation marks omitted).

The claims for injunctive relief in these three cases suffer from the same defect. Because Plaintiffs lack standing to enjoin Sea Star from future conduct regarding Puerto Rican Cabotage, the claims for injunctive relief asserted by the *Arrowpac*, *Home Depot* and *Mondeléz* Plaintiffs should be dismissed with prejudice pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure. *McCray*, 682 F.3d at 243 (holding that absent Article III standing, a federal court lacks subject matter jurisdiction to address a plaintiff's claims).

### 2. The Filed Rate Doctrine Bars Plaintiffs' Claims for Injunctive Relief

"The filed-rate doctrine can also bar injunctive relief, if the injunction that plaintiffs seek is no more than a request for a different rate-making decision." *Katz v. Fidelity Nat'l Title Ins. Co*., 685 F.3d 588, 599 n.6 (6th Cir. 2012) (citation omitted). Thus, where "any meaningful relief" would require altering or affecting future rates which a regulator has the authority to approve or set, the filed rate doctrine does not allow Sherman Act claims for injunctive relief. *See e.g., Town of Norwood, Mass. v. New Eng. Power Co.*, 202 F.3d 408, 419-420 (1st Cir. 2000) (affirming dismissal of Sherman Act claims for declaratory and injunctive relief under the filed rate doctrine); *Dolan*, 365 F. App'x at 275-276 (affirming dismissal of antitrust claims for injunctive relief pursuant to filed rate doctrine); *see also Pfeil*, 284 F. App'x at 643 (affirming dismissal of claims seeking injunctive relief pursuant to filed rate doctrine).

The only potential (and purely speculative) future injury for which the *Arrowpac*, *Home Depot* and *Mondeléz* Plaintiffs could seek injunctive relief would be increased shipping rates for Puerto Rican Cabotage—thereby directly infringing on the authority of the STB to regulate future rates and rate setting practices.

    **C.**    **The *Arrowpac* and *Mondeléz* Complaints Fail to State a Claim For Relief Because They Violate the Pleading Standards of Rule 8**

Sea Star adopts and asserts on its own behalf the arguments regarding Rule 8, Federal Rules of Civil Procedure, advanced in the Motion to Dismiss filed by co-defendant Saltchuk Resources, Inc. on even date.

## CONCLUSION

For these reasons, the complaints in these four cases should be dismissed with prejudice.

Dated:  June 17, 2013

               Respectfully submitted,

               TANNER BISHOP

               By: */s/ Michael G. Tanner*
                     Michael G. Tanner

               Michael G. Tanner
               Florida Bar No. 261300
               Gilbert L. Feltel, Jr.
               Florida Bar No. 993603
               One Independent Drive, Suite 1700
               Jacksonville, FL 32202
               (904) 446-2980/(904) 598-0395 Fax
               mtanner@tannerbishoplaw.com
               gfeltel@tannerbishoplaw.com

               *Counsel for Sea Star Line, LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on the 17th day of June 2013, I electronically filed a copy of the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of the electronic filing to:

Charles P. Pillans, III, and Patrick P. Coll, **Bedell, Dittmar, DeVault, Pillans & Coxe, PA**, The Bedell Bldg., 101 E Adams St., Jacksonville, FL 32202; David C. Eddy, Dennis J. Lynch, Travis C. Wheeler, **Nexsen Pruet, LLC**, 1230 Main Street, Suite 700, P.O. Drawer 2426, Columbia, SC 29202; E. Lanny Russell, **Smith Hulsey & Busey**, 225 Water Street, Suite 1800, Jacksonville, Florida 32202; and Geddes D. Anderson, Jr., **Murphy & Anderson, P.A.**, 1501 San Marco Blvd., Jacksonville, FL 32207; David M. Wells, William E. Adams, Jr., **Gunster Yoakley & Stewart, P.A.**, 225 Water Street, Suite 1750, Jacksonville, Florida 32202; John C. Taylor, Jr., Latasha A. Garrison-Fullwood, **Taylor, Day, Grimm, Boyd & Johnson**, 50 N. Laura Street, Suite 3500, Jacksonville, Florida 32202; John F. Kinney, James T. Malysiak, Richard P. Campbell, Shaun M. Van Horn, Stephen R. Brown, **Jenner & Block LLP**, 353 N. Clark Street, Chicago, IL 60654-3456; William J. Blechman, **Kenny Nachwalter, P.A.**, 201 S. Biscayne Blvd., Suite 1100, Miami, Florida 33131; Jaclyn Sklar, G. Patrick Watson, and William Bard Brockman, **Bryan Cave, LLP**, One Atlantic Center, 14th Floor, 1201 W. Peachtree St. NW, Atlanta, Georgia, 30309.

*/s/ Michael G. Tanner*
Attorney

00031195.doc v.4